# EXHIBIT A

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

BY AND AMONG

APX ACQUISITION COMPANY LLC

as Purchaser,

And

TZEW INTERMEDIATE CORP.

And

THE OTHER SELLERS NAMED HEREIN,

as Sellers

Dated as of April 12, 2020

**TABLE OF CONTENTS**

Page

ARTICLE 1 PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ...........2

| | | |
|---|---|---|
| 1.1 | Purchase and Sale of Assets | 2 |
| 1.2 | Excluded Assets | 5 |
| 1.3 | Assumption of Liabilities | 7 |
| 1.4 | Excluded Liabilities | 8 |
| 1.5 | Cure Costs; Schedule Updates | 10 |

ARTICLE 2 CONSIDERATION ...........................................................................14

| | | |
|---|---|---|
| 2.1 | Consideration | 14 |
| 2.2 | Allocation of Purchase Price | 14 |

ARTICLE 3 CLOSING AND TERMINATION ....................................................15

| | | |
|---|---|---|
| 3.1 | Closing | 15 |
| 3.2 | Closing Deliveries by Sellers | 15 |
| 3.3 | Closing Deliveries by the Purchaser | 16 |
| 3.4 | Termination of Agreement | 17 |
| 3.5 | Procedure Upon Termination | 19 |
| 3.6 | Effect of Termination | 19 |

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE SELLERS.................19

| | | |
|---|---|---|
| 4.1 | Organization and Qualification | 20 |
| 4.2 | Subsidiaries | 20 |
| 4.3 | Authority Relative to This Agreement | 20 |
| 4.4 | Conflicts; Consents and Approvals | 20 |
| 4.5 | Ordinary Course of Business | 21 |
| 4.6 | Litigation | 21 |
| 4.7 | Intellectual Property | 21 |
| 4.8 | Material Contracts | 23 |
| 4.9 | Permits | 25 |
| 4.10 | Brokers and Finders | 26 |
| 4.11 | Title to Assets | 26 |
| 4.12 | Tangible Personal Property; Furniture and Equipment | 26 |
| 4.13 | Real Property | 26 |
| 4.14 | Compliance with Law | 27 |
| 4.15 | Tax Returns; Taxes | 27 |
| 4.16 | Benefit Plans | 29 |
| 4.17 | Labor Matters | 30 |
| 4.18 | Insurance Policies | 30 |
| 4.19 | Environmental Matters | 31 |
| 4.20 | Vendors and Suppliers | 31 |
| 4.21 | Inventory | 31 |

i

4.22   Financial Statements......................................................................................31
4.23   Gift Cards; Season Passes .............................................................................32
4.24   Affiliate Transactions ....................................................................................32
4.25   Condition of Assets .......................................................................................32

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.................33

5.1   Organization and Qualification .......................................................................33
5.2   Authority Relative to This Agreement .............................................................33
5.3   Conflicts; Consents and Approvals .................................................................33
5.4   Litigation .......................................................................................................34
5.5   Brokers and Finders.......................................................................................34
5.6   Investigation ..................................................................................................34

ARTICLE 6 EMPLOYEES ...............................................................................................34

6.1   Employee Offers.............................................................................................34
6.2   Assumed Seller Plans ....................................................................................36
6.3   WARN Act Liability .......................................................................................37
6.4   No Third-Party Beneficiaries..........................................................................37

ARTICLE 7 BANKRUPTCY COURT MATTERS ..............................................................37

7.1   Competing Bids..............................................................................................37
7.2   Bankruptcy Court Filings ...............................................................................38
7.3   Bankruptcy Court Milestones..........................................................................38

ARTICLE 8 COVENANTS AND AGREEMENTS ..............................................................39

8.1   Conduct of Business of the Sellers .................................................................39
8.2   Access to Information......................................................................................42
8.3   Assignability of Certain Purchased Assets ......................................................43
8.4   Contracts and Leases ......................................................................................44
8.5   Further Agreements ........................................................................................44
8.6   Preservation of Records..................................................................................45
8.7   Publicity.........................................................................................................45
8.8   Prohibition on Use of Purchased Names ..........................................................45
8.9   Taxes..............................................................................................................46
8.10   Further Assurances.........................................................................................46
8.11   Delivery of Certain Financial Information .......................................................48
8.12   Personally Identifiable Information..................................................................48
8.13   Confidential Information..................................................................................48
8.14   Transition Services .........................................................................................49
8.15   Gift Cards; Season Passes ..............................................................................49

ARTICLE 9 CONDITIONS TO CLOSING .........................................................................50

9.1   Conditions Precedent to the Obligations of the Purchaser and the Sellers.................50
9.2   Conditions Precedent to the Obligations of the Sellers .....................................51
9.3   Conditions Precedent to the Obligations of the Purchaser .................................52

ARTICLE 10 ADDITIONAL DEFINITIONS .......................................................................53

10.1    Certain Definitions .................................................................................53
10.2    Additional Defined Terms .......................................................................62

ARTICLE 11 MISCELLANEOUS ..........................................................................63
11.1    Payment of Expenses ..............................................................................63
11.2    Survival of Representations and Warranties; Survival of Post-Closing
        Covenants ...............................................................................................63
11.3    Entire Agreement; Amendments and Waivers ..........................................63
11.4    Counterparts ...........................................................................................64
11.5    Governing Law ........................................................................................64
11.6    Jurisdiction, Waiver of Jury Trial .............................................................64
11.7    Notices ....................................................................................................64
11.8    Binding Effect; Assignment .....................................................................65
11.9    Severability .............................................................................................66
11.10   Right to Equitable Relief ..........................................................................66
11.11   Third Party Beneficiaries .........................................................................66
11.12   Time of the Essence ................................................................................67
11.13   Certain Interpretations ............................................................................67
11.14   Non-Recourse .........................................................................................68
11.15   Limited Involvement of Apex Beverage ...................................................68
11.16   General Release ......................................................................................68

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), dated as of April 12, 2020 (the "Execution Date"), by and among (a)(i) TZEW Intermediate Corp., a Delaware corporation ("Intermediate"), (ii) Apex Parks Group, LLC, a Delaware limited liability company ("Apex Parks"), (iii) Apex Beverage and Concessions, LLC, a Delaware limited liability company and indirect subsidiary of Apex Parks ("Apex Beverage"), and (iv) the other direct and indirect subsidiaries of Apex Parks party hereto as set forth on the signature pages attached hereto (together with Intermediate, Apex Parks and Apex Beverage, and the bankruptcy estates of each Seller that is a debtor in a Chapter 11 Case (as defined below)) and their respective successors, collectively, the "Sellers"), and (b) APX Acquisition Company LLC, a Delaware limited liability company (and together with its designee(s), successors and/or permitted assigns, as provided under Section 11.8, the "Purchaser"). Article 10 contains definitions of certain terms used in this Agreement and also provides cross-references to certain terms defined elsewhere in this Agreement. Purchaser acknowledges and agrees that, except where Apex Beverage may be expressly include by name in certain provisions hereof, Apex Beverage is joining in this Agreement solely for the limited purposes described in Section 11.15 below.

# RECITALS

WHEREAS, on April 8, 2020 (the "Petition Date"), each Seller, other than Apex Beverage, commenced voluntary cases (such cases, the "Chapter 11 Cases") under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, each Seller commencing a Chapter 11 Case continues in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor in possession;

WHEREAS, subject to the terms and conditions hereof, (a) the Sellers desire to sell to the Purchaser, and the Purchaser desires to purchase from the Sellers, all of the Sellers' right, title and interest in and to the Purchased Assets, and (b) the Sellers desire to transfer and assign to the Purchaser, and the Purchaser and Sellers desire that Purchaser assume from the Sellers, all of the Assumed Liabilities;

WHEREAS, the Sellers and the Purchaser have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Sellers to the Purchaser shall be effected pursuant to sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"); and

WHEREAS, in connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, following entry of the Sale Order finding the Purchaser as the Successful Bidder at the Auction, the Sellers shall sell and transfer to the Purchaser, and the Purchaser shall purchase and acquire from the Sellers, pursuant to sections 105, 363 and 365 of

the Bankruptcy Code, the Purchased Assets, and the Purchaser shall assume from the Sellers the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby (subject, as to Sellers, to entry of the Sale Order), the Purchaser and the Sellers hereby agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1    Purchase and Sale of Assets.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, each Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from each Seller, on the Closing Date, all of such Seller's right, title and interest in, to and under, free and clear of all Encumbrances to the extent provided in the Sale Order (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), all of the assets, properties, rights and interests of any nature, tangible or intangible, real or personal, wherever located, of such Seller related to or used, or held for use, in connection with the operation of the Business, now existing or hereafter acquired on or prior to the Closing Date, whether or not reflected on the books or financial statements of such Seller, as the same shall exist on the Closing Date, but in all cases excluding the Excluded Assets (as amended or modified by Section 1.5, collectively, the "Purchased Assets"), including the following assets, properties, rights and interests of such Seller:

(a)    all Accounts Receivable;

(b)    all Documents used in or relating to the Business or in respect of the Purchased Assets or the Assumed Liabilities (including customer data and including emails); provided, however, that subject to the limitations contained in Section 8.6, the Sellers shall have continued access to such Documents as are necessary to administer the Chapter 11 Cases; and, provided further, the Purchased Assets shall not include any Documents to the extent they (i) relate to communications between any Seller and its attorney regarding the transactions contemplated herein and/or the preparation for or in an anticipation of the commencement of the Chapter 11 Cases or any work product of such attorney(s) relating to such matters, or (ii) contain information about employees, the disclosure of which would violate applicable law notwithstanding entry of the Sale Order (the materials described in clauses (i) and (ii), collectively, "Retained Documents");

(c)    to the extent transferable or assignable (and such non-transferability is not overridden or cancelled by the Sale Order or other order of the Bankruptcy Court), (i) all Contracts of such Seller to which such Seller is a party or is otherwise bound or to which it is a beneficiary, and all rights pursuant thereto, as set forth on Schedule 1.1(c) and (ii) any other Contract of such Seller added as a Purchased Asset in accordance with Section 1.5 (including any Contract added as a Purchased Asset following the Closing Date in accordance with Section

1.5) (the Contracts referred to in this Section 1.1(c), together with the Assumed Real Property Leases, collectively, the "Assigned Contracts"), subject to the right of the Purchaser to cause any Assigned Contract to be a Non-Assigned Contract in accordance with Section 1.5;

(d)     all deposits and all prepaid charges and expenses of such Seller, including (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes), and (v) pre-payments, except to the extent that any of the foregoing relate solely to any Excluded Asset (including a Non-Assigned Contract) or Excluded Liability;

(e)     all Furniture and Equipment;

(f)     the name "Apex Parks", the names of the Sellers, all other trade names owned by any Seller that are listed on Schedule 1.1(f) used in connection with the Business and, in all cases, any derivations thereof (collectively, the "Purchased Names");

(g)     (i) all leases and subleases for the Leased Real Property to which such Seller is a party or is otherwise bound or to which it is a beneficiary, and all rights pursuant thereto, set forth on Schedule 1.1(g) and (ii) any other lease or sublease for Leased Real Property added as a Purchased Asset in accordance with Section 1.5 (including any lease or sublease added as a Purchased Asset following the Closing Date in accordance with Section 1.5) (such leases and subleases referred to in this Section 1.1(g), collectively, the "Assumed Real Property Leases" and the underlying Leased Real Property, the "Assumed Leased Real Property"), subject to the right of the Purchaser to cause any Assumed Real Property Lease to be a Non-Assigned Contract in accordance with Section 1.5;

(h)     all Permits and all pending applications or filings therefor and renewals thereof and all rights and incidents of interest therein, in each case, including any of the foregoing held by or in the name of Apex Beverage, subject to the right of the Purchaser to cause any Permit or pending applications or filings therefor or renewals thereof to be an Excluded Asset in accordance with Section 1.5, in each case to the extent transferable and assignable (and such non-transferability is not overridden or cancelled by the Sale Order or other order of the Bankruptcy Court);

(i)     all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements to which such Seller is a party with current or former directors, officers, employees or agents, or with third parties, or any such agreement of which such Seller is a beneficiary;

(j)     (i) all rights, claims, credits, settlement proceeds, causes of action or rights of set off against third parties relating to the Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to, the Assigned Contracts) or the Assumed Liabilities, including all rights under vendors', manufacturers' and contractors' warranties, indemnities and guarantees, and (ii) all Avoidance Actions;

(k)     any claims, counterclaims, setoffs, rights of recoupment, equity rights or defenses that such Seller may have with respect to any Assumed Liabilities;

3

(l)     except as contemplated by Section 1.2(e), Section 1.2(i), and Section 1.2(n), (i) all of such Seller's insurance policies and rights and benefits thereunder (including (x) all rights pursuant to and proceeds from such insurance policies, (y) all claims, demands, proceedings and causes of action asserted by such Seller under such insurance policies), but in each case only to the extent relating to a Purchased Asset or Assumed Liability ultimately acquired or assumed, as applicable, by Purchaser, (ii) all proceeds payable to such Seller in respect of life insurance policies that are owned by such Seller or of which such Seller is a beneficiary and (iii) any letters of credit related to insurance policies included in the Purchased Assets pursuant to this Section 1.1(l);

(m)     any claim, right or interests of such Seller in or to any refund, rebate, abatement or other recovery for Taxes with respect to the Business, the Purchased Assets or the Assumed Liabilities, in each case, together with any interest due thereon or penalty rebate arising therefrom;

(n)     (i) Contracts of the Seller Plans set forth on Schedule 1.1(n) and (ii) any other Seller Plan added as a Purchased Asset in accordance with Section 1.5 (such Seller Plans referred to in this Section 1.1(n), collectively, the "Assumed Seller Plans"), and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with the Assumed Seller Plans and, to the extent relating to the liabilities assumed by Purchaser in connection with the Assumed Seller Plans, any applicable insurance policies;

(o)     To the extent transferable or assignable (and any non-transferability is not overridden or cancelled by the Sale Order or other order of the Bankruptcy Court), all Seller Intellectual Property and IT Assets;

(p)     all Inventory;

(q)     except to the extent that any transfer or assignment is restricted or prohibited by applicable Law, all personnel files for Transferred Employees;

(r)     all goodwill and, to the extent transferable or assignable (and such non-transferability is not overridden or cancelled by the Sale Order or other order of the Bankruptcy Court), other intangible assets associated with, or relating to, the Business or the Purchased Assets;

(s)     ownership interests in other entities (except for equity of any Seller), including joint ventures;

(t)     subject to section 363(b)(1)(A) of the Bankruptcy Code, all rights to the websites, domain names, telephone and facsimile numbers and e-mail addresses used by such Seller, as well as rights to receive mail and other communications addressed to such Seller (including mail and communications from customers, vendors, suppliers, distributors and agents);

(u)    Sellers' interest in that certain promissory note dated April 8, 2020, executed by Indiana Beach Holdings, LLC in favor of Apex Parks Group, LLC in the original principal amount of $2,034,000 (the "Indiana Beach Note");

(v)    all Cash and Cash Equivalents, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit or insurance policies, or any obligations with respect thereto, except that the foregoing shall not include any Cash and Cash Equivalents (i) in the Bankruptcy Deposit Accounts or (ii) in an aggregate amount equal to $500,000 to fund the wind-down budget set forth on Schedule 1.1(v) (as may be amended from time to time with the prior written consent of Purchaser in its sole discretion, the "Wind-Down Budget" and, the aggregate amount of such Cash and Cash Equivalents in the foregoing clauses (i) and (ii), the "Excluded Cash"); provided, that to the extent that Excluded Cash is insufficient to fund the entire Wind-Down Budget, Purchaser shall fund the Excluded Cash Deficiency Amount to the Sellers at the Closing in accordance with Sections 2.1 and 3.3(f); and

(w)    the Surplus Cash.

For the avoidance of all doubt, notwithstanding anything to the contrary herein, the Purchased Assets shall expressly exclude any of the foregoing held (but not owned) under a lease, rental agreement, license or similar arrangement by any Seller pursuant to a Contract where such Contract is not among the Assigned Contracts assumed and assigned to Purchaser at the Closing.

1.2    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and each Seller shall retain all right, title and interest to, in and under, all assets, properties, rights and interests expressly excluded from the Purchased Assets pursuant to the provisions of Section 1.1 above and the following assets, properties, rights and interests of such Seller (collectively, the "Excluded Assets"):

(a)    all Contracts that are not Assigned Contracts (subject to Section 1.5, the "Non-Assigned Contracts");

(b)    all Documents (whether copies or originals) (i) to the extent they relate solely to any of the Excluded Assets or the Excluded Liabilities, (ii) that such Seller is required by Law to retain and is prohibited by Law from providing a copy of to the Purchaser, (iii) that are Retained Documents, or (iv) to the extent they relate solely to any employees of such Seller who are not Transferred Employees;

(c)    all Permits that relate solely to any of the Excluded Assets or the Excluded Liabilities;

(d)    all shares of capital stock or other equity interests of a Seller, or securities convertible into or exchangeable or exercisable for any such shares of capital stock or other equity interests;

5

(e)     all of such Seller's director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of such Seller's rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

(f)     all rights under this Agreement and the Ancillary Agreements (including the right to receive the Purchase Price);

(g)     all Documents (whether copies or originals) relating to formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, by-laws and other documents relating to the organization and existence of such Seller as a corporation or other legal entity, as applicable (together with analogous documentation);

(h)     the portion of any deposits and prepaid charges and expenses of such Seller related solely to any Excluded Asset (including a Non-Assigned Contract) or Excluded Liability, including (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes), and (v) pre-payments;

(i)     all claims or causes of action (other than Avoidance Actions) that either are Excluded Assets or relate solely to any Excluded Asset or Excluded Liability;

(j)     all of the Seller Plans other than the Assumed Seller Plans, and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with such Seller Plans and any applicable insurance policies;

(k)     all Tax Returns of any of the Sellers and all Documents (including working papers) related thereto;

(l)     all rights, claims and causes of action (whenever arising) against any officers or   directors (in each case, whether current or prior) of any Seller that is not a Transferred Employee;

(m)     all intercompany obligations among Sellers;

(n)     all cash deposits solely to the extent comprising professional fee retainers, professional fee escrows, and indemnity accounts funded in accordance with the order approving the DIP Credit Agreement, held by or on behalf of the Sellers' or the bankruptcy estates' professionals ("Bankruptcy Deposit Accounts") except to the extent constituting Surplus Cash;

(o)     all Excluded Cash except to the extent constituting Surplus Cash; and

(p)     the properties and assets set forth on Schedule 1.2(p).

6

1.3     Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement and the Sale Order, on the Closing Date, the Purchaser shall assume only the following Liabilities expressly set forth in this Section 1.3 (collectively, the "Assumed Liabilities"):

(a)     all Liabilities of any of the Sellers under each Assigned Contract arising after the Closing Date and which relate solely to events, facts, circumstances or periods of time occurring after the Closing Date (excluding, without in any way limiting Purchaser's obligations hereunder with respect to Determined Cure Costs, any Liabilities not expressly assumed in this Agreement arising out of any breach or default of the Assigned Contracts on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or after giving notice, or both, would constitute or give rise to such a breach or default);

(b)     all Determined Cure Costs with respect to any Assigned Contract;

(c)     sponsorship of and all Liabilities arising under or otherwise in respect of the Assumed Seller Plans arising after the Closing Date and which relate solely to events, facts, circumstances or periods of time occurring after the Closing Date (excluding any Liabilities not expressly assumed in this Agreement arising out of any breach or default of the Assumed Seller Plans on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or after giving notice, or both, would constitute or give rise to such a breach or default);

(d)     all Liabilities arising from the operation of the Purchased Assets by Purchaser from and after the Closing Date, but solely to the extent that such Liabilities relate to events occurring after the Closing Date;

(e)     Liabilities arising after the Petition Date with respect to earned and accrued wages, salaries and health benefits, in the aggregate, together with any amounts payable by Purchaser pursuant to Section 6.1(c)(i)(A), not in excess of an amount equal to $160,000, in each case with respect to the items described in this Section 1.3(e), earned and/or accrued in the Ordinary Course of Business with respect to the Transferred Employees as of the Closing Date, but expressly excluding any Liabilities of each Seller for any and all claims by or on behalf of such Seller's current or former employees arising under or relating to employment practices, terms and conditions of employment, labor relations, union organizing, employee safety and health, wages and hours, fair labor standards, child labor, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment, affirmative action (to the extent applicable), breach of contract and wrongful discharge, employee grievances and liability for any pension, profit sharing, deferred compensation (and the funding of any such benefits relating to all income earned by such Seller's current or former employees relating to periods ending on or prior to the Closing Date), workers' compensation or any other employee health, welfare or other benefit plans;

(f)     Liabilities of any of the Sellers with respect to Specified Accrued Liabilities incurred prior to the Closing (but only to the extent any such Specified Accrued

Liability is not paid by the Sellers at or prior to the Closing), in the aggregate not in excess of the amount set forth on Schedule 1.3(f);

(g)    all labor- and employment-related Liabilities with respect to Transferred Employees from and after the Closing Date, but solely to the extent that such Liabilities relate to events occurring after the Closing Date;

(h)    Transfer Taxes in the aggregate not in excess of the amount set forth on Schedule 1.3(h) (the "Assumed Transfer Taxes");

(i)    Liabilities of the Sellers for franchise and tourism Taxes in the aggregate not in excess of the amount set forth on Schedule 1.3(i);

(j)    Liabilities of the Sellers for sales Tax in the aggregate not in excess of the amount set forth on Schedule 1.3(j) (together with the Assumed Liabilities specified in Sections 1.3(h) and 1.3(i), subject to the limitations specified therein and in this Section 1.3(j), the "Assumed Taxes"); and

(k)    Liabilities of the Sellers for "stub rent" under Section 365(d)(3) of the Bankruptcy Code in the aggregate not in excess of the amount set forth on Schedule 1.3(k).

Notwithstanding anything to the contrary herein, the Purchaser's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against the Purchaser as compared to the rights and remedies which such parties would have had against Sellers had this Agreement not been consummated.

1.4    Excluded Liabilities.  Except for the Assumed Liabilities expressly set forth in Section 1.3, the Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of any Seller of any nature whatsoever, whether accrued or unaccrued, known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, liquidated or unliquidated, or due or to become due (collectively, the "Excluded Liabilities"), including the following Liabilities, all of which shall remain Liabilities of the Sellers for which the Sellers shall remain solely and exclusively liable:

(a)    all Liabilities of any of the Sellers relating to any of the Excluded Assets (including the Non-Assigned Contracts);

(b)    all Liabilities relating to any environmental, health or safety matters (including any Liability under any Environmental Law), arising out of or relating to any Seller's operation of its business or its leasing, ownership, use or operation of real property prior to the Closing Date, no matter when raised;

(c)    all Liabilities of any Seller in respect of Indebtedness, whether or not relating to the Business, except for the Liabilities expressly set forth in Section 1.3(e);

(d)    all Liabilities of any Seller to any current, former or prospective shareholder or other holder of equity securities or equity-linked securities of such Seller, including all Liabilities of such Seller related to the right to or issuance of any capital stock or

other equity securities or the payment of any dividend or other distribution on or in respect of any capital stock or other equity securities;

(e)    all Liabilities arising out of any breach or default of the Assigned Contracts on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or giving of notice, or both, would constitute or give rise to such a breach or default, other than any Determined Cure Costs;

(f)    all Liabilities of any Seller for Taxes (other than the Assumed Taxes);

(g)    all Liabilities of any Seller for the unpaid Taxes of any Person under Reg. §1.1502-6 (or any similar provision of state, local, or non-U.S. Law), as a transferee or successor, by contract, or otherwise;

(h)    all Liabilities of any Seller with respect to current or former employees that are not Transferred Employees, regardless of when arising;

(i)    without limiting Purchaser's obligations with respect to Determined Cure Costs or Assumed Taxes hereunder, all Liabilities of such Seller for pending or threatened Actions against such Seller, any of its assets or properties, the Business and/or such Seller's operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance that occurred or existed on or prior to the Closing Date;

(j)    all Liabilities (whether civil or criminal) occurring, arising out of or relating to acts or omissions of such Seller or its Affiliates, or any of their respective current or former directors, officers, employees, agents or independent contractors, in respect of any claimed violation of any Law at any time;

(k)    except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to Section 1.3(e), all Liabilities of such Seller for any and all claims by or on behalf of such Seller's current or former employees relating to periods ending on or prior to the Closing Date, including employment practices, terms and conditions of employment, labor relations, union organizing, employee safety and health, wages and hours, fair labor standards, child labor, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment, affirmative action (to the extent applicable), breach of contract and wrongful discharge, employee grievances and liability for any pension, profit sharing, deferred compensation (and the funding of any such benefits relating to all income earned by such Seller's current or former employees relating to periods ending on or prior to the Closing Date), workers' compensation or any other employee health, welfare or other benefit plans;

(l)    all Liabilities of such Seller under any collective bargaining agreement or any agreement with any labor union;

(m)    all Liabilities for any legal, accounting, investment banking, financial advisory, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by such Seller in connection with, resulting from or attributable to, the transactions contemplated by this Agreement, the Chapter 11 Cases or

9

otherwise; provided, however, in no event shall anything in this Section 1.4(m) be deemed to limit in any way Sellers' rights with respect to any of the foregoing fees, costs or expenses which may be provided for in the Wind-Down Budget or Bankruptcy Deposit Accounts;

(n)    all Liabilities incurred in connection with charitable contributions from customers and amounts owed to charitable organizations;

(o)    all Liabilities of any of the Sellers with respect to Specified Accrued Liabilities in excess of the Specified Accrued Liabilities assumed by Purchaser pursuant to Section 1.3(f);

(p)    all Liabilities related to or arising in connection with the Closed Parks;

(q)    all Liabilities in respect of administrative claims arising under section 503(b)(9) of the Bankruptcy Code; and

(r)    all Liabilities relating to or arising under any escheatment, abandoned property, unclaimed property or similar Laws of any jurisdiction.

For the avoidance of doubt, to the extent of any inconsistency between the provisions of this Section 1.4 and those of Section 1.3 above, the provisions of Section 1.3 above shall govern and control.

1.5    Cure Costs; Schedule Updates.

(a)    On or prior to the Execution Date, the Sellers have provided the Purchaser with Schedule 1.5(a) (the "Original Contract & Cure Schedule") which contains a list of each Contract of the Sellers and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Contract, the amount of such Cure Cost has been designated for such Contract as "$0.00"). From the Execution Date through (and including) the date which is one (1) Business Day prior to the Closing Date, promptly following any changes to the information set forth on the Original Contract & Cure Schedule (including any new Contracts to which any Seller becomes a party and any change in the Cure Cost of any Contract), the Sellers shall provide the Purchaser with a schedule (as such schedule may be amended, supplemented or otherwise modified from time to time prior to the Closing Date in accordance with the terms of this Agreement, the "Contract & Cure Update Schedule") that updates and corrects such information. The Purchaser may, at any time and from time to time through (and including) the date which is one (1) Business day prior to the Closing Date, upon written notice to the Sellers, include and exclude from the definitions of Assigned Contracts and Non-Assigned Contracts, respectively; provided, that no change in the definitions of Assigned Contracts or Non-Assigned Contracts referred to in this sentence shall reduce or increase the amount of the Purchaser Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as result of Contracts being excluded from the Assigned Contracts by the Purchaser pursuant to this Section 1.5(a). Any Contract not designated by the Purchaser in writing as either an Assigned Contract or a Non-Assigned Contract, and any Permits and other assets designated in writing by the Purchaser, in each case at least one (1) Business Day prior to the Closing, shall constitute "Non-Assigned Contracts" and "Excluded Assets", respectively; provided, that no change of the

definitions of Assigned Contracts or Non-Assigned Contracts referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities as a result of Contracts being added to the Assigned Contracts by the Purchaser pursuant to this Section 1.5(a). If any Contract is added to (or excluded from) the Assigned Contracts and the Non-Assigned Contracts as permitted by this Section 1.5(a), then Schedule 1.1(c) and/or Schedule 1.1(g) shall be deemed amended to reflect such addition, deletion or other change automatically (without any further action on the part of, or notice to, any Person) upon the delivery by the Purchaser of the notice referred to above in this Section 1.5(a) and, as an administrative matter only, the Purchaser and the Sellers shall make appropriate additions, deletions or other changes to Schedule 1.1(c) and/or Schedule 1.1(g), as applicable, to reflect such addition or exclusion. In addition, if any Contract is added to (or excluded from) the Assigned Contracts and the Non-Assigned Contracts as permitted by this Section 1.5(a), the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller, and assigned to the Purchaser, or excluded and rejected, as applicable, on the Closing Date.

(b)    The Sellers shall be responsible for the verification of all Cure Costs for each Assigned Contract and shall, in consultation with and subject to the consent of the Purchaser, use commercially reasonable efforts to establish the proper Cure Costs, if any, for each Assigned Contract prior to the Closing Date. To the extent that any Assigned Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, whether determined prior to or after the Closing, the Determined Cure Costs related to such Assigned Contract, or any portion thereof, shall be paid by the Purchaser either (i) concurrently with Sellers' assumption and assignment of such Assigned Contract to the Purchaser or (ii) as agreed in writing by the Purchaser and the applicable counterparty to an Assigned Contract. Notwithstanding the foregoing, (A) no prepetition Cure Costs with respect to any Assigned Contract shall be due until the permanent assumption thereof pursuant to this Section 1.5 and (B) the Purchaser shall not be required to make any payment for Cure Costs for or otherwise have any Liabilities with respect to, any Non-Assigned Contract.

(c)    If any Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, and such Cure Costs are undetermined on the Closing Date because a non-Seller counterparty to such Contract proposed Cure Costs in an amount that is different than the amount of Cure Costs proposed by the Sellers and such difference will not be resolved prior to the Closing Date (each such Contract, a "Disputed Amount Contract"), then the Sellers shall provide the Purchaser, not less than three (3) Business Days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-Seller counterparty; provided, Sellers shall agree to any Cure Costs for any Contract irrevocably designated by Purchaser in writing as an Assigned Contract if instructed to do so by Purchaser. If the Sellers, with the consent of the Purchaser, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for such Disputed Amount Contract within five (5) Business Days following the Closing Date, solely upon the Purchaser's written request, the Sellers shall, at the expense of the Purchaser, seek to have the amount of Cure Costs related to such Disputed Amount Contract determined by the Bankruptcy Court. Upon final determination of such Cure Costs, Purchaser may elect to re-designate such Assigned Contract or

11

Assumed Real Property Lease as a Non-Assigned Contract. If such Assigned Contract or Assumed Real Property Lease is not so re-designated, (x) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to the Purchaser, including by executing and delivering to the Purchaser an Assignment and Assumption Agreement with respect to such Assigned Contract and, in the case of an Assumed Real Property Lease, an Assignment and Assumption of Lease Agreement with respect to such Assumed Real Property Lease, and (y) the Purchaser shall pay the Determined Cure Costs with respect to such Assigned Contract either (i) concurrently with Sellers' assumption and assignment thereof to the Purchaser or (ii) as agreed in writing by the Purchaser and the applicable counterparty to such Assigned Contract, and execute and deliver to the applicable Sellers an Assignment and Assumption Agreement with respect to such Assigned Contract and, in the case of an Assumed Real Property Lease, an Assignment and Assumption of Lease Agreement with respect to such Assumed Real Property Lease.

(d)     The Sellers shall take all actions reasonably required to assume and assign the Assigned Contracts to the Purchaser (other than payment of the Determined Cure Costs, which shall be the sole responsibility of the Purchaser), including taking all reasonable actions required to obtain a Bankruptcy Court order containing a finding that the proposed assumption and assignment of the Assigned Contracts to the Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code. Notwithstanding the foregoing, if, following the Closing, it is discovered that a Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule was not so listed, the Sellers shall, to the extent the Sellers are still debtors-in-possession in the Chapter 11 Cases, promptly following the discovery thereof, notify the Purchaser in writing of any such Contract and the Seller's good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any such Contract, the amount of such Cure Cost shall be designated for such Contract as "$0.00"), and upon Purchaser's request, take all actions reasonably required to assume and assign to Purchaser such Contract, provided, that the Purchaser pay the applicable Cure Cost.

(e)     Notwithstanding the foregoing, the Purchaser may, in lieu of paying any Determined Cure Costs (or any portion thereof) with respect to any Assigned Contract directly to the applicable non-Seller counterparty, pay such Determined Cure Cost (or portion thereof) to the Sellers who shall promptly deliver such Determined Cure Cost to the applicable non-Seller counterparty. In addition, notwithstanding anything herein to the contrary, in lieu of paying any Determined Cure Costs (or any portion thereof) with respect to any Assigned Contract pursuant to Section 1.5(b), the Sellers, the Purchaser and the applicable non-Seller counterparty to such Assigned Contract may agree to a post-Closing payment schedule pursuant to which the Purchaser will make agreed upon Cure Cost payments to the applicable non-Seller counterparty (any such agreement, a "Post-Closing Cure Payment Arrangement"). To the extent any Post-Closing Cure Payment Arrangements are made, the aggregate amount payable under all Post-Closing Cure Payment Arrangements shall be included in the Closing Payments Schedule as if it is an Assumed Liability that is payable at the Closing.

(f)    The Purchaser may, at any time and from time to time through (and including) the Closing Date, include in the definition of Assumed Seller Plans and exclude from the definition of Excluded Assets any Seller Plan not otherwise included in the definition of Assumed Seller Plans; provided, that no such change of the definitions of Assumed Seller Plans or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities (subject to the limitations set forth in Section 1.3) as a result of Seller Plans being added to the Assumed Seller Plans by the Purchaser pursuant to this Section 1.5(f). The Purchaser may, at any time and from time to time through (and including) the Closing Date, exclude from the definition of Assumed Seller Plans and include in the definition of Excluded Assets, any Seller Plan otherwise included in the definition of Assumed Seller Plans; provided, that no such change of the definitions of Assumed Seller Plans or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of Seller Plans being excluded from the Assumed Seller Plans by the Purchaser pursuant to this Section 1.5(f). To exercise its rights under this Section 1.5(f) to include Seller Plans in, or exclude Seller Plans from, the Assumed Seller Plans and the Excluded Assets, as applicable, the Purchaser shall deliver one or more written notices to the Sellers specifying the Seller Plan(s) to be so included or excluded. If any Seller Plan is added to (or excluded from) the Assumed Seller Plans and the Excluded Assets as permitted by this Section 1.5(f), then Schedule 1.1(n) shall be deemed amended to reflect such addition, deletion or other change automatically (without any further action on the part of, or notice to, any Person) upon the delivery by the Purchaser of the notice referred to in the immediately preceding sentence and, as an administrative matter only, the Purchaser and the Sellers shall make appropriate additions, deletions or other changes to Schedule 1.1(n) to reflect such addition or exclusion.

(g)    The Purchaser may, at any time and from time to time through (and including) the Closing Date, include in the definition of Purchased Assets and exclude from the definition of Excluded Assets any Excluded Asset that is included on Schedule 1.2(p); provided, that no such change of the definitions of Excluded Assets or Purchased Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities as a result of any Excluded Asset being added to the Purchased Assets by the Purchaser pursuant to this Section 1.5(g). The Purchaser may, at any time and from time to time through (and including) the Closing Date, exclude from the definition of Purchased Assets and include in the definition of Excluded Assets, any Purchased Asset otherwise included in the definition of Purchased Assets; provided, that no such change of the definitions of Purchased Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of Purchased Assets being excluded from the Purchased Assets by the Purchaser pursuant to this Section 1.5(g). To exercise its rights under this Section 1.5(g) to add or exclude assets to or from the Excluded Assets and the Purchased Assets, as applicable, the Purchaser shall deliver one or more written notices to the Sellers specifying the asset(s) to be so included or excluded. If any Excluded Asset is added to (or excluded from) the Purchased Assets and the Excluded Assets, or if any Purchased Asset is added to (or excluded from) the Excluded Assets and the Purchased Assets, in any such case as permitted by this Section 1.5(g), then Schedule 1.2(m) and any applicable Schedule referenced in Section 1.1 shall be deemed amended to reflect such addition, deletion or other change automatically (without any further action on the part of, or notice to, any Person) upon the

delivery by the Purchaser of the notice referred to in the immediately preceding sentence and, as an administrative matter only, the Purchaser and the Sellers agree to make appropriate additions, deletions or other changes to Schedule 1.2(p) and any other applicable Schedule to reflect such addition or exclusion.

(h)    The Sellers shall continue to retain the CRO or another outside professional that is reasonably acceptable to the Purchaser to serve as a responsible officer of each Seller during the period from the Closing until one (1) Business Day following the conversion or dismissal of the Chapter 11 Cases or the appointment of a Chapter 11 trustee, and during such period, the Sellers shall pay such responsible officer's remuneration in accordance with the Wind-Down Budget.

## ARTICLE 2

## CONSIDERATION

2.1    Consideration.  In consideration for the transfer of the Purchased Assets to the Purchaser and the other undertakings set forth herein, the purchase price (the "Purchase Price") for the Purchased Assets shall be (i) the assumption of the Assumed Liabilities by the Purchaser at Closing, plus (ii) an amount equal to $45,000,000 (the "Credit Bid Amount"), which such amount will be satisfied by way of an offset against the Senior Secured Obligations held by the Senior Secured Lenders pursuant to section 363(k) of the Bankruptcy Code (the "Credit Bid") (it being understood and agreed that the portion of the Senior Secured Obligations in excess of the Credit Bid Amount (if any) will remain outstanding as an unsecured claim against Sellers), plus (iii) Cash and Cash Equivalents of an amount equal to the DIP Repayment Amount, plus, (iv) if Excluded Cash is insufficient to fund the entire Wind-Down Budget, an amount of Cash and Cash Equivalents equal to the amount of such shortfall (the "Excluded Cash Deficiency Amount"). Notwithstanding anything to the contrary herein, under no circumstances shall any portion of the Credit Bid Amount be converted into or otherwise require a cash payment.

2.2    Allocation of Purchase Price.  The Purchaser shall, not later than twenty days after the Execution Date, prepare and deliver to the Sellers for Sellers' review and approval a schedule allocating the Purchase Price, including Assumed Liabilities to the extent that such Liabilities are required to be treated as part of the purchase price for Tax purposes, among the Purchased Assets of each Seller (such schedule, the "Proposed Allocation"). Within seven days following receipt of the Proposed Allocation, Sellers shall provide to Purchaser, in writing, any comments or objections Sellers may have to the Proposed Allocation ("Allocation Comments"). If Sellers fail to provide any such written response prior to the end of such seven day period, the Proposed Allocation shall be deemed mutually approved by Purchaser and Sellers and shall be conclusively deemed to be the "Allocation" for purposes of this Section 2.2. Should Sellers timely provide Allocation Comments to Purchaser, Purchaser and Sellers shall consult with each other with respect to the comments and objections in good faith and attempt to resolve the same to their mutual satisfaction. Any mutually approved allocation resulting from such consultation shall be deemed to be the "Allocation" for purposes of this Section 2.2. The Sellers and the Purchaser shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other proceeding); provided, however, that nothing contained herein shall prevent the Sellers or the

14

Purchaser from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation, and neither the Sellers nor the Purchaser shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging the Allocation. The Purchaser and each of the Sellers shall cooperate in the filing of any forms, Tax Returns or other documents with respect to the Allocation, including any amendments to such forms, Tax Returns or other documents required pursuant to this Agreement with respect to any adjustment to the Purchase Price. In the event that the "Allocation" has neither been deemed to have been mutually approved nor affirmatively agreed upon by the Sellers and Purchaser by the Closing Date pursuant to the procedure described above, each of Purchaser and Sellers shall be permitted to report for all Tax purposes such allocation of the purchase price each deems appropriate.

## ARTICLE 3

## CLOSING AND TERMINATION

3.1     <u>Closing</u>. Subject to the satisfaction of the conditions set forth in <u>Section 9.1</u>, <u>Section 9.2</u> and <u>Section 9.3</u>, or the waiver thereof by the party or parties entitled to waive the applicable condition, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") will take place by telephone conference and electronic exchange of documents (or, if the parties hereto agree to hold a physical closing, at the offices of KTBS Law LLP, located at 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, CA 90067 (or at such other place as the parties may mutually designate in writing)) on a date that is no later than the second (2nd) Business Day following the date on which all of the conditions set forth in <u>Section 9.1</u>, <u>Section 9.2</u> and <u>Section 9.3</u> are satisfied or waived by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing). The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>."

3.2     <u>Closing Deliveries by Sellers</u>. At the Closing, the Sellers shall deliver to:

(a)     the Purchaser a duly executed bill of sale with respect to the Purchased Assets, in form and substance reasonably satisfactory to the Purchaser and the Sellers (the "<u>Bill of Sale</u>");

(b)     the Purchaser a duly executed assignment and assumption agreement with respect to the Assumed Liabilities, in form and substance reasonably satisfactory to the Purchaser and the Sellers (the "<u>Assignment and Assumption Agreement</u>");

(c)     the Purchaser each duly executed assignment and assumption of lease agreement, in form and substance reasonably satisfactory to the Purchaser and the Sellers (each, an "<u>Assignment and Assumption of Lease Agreement</u>"), effecting the assignment to, and the assumption by, the Purchaser of each Assumed Real Property Lease;

(d)     the Purchaser a true and correct copy of the Sale Order;

(e)     the Purchaser a duly executed non-foreign person affidavit of each Seller dated as of the Closing Date, sworn under penalty of perjury, and in form and substance required

15

under the Treasury Regulations or IRS published guidance pursuant to Section 1445 of the Code, stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

(f)     the Purchaser the officer's certificates required to be delivered pursuant to Section 9.3(a), Section 9.3(c) and Section 9.3(f);

(g)     the Purchaser physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery, provided that the physical presence of any such Purchased Assets at any leased real property that is also included in the Purchased Assets shall be deemed to be so delivered;

(h)     the Purchaser such documentation as may be necessary to change the authorized signatories on any bank accounts or powers of attorney relating (directly or indirectly) to the Purchased Assets;

(i)     the Purchaser evidence of the required name changes of the Sellers as more fully set forth in Section 8.8;

(j)     [reserved];

(k)     the Purchaser such other bills of sale, deeds, endorsements, assignments (including assignments with respect to the Seller Intellectual Property), acknowledgments and other good and sufficient instruments of conveyance and transfer, all in form and substance reasonably satisfactory to the Purchaser, that are necessary to vest in the Purchaser all of the right, title and interest of the Sellers in, to and under all of the Purchased Assets; and

(l)     the Purchaser all other previously undelivered Seller Ancillary Agreements required by this Agreement to be executed and/or delivered by the Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.3     Closing Deliveries by the Purchaser. At the Closing, the Purchaser shall deliver to:

(a)     the Sellers evidence (in form and content reasonably satisfactory to Sellers) of a credit against the Senior Secured Obligations pursuant to section 363(k) of the Bankruptcy Code equal to the Credit Bid Amount;

(b)     the Sellers a duly executed Assignment and Assumption Agreement;

(c)     the Sellers each duly executed Assignment and Assumption of Lease Agreement;

(d)     the Sellers the officer's certificates required to be delivered pursuant to Section 9.2(a) and Section 9.2(b);

(e)     the Sellers all other previously undelivered Purchaser Ancillary Agreements required by this Agreement to be executed and/or delivered by the Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement;

16

(f)     the Sellers, by wire transfer of immediately available funds, an amount equal to the Excluded Cash Deficiency Amount, if any; and

(g)     the DIP Agent, by wire transfer of immediately available funds, an amount equal to the DIP Repayment Amount in accordance with the DIP Financing Agreement.

3.4    <u>Termination of Agreement</u>.

This Agreement may be terminated as follows:

(a)     by the mutual written consent of the Sellers and the Purchaser at any time prior to the Closing;

(b)     by either the Purchaser or the Sellers, if the Closing shall not have been consummated on or prior to May 14, 2020 (the "<u>Outside Date</u>"); <u>provided, further</u>, that the right to terminate this Agreement under this <u>Section 3.4(b)</u> shall not be available to the Purchaser or the Sellers, as applicable, if the Purchaser or any Seller, as applicable, is then in material breach or violation of any of their respective representations, warranties, covenants or agreements under this Agreement;

(c)     by either the Purchaser or the Sellers, if there shall be a permanent injunction, restraining order or decree of any nature of any Governmental Body that is in effect that prevents or prohibits the consummation of the transactions contemplated hereby;

(d)     by the Purchaser, if any of the Sellers seek an order of the Bankruptcy Court dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a case or cases under Chapter 7 of the Bankruptcy Code, or the Bankruptcy Court enters such an order for any reason (except with the Purchaser's prior written consent), or if any of the Sellers seek an order of the Bankruptcy Court appointing a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Seller in the Chapter 11 Cases, or if any such appointment occurs for any reason;

(e)     by the Purchaser, if any Seller has entered into, or shall have publicly announced its intention (including by means of any filings made with the Bankruptcy Court or any other Governmental Body) to enter into, an agreement in principle, letter of intent, memorandum of understanding, definitive agreement or other arrangement, whether binding or non-binding, or whether subject to terms and conditions, with any Person (other than the Purchaser or its Affiliates) with respect to any Alternative Transaction except, subject to the terms of the Bid Procedures, in the event that the entering into such agreement or document, or such announcement, relates to an Alternative Transaction with the Successful Bidder and the Purchaser elects to be, and is identified by the Sellers as, the Back-Up Bidder; <u>provided, however</u>, that the Purchaser shall have the right to terminate this Agreement pursuant to this <u>Section 3.4(e)</u> on or at any time after the twentieth (20th) day following the date which is twenty (20) days after the date of the entry of the Sale Order unless the Purchaser becomes the Successful Bidder on or prior to such date;

(f)     automatically, upon consummation of an Alternative Transaction;

17

(g)    by the Purchaser, (i) if any Seller shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of any Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in <u>clause (i)</u> (A) would result in a failure of any condition set forth in <u>Section 9.3</u> and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) fifteen (15) days after written notice of such breach, failure or occurrence is given to the Sellers by the Purchaser;

(h)    by the Sellers, (i) if the Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in <u>clause (i)</u> (A) would result in a failure of a condition set forth in <u>Section 9.2</u> and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) fifteen (15) days after written notice of such breach, failure or occurrence is given to the Purchaser by the Sellers;

(i)    by the Purchaser, if all the conditions set forth in <u>Section 9.1</u>, <u>Section 9.2</u> and <u>Section 9.3</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and the Sellers fail to consummate the transactions contemplated hereby at the Closing;

(j)    by the Sellers, if all of the conditions set forth in <u>Section 9.1</u>, <u>Section 9.2</u> and <u>Section 9.3</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and the Purchaser fails to deliver any portion of the Purchase Price;

(k)    by either the Purchaser or the Sellers, if, following the Sale Hearing, the Purchaser is not the Successful Bidder or the Back-Up Bidder;

(l)    by the Purchaser, if (i) following entry by the Bankruptcy Court of the Bid Procedures Order, such order is (A) amended, modified or supplemented in any way without the Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (A) amended, modified or supplemented in any way without the Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay;

(m)    by the Purchaser if for any reason the Purchaser is unable, pursuant to section 363(k) of the Bankruptcy Code, to credit bid the Credit Bid Amount in payment of the Purchase Price as set forth in <u>Section 2.1</u>;

(n)    by the Purchaser if, prior to Sale Hearing, Purchaser or the Senior Secured Agent in their sole discretion shall have determined that the results of their legal, tax, accounting and business due diligence of the Sellers are not satisfactory, including if the Sellers' family entertainment centers and gated amusement parks, that as of the Execution Date are closed to the public due to applicable Law in connection with the ongoing Coronavirus pandemic, have not re-

opened and remained open to the public prior to the Sale Hearing and the Purchaser or the Senior Secured Agent makes such determination based on such circumstances;

(o)    by the Purchaser, if an "Event of Default" under the DIP Financing Agreement shall have occurred and not have been waived in accordance with the terms of the DIP Financing Agreement, subject to any applicable cure period; or

(p)    by the Purchaser, if any of the Bankruptcy Court Milestones are not met.

3.5    Procedure Upon Termination.  In the event of a termination of this Agreement by the Purchaser or the Sellers, or both, pursuant to Section 3.4, (a) written notice of such termination shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made; (b) except as set forth in Section 3.6, this Agreement shall thereupon terminate and become void and of no further force or effect and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto.   Any termination of this Agreement by the Purchaser or the Sellers, or both, pursuant to Section 3.4 shall be effective on the date that written notice of such termination is given by the terminating party to the other parties hereto, and any automatic termination of this Agreement pursuant to Section 3.4(f) shall be effective on the date that an Alternative Transaction is consummated.

3.6    Effect of Termination.  In the event that this Agreement is validly terminated in accordance with Section 3.4, then this Agreement shall become null and void and of no further force or effect, and there shall be no Liability hereunder on the part of the Sellers, any of the Seller Parties, the Purchaser or any of the Purchaser Parties, except that the provisions of this Section 3.6 and Article 11, and any defined terms used in such Section or Article, shall survive the termination of this Agreement for any reason indefinitely; provided, however, that if such termination shall have been caused by, or shall have resulted from, the material breach by a party of any of its representations, warranties, covenants or obligations set forth in this Agreement, then any such termination shall not relieve any such breaching or failing party for damages incurred or suffered by any other party as a result of any such breach or failure.   For the avoidance of doubt, but without limiting the foregoing proviso or Sellers' rights to seek equitable relief pursuant to Section 11.10 below, if this Agreement is terminated in accordance with Section 3.4, the Purchaser shall not be obligated to (a) pay or assume any portion of the Purchase Price or (b) pay or make any other payments described herein that would be required to be paid or made if the transactions contemplated herein were consummated.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Schedules referred to in this Article 4, the Sellers hereby, jointly and severally, make the representations and warranties in this Article 4 to the Purchaser as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

4.1     <u>Organization and Qualification</u>.  Each Seller is a corporation or limited liability company (as applicable) duly incorporated or organized (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization (as applicable). Each Seller is qualified and in good standing as a foreign corporation or limited liability company (as applicable) in each jurisdiction where the properties owned, leased or operated or the conduct of its Business require such qualification.  Each Seller has all requisite power and authority to own, lease and operate its properties and to carry on its Business as it is now being conducted, subject to the provisions of the Bankruptcy Code.

4.2     <u>Subsidiaries</u>.  <u>Schedule 4.2</u> sets forth each corporation, association or other entity in which Intermediate owns, of record or beneficially, any direct or indirect equity interest or any right (contingent or otherwise) to acquire any equity interest.

4.3     <u>Authority Relative to This Agreement</u>.  Except for such authorization as is required from the Bankruptcy Court, each Seller has all requisite power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Seller Ancillary Agreements to be executed and delivered by such Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed and delivered by such Seller, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by each Seller of this Agreement and each of the Seller Ancillary Agreements to be executed and delivered by such Seller, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of such Seller.  This Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity) (the "<u>Bankruptcy Exceptions</u>").

4.4     <u>Conflicts; Consents and Approvals</u>.

(a)     Except as set forth on <u>Schedule 4.4(a)</u>, none of the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will conflict with or result in a breach of any provision of (i) the Seller Organizational Documents, (ii) subject to and assuming entry of the Bid Procedures Order and the Sale Order, any Material Contract to which such Seller is a party or by which such Seller or any of the Purchased Assets is bound, or (iii) subject to and assuming entry of the Bid Procedures and the Sale Order, any applicable Law, other than, in the case of <u>clauses (ii)</u> and <u>(iii)</u> such conflicts or breaches that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchased Assets or such Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business.

(b)     Except as set forth on <u>Schedule 4.4(b)</u>, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of any Seller in connection with the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, or the consummation by any Seller of the transactions contemplated hereby or thereby (including the assumption by the Sellers of the Assigned Contracts and the assignment thereof to the Purchaser, but excluding the transfer of any Permit from a Seller to the Purchaser pursuant to this Agreement to the extent such transfer is prohibited by the terms of any such Permit or the Law governing the issuance of such Permit to such Seller and such prohibition cannot overridden by the Sale Order or other related order of the Bankruptcy Court), except for (i) the entry of the Bid Procedures Order and the Sale Order and (ii) such other approvals, orders, Permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchased Assets or to such Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business.

4.5     <u>Ordinary Course of Business</u>.  Except (a) as required by the Bankruptcy Court, (b) as contemplated or expressly required or permitted by this Agreement, (c) as disclosed in the Unaudited Financial Statements, or (d) as set forth on <u>Schedule 4.5</u>, since the Balance Sheet Date, (i) the Business has been conducted in the Ordinary Course of Business, (ii) other than the Chapter 11 Cases, no Material Adverse Effect has occurred and (iii) none of the Sellers has taken any action that, if taken after the Execution Date, would violate <u>Section 8.1</u> in any material respect.

4.6     <u>Litigation</u>.  Except for the Chapter 11 Cases, or as set forth on <u>Schedule 4.6</u>, there is no material litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (collectively, "<u>Actions</u>"), pending or, to the Knowledge of the Sellers, threatened against any Seller or any property or asset of any Seller which would not be discharged through the Chapter 11 Cases or which could give rise to or increase an Assumed Liability or which seeks to or is reasonably likely to have the effect of preventing the Sellers from consummating the transactions contemplated by this Agreement.  Except with respect to orders issued in the Chapter 11 Cases or as set forth on <u>Schedule 4.6</u>, no Seller is subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other Governmental Body that relates to the Business, the Purchased Assets or the Assumed Liabilities and for which such Seller has continuing obligations or Liabilities.

4.7     <u>Intellectual Property</u>.

(a)     <u>Schedule 4.7(a)</u> sets forth a true, complete and correct list of (i) all of the patents, registered trademarks, registered copyrights, Internet domain names, and applications for any of the foregoing, in each case that constitute the Owned Intellectual Property, (ii) a list of all other material Owned Intellectual Property and (iii) a list of all Licensed Intellectual Property (except for Intellectual Property licensed pursuant to off the shelf software and licenses implied in the sale of such software).

(b)     Except as set forth on <u>Schedule 4.7(b)</u>, (i) the Sellers own all right, title and interest in and to the Owned Intellectual Property, free and clear from any Encumbrances

21

(other than Permitted Encumbrances) and free from any requirement of any present or future royalty payments, license fees, charges or other payments, or conditions or restrictions whatsoever; and (ii) no Action is pending, or, to the Knowledge of the Sellers, threatened challenging the validity, enforceability, registration, ownership or use of any Seller Intellectual Property.

(c)     None of the Sellers nor any of their respective products or services is infringing upon, misappropriating, diluting or otherwise violating, the Intellectual Property of any third party and no Person is infringing upon, misappropriating, diluting or otherwise violating, any Seller Intellectual Property.  Except as set forth on Schedule 4.7(c), there is no pending Action alleging that any Seller or any of its products or services is infringing, misappropriating, diluting or otherwise violating the Intellectual Property rights of any Person and, to the Knowledge of the Sellers, no such Actions are threatened.

(d)     All Seller Intellectual Property is valid and enforceable and has not been adjudged invalid or unenforceable, in whole or in part, and the Sellers have paid all renewal, maintenance, and other fees and taxes when due as required to maintain each and every registration and application of any applicable Seller Intellectual Property in full force and effect.  Except as set forth on Schedule 4.7(d), the Sellers have the right to use the Licensed Intellectual Property as used in the conduct of the Business as currently conducted, free and clear of any Encumbrances (other than Permitted Encumbrances).  To the Knowledge of the Sellers, the Seller Intellectual Property together with the other Purchased Assets comprises all the Intellectual Property necessary for the Sellers to conduct and operate the Business in the Ordinary Course of Business.

(e)     The Sellers have taken all necessary and desirable actions to maintain and protect all of the Seller Intellectual Property and IT Assets and to protect and preserve the confidentiality of all trade secrets and other confidential information included in the Seller Intellectual Property, including requiring all Persons having access thereto to execute written non-disclosure agreements.  The Sellers have obtained from all employees and consultants who provide or provided services to the Sellers related to the creation, development, modification or ownership of trade secrets used in the Business, executed agreements under which such employees or consultants are or were required to convey to the Sellers ownership of all inventions and developments conceived or created by them in the course of their work for any of the Sellers.

(f)     The IT Assets are adequate for their intended use and for the operation of the Business as currently operated and are in good working condition (normal wear and tear excepted).  There has not been any material malfunction with respect to any of the IT Assets in the last five (5) years that has not been remedied or replaced in all material respects.  The IT Assets include all of the information technology equipment necessary to operate the Business as presently conducted or proposed to be conducted.  The consummation of the transactions contemplated hereby will not result in the loss or impairment of or payment of additional amounts with respect to, nor require the consent of any other Person in respect of, the Purchaser's right to own, use or hold for use any of the IT Assets as owned, used or held for use in the conduct of the Business as currently conducted or proposed to be conducted.

(g)    In connection with its collection, retention, storage, transfer (including any transfer across national borders) and/or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees and/or other third parties (collectively, "Personal Information"), except as set forth in Schedule 4.7(g) hereto, the Sellers have been in compliance with all Laws in all relevant jurisdictions, all applicable privacy policies and the requirements of any Contract or codes of conduct to which a Seller is a party or to which a Seller is bound or subject. Each Seller has commercially reasonable physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information collected and/or stored by it or on its behalf in connection with the Business from and against unauthorized access, use and/or disclosure. Except as set forth in Schedule 4.7(g) hereto, in connection with the operation of the Business, each Seller is and has been in compliance in all material respects with all Laws relating to data loss, theft and breach of security notification obligations. No Person (including any Governmental Body) has made any claim or commenced any Action relating to the Sellers' information privacy or data security practices, including with respect to the access, disclosure or use of Personal Information maintained by or on behalf of any Seller in connection with operation of the Business or threatened any such Action or conducted investigation or inquiry thereof. The execution, delivery, or performance of this Agreement or the Ancillary Agreements or the consummation of the transactions contemplated hereby will not violate any Laws or applicable privacy policy as it currently exists or as it existed at any time during which any Personal Information was collected or obtained by or on behalf of the Sellers. The Sellers have not, in the past five (5) years, experienced any loss, damage, or unauthorized access, disclosure, use or breach of security of any Personal Information in its possession, custody or control, or otherwise held or processed on its behalf.

4.8    Material Contracts.

(a)    Schedule 4.8(a) sets forth the following types of Contracts that are unexpired as of the Execution Date to which a Seller is a party or a beneficiary or by which any of the Purchased Assets are bound (such Contracts set forth below are collectively referred to as the "Material Contracts"):

(i)    all Contracts requiring payments by or to a Seller in excess of $50,000 during (A) any twelve (12)-month period or (B) during the term of the Contract, if such term is less than twelve (12) months, in each case, which Contract is not set forth in the following clauses (ii) through (xvii);

(ii)    all collective bargaining agreements (and any other Contract with any labor organization, union or association);

(iii)    Contracts to which any Significant Vendor/Supplier is a party;

(iv)    Each employment agreement, consulting agreement, severance agreement, change of control agreement and retention agreement, in each case requiring payments by a Seller in excess of $50,000 in any twelve (12) month period;

(v)     Contracts to which any officer, director or equity holder of a Seller, or any Affiliate of any such Person is a party;

(vi)     each Contract for the lease, sublease, license or use of any real property or any material Furniture and Equipment used or held for use in the Business, in each case requiring payments by a Seller in excess of $50,000 in any twelve (12)-month period;

(vii)     Contracts that (A) limit or restrict a Seller from engaging in any business or other activity in any jurisdiction or (B) create any exclusive relationship or arrangement;

(viii)     Contracts granting to any Person an option or a right of first refusal, first-offer or similar preferential right to purchase or acquire any of the Purchased Assets;

(ix)     Contracts for the granting or receiving of a license, sublicense or franchise or under which any Person is obligated to pay or has the right to receive a royalty, license fee, franchise fee or similar payment, in each case requiring payments by a Seller in excess of $50,000 in any twelve (12)-month period;

(x)     Contracts (other than for commercially available off the shelf software) where a Seller is a licensor or licensee of Intellectual Property used in the operation of the Business, in each case requiring payments by a Seller in excess of $50,000 in any twelve (12)-month period;

(xi)     joint venture or partnership Contracts;

(xii)     each Contract for capital expenditures or the acquisition or construction of fixed assets relating to the Business, the performance of which involves consideration in excess of $50,000;

(xiii)     each Contract that provides for an increased payment or benefit, or accelerated vesting of any benefit, to any current or former employee of a Seller upon the execution of this Agreement or the consummation of the transactions contemplated hereby;

(xiv)     Contracts relating to the acquisition (by merger, consolidation or acquisition of stock or assets) of any Person or division thereof or collection of assets constituting all or substantially all of a business or business unit entered into at any time during the three (3) years prior to the Execution Date;

(xv)     each Contract that is a requirements contract or other arrangement pursuant to which a Seller is obligated or otherwise required to obtain all or any portion of products or services exclusively from any Person, in each case requiring payments by a Seller in excess of $50,000 in any twelve (12)-month period;

24

(xvi)    each Contract that contains minimum purchase obligations (e.g., take-or-pay) or that contains penalties or repricing provisions if certain minimum quantities of products or services are not purchased, in each case requiring payments by a Seller in excess of $50,000 in any twelve (12)-month period; and

(xvii)    Contracts with any Governmental Body.

(b)    Assuming entry of the Bid Procedures Order and the Sale Order and that all consents, approvals, notices and disclosures described on Schedule 4.4(a) and Schedule 4.4(b) are obtained or made (as applicable), (i) each Material Contract (other than any Material Contract that has expired or terminated in accordance with its terms after the Execution Date or that has been terminated not in violation of this Agreement) (x) constitutes a valid and binding obligation of the Seller party thereto and, to the Knowledge of the Sellers, each other party thereto and (y) is in full force and effect, except in each of the preceding clauses (x) and (y) as limited by Bankruptcy Exceptions, (ii) no Seller is in, or is alleged to be in, any material breach or material default under any Material Contract, except for payment defaults for which estimated Cure Costs have been set forth on the Original Contract & Cure Schedule in accordance with Section 1.5(a) and such other breaches or defaults arising as a consequence of the commencement of the Chapter 11 Cases and (iii) assuming entry of the Sale Order, upon consummation of the transactions contemplated by this Agreement, each Material Contract shall continue in full force and effect without penalty or any adverse consequence to the Purchaser, except for any Material Contracts that expired in accordance with the terms thereof after the Execution Date and prior to the Closing Date.

(c)    The Sellers have heretofore delivered or made available to the Purchaser true, correct and complete copies of all Material Contracts that are in writing, including all amendments, modifications, schedules and supplements thereto and all waivers (including descriptions of oral waivers) with respect thereto.

4.9    Permits.

(a)    Except as set forth on Schedule 4.9(a)(i), all of the material Permits that are necessary for the operation of the Business and the ownership or use of the Purchased Assets (collectively, the "Material Permits") are held by the Sellers and are in full force and effect. Schedule 4.9(a) (ii) sets forth a true, complete and correct list of all Material Permits held by the Sellers (including Apex Beverage) as of the Execution Date.

(b)    Each Seller (including Apex Beverage) is in compliance with its obligations under each of the Material Permits and the rules and regulations of the Governmental Body issuing such Material Permits, and no condition exists that with notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit.

(c)    Each Material Permit is valid and in full force and effect and there is no Action, notice of violation, order of forfeiture or written complaint or investigation against any Seller (including Apex Beverage) relating to any of the Material Permits pending or, to the Knowledge of the Sellers, threatened before any Governmental Body.  None of the Material

Permits will be terminated or otherwise adversely impacted by the transactions contemplated by this Agreement.

4.10    Brokers and Finders.    Except as set forth on Schedule 4.10, no Seller has employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.11    Title to Assets.    Upon the entry and effectiveness of the Sale Order, the Sellers will have the power and right to sell, assign, transfer, convey and deliver to the Purchaser good and valid title to (or, in the case of leased Purchased Assets, a valid and subsisting leasehold interest in), free and clear of any Encumbrances (except for Permitted Encumbrances), all of the Purchased Assets, subject to the terms of Section 8.3.    The Purchased Assets constitute all of the properties, assets and rights used by the Sellers and necessary for the Purchaser to conduct and operate the Business in the Ordinary Course of Business.    All of the Purchased Assets are in good order and repair for assets of comparable age and past use and are capable of being used in the Ordinary Course of Business in the manner necessary to operate the Business.

4.12    Tangible Personal Property; Furniture and Equipment.    Schedule 4.12(a) sets forth all leases and subleases involving annual payments under such lease or sublease relating to personal property, including Furniture and Equipment, used by any Seller in the Business or to which any Seller is a party or by which the personal property, including Furniture and Equipment, of any Seller is bound.    Except as set forth on Schedule 4.12(b), no Seller has received any written notice, or to the Knowledge of the Sellers, oral notice, of any default or event that with notice or lapse of time or both would constitute such a default by such Seller under any such leases or subleases.

4.13    Real Property.

(a)    Except as set forth on Schedule 4.13(a), none of the Sellers owns any real property.

(b)    Schedule 4.13(b) (i) sets forth a complete and correct list of all Leased Real Property specifying the address or other information sufficient to identify all such Leased Real Property and a description of all documents comprising the Assumed Real Property Leases. Each Assumed Real Property Lease grants the Seller party thereto the sole and exclusive right to use and occupy the applicable Assumed Leased Real Property, in accordance with the terms thereof, subject to Permitted Encumbrances.    Except as set forth on Schedule 4.13(b)(ii), no Seller has assigned, subleased, mortgaged, pledged or otherwise encumbered its interest under any Assumed Real Property Lease and no Seller has leased, subleased or granted to any Person the right to access, enter upon, use, occupy, lease, manage, operate, maintain, broker or purchase any portion of such Seller's interest in the Leased Real Property that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date.

(c)    Except as a result of the filing of the Chapter 11 Cases or as set forth on Schedule 4.13(c), Sellers and, to the Knowledge of the Sellers, each of the other parties thereto

26

has performed in all material respects all material obligations required to be performed by it under each Assumed Real Property Lease and each Assumed Real Property Lease is in full force and effect, not subject to any uncured defaults and has not been amended, except as set forth on Schedule 4.13(b)(i). No Seller has received any written notice of, or to the Knowledge of the Sellers, oral notice of, condemnation or eminent domain proceedings pending or threatened that affect any of the Assumed Leased Real Property. No Seller has received any written notice of, or to the Knowledge of the Sellers, any oral notice of, any zoning, ordinance, building, fire or health code or other legal violation affecting any of the Assumed Leased Real Property, except where any such violations would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchased Assets or to such Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business.

(d)    Except as set forth on Schedule 4.13(d), all material improvements used in the conduct of the Business are in good and useable condition, reasonable wear and tear excepted, and conform in all material respects, with all existing applicable ordinances, codes, regulations and manufacturer's suggested operating and maintenance procedures in effect or issued as of the Effective Date.

(e)    Each Leased Real Property which operates a water amusement park or any amusement rides or games dependent upon water, in each case, has access to a municipal water supply which is sufficient for the current use and operation of such Leased Real Property.

4.14    Compliance with Law. Except as set forth on Schedule 4.14, each Seller is in compliance in all material respects with all applicable Laws. No Seller has received any written notice or, to the Knowledge of the Sellers, oral notice of any alleged violation of any Law applicable to it from any Governmental Body or third party. No Seller is subject to, or in default in any respect with, any order of any Governmental Body applicable to the Business, the Purchased Assets or the transactions contemplated under this Agreement. Except as set forth on Schedule 4.14, no investigations, inquiries, reviews or Actions by any Governmental Body with respect to the Business have been commenced nor, to the Knowledge of the Sellers, are any contemplated that would impose any Liability on any Seller or, from and after the Closing Date, the Purchaser, the Purchased Assets or the Business.

4.15    Tax Returns; Taxes. Except as set forth on Schedule 4.15:

(a)    All Tax Returns required to have been filed by the Sellers have been duly and timely filed and are true, correct and complete in all material respects, and no material fact has been omitted therefrom. No extension of time in which to file any such Tax Returns is in effect.

(b)    All Taxes due and payable by the Sellers (whether or not shown on any Tax Return) have been paid in full. The accruals and reserves with respect to Taxes (other than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the Most Recent Balance Sheet are adequate to cover all material Taxes of the Sellers accruing or payable with respect to Tax periods (or portions thereof) ending on or before the Balance Sheet Date. All material Taxes of the Sellers attributable to Tax periods (or

27

portions thereof) commencing after the date of the Most Recent Balance Sheet have arisen in the Ordinary Course of Business.

(c)     No claims have been asserted, no Taxes have been assessed and no proposals or deficiencies for any material amount of Taxes of the Sellers are being asserted, proposed or, to the Knowledge of the Sellers, threatened, and no audit or investigation of any Tax Return of any Seller has occurred in the last five (5) years or is currently underway, pending or, to the Knowledge of the Sellers, threatened. No claim has ever been made against any Seller by any Governmental Body in a jurisdiction where such Seller does not file Tax Returns that such Seller is or may be subject to taxation in such jurisdiction.

(d)     The Sellers have withheld and paid all Taxes required to have been withheld and paid by them to the appropriate Governmental Body in connection with amounts paid or owing to any current or former employee, independent contractor, creditor or shareholder thereof or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed. There are no Encumbrances for Taxes with respect to the Sellers or their respective assets or the Business, nor is there any such Encumbrance that is pending or, to the Knowledge of the Sellers, threatened, other than Permitted Encumbrances.

(e)     No Seller has executed or filed with any Governmental Body any agreement or waiver extending the period for assessment, reassessment or collection of any material Taxes. No Seller has made an election, nor is any Seller required, to treat any of its assets or properties as owned by another Person or as tax-exempt bond financed property or tax-exempt use property within the meaning of Section 168 of the Code or under any comparable provision of state or local Tax law.

(f)     No Seller is a party to or bound by any written tax sharing, tax indemnity or tax allocation agreement or other similar written arrangement with any other party. No Seller has any Liability for Taxes of any other Person as a transferee or successor, by Law or by Contract.

(g)     No Seller will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period (or portion thereof) ending on or prior to the Closing Date; (ii) "closing agreement," as described in Code §7121 (or any corresponding provision of state, local, or non-U.S. income Tax Law); (iii) installment sale or open transaction made on or prior to the Closing Date; (iv) prepaid amount received on or prior to the Closing Date; or (v) election under Code §108(i).

(h)     No Seller has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code §355 or Code §361.

(i)     No Seller is or has been a party to any "listed transaction," as defined in Code §6707A(c) (2) and Reg. §1.6011-4(b) (2).

28

4.16    Benefit Plans.

(a)    Schedule 4.16(a) contains a list of each Seller Plan. "Seller Plans" means (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA), including all employee benefit plans which are "pension plans" (as defined in Section 3(2) of ERISA) and any other written employee benefit arrangements or payroll practices (including severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, survivor benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock purchase, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies) and (ii) all written employment, termination, bonus, severance, change in control or other similar contracts or agreements, in each case to which any Seller is a party, with respect to which any Seller has any Liability or obligation or which are maintained by any Seller and to which any Seller contributes or is obligated to contribute with respect to current or former directors, officers, consultants and employees of any Seller.

(b)    The Sellers have delivered or made available to the Purchaser true, correct and complete copies of all Assumed Seller Plans and related trust agreements, annuity contracts or other funding instruments and summary plan descriptions, if applicable.

(c)    Except as listed on Schedule 4.16(c), none of the Seller Plans is a "multiemployer plan" (as defined in Section 3(37) of ERISA), is or has been subject to Sections 4063 or 4064 of ERISA, or is or has been subject to Title IV of ERISA or Section 412 or 430 of the Code. Neither any Seller nor any of its ERISA Affiliates has any Liability under Title IV of ERISA or Section 412 or 430 of the Code. None of the Seller Plans is subject to any Laws outside of the United States.

(d)    Each Assumed Seller Plan has been established, administered and invested in accordance with its terms and in material compliance with all applicable Laws, include ERISA and the Code. Each Seller has performed and complied in all material respects with all of its obligations under or with respect to the Assumed Seller Plans. Each Assumed Seller Plan that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code ("Qualified Plan") and each trust that is intended to be exempt under Section 501 of the Code ("Exempt Trust") has received a determination or opinion letter from the Internal Revenue Service to the effect that such Qualified Plan is so qualified and such Exempt Trust is so exempt, and, to the Knowledge of the Sellers, nothing has occurred since the date of the most recent Internal Revenue Service determination or opinion letter, as applicable, that would adversely affect the tax-qualified status of any Qualified Plan or Exempt Trust.

(e)    There is no Action relating to, or seeking benefits under, any Assumed Seller Assumed that is pending or, to the Knowledge of the Sellers, threatened against any Seller (other than any claims for benefits under the Assumed Seller Plans in the Ordinary Course of Business).

(f)    No Assumed Seller Plan provides post-retirement or post-termination employee benefits (including death, medical or health benefits) to or in respect of any current or

former employees of any Seller or their beneficiaries, and no Seller has any obligation to provide such benefits other than COBRA continuation coverage. All contributions or premiums required to be made by any Seller to or under each Assumed Seller Plan have been made in a timely fashion in accordance with applicable Law, and the terms of the applicable Assumed Seller Plan, and no Seller has, and as of the Closing Date will not have, any actual or potential unfunded Liabilities with respect to any Assumed Seller Plans.

(g)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (whether alone or in conjunction with any other event) will limit the ability of Purchaser to amend or terminate any Assumed Seller Plan.

4.17    Labor Matters.

(a)     A true and correct list of all of the employees of the Sellers as of the Execution Date, specifying their position, date of hire, hourly wage rate or annual base salary, bonus opportunity, and accrued vacation, sick leave time and other paid time off, earned and accrued wages, salaries, commissions and bonuses, has been provided to the Purchaser on the Execution Date.

(b)     No Seller is a party to or bound by, either directly or by operation of Law, any collective bargaining agreement, labor contract, letter of understanding, letter of intent, voluntary recognition agreement or legally binding commitment to any labor union, trade union or employee organization or group which may qualify as a trade union in respect of or affecting employees of any Seller, nor is any Seller subject to any union organization effort, nor is any Seller engaged in any labor negotiation. Except as set forth on Schedule 4.17(b), there are no, and within the prior three (3) years there have not been, any (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Sellers, threatened against or involving any Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Sellers, threatened by or on behalf of any current or former employee or group of employees of any Seller, which if adversely determined, would reasonably be expected to be adverse in any material respect to the Purchased Assets or to such Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business. No Seller has any obligation to make any severance or termination payment to any current or former employees in excess of any amount required to be paid under applicable Law.

4.18    Insurance Policies. Schedule 4.18 lists all insurance policies owned or held by any Seller or otherwise applicable to the Business, the Purchased Assets or the Assumed Liabilities (the "Insurance Policies"). All Insurance Policies (or substitute policies with substantially similar terms) are in full force and effect, all premiums with respect thereto covering all periods up to and including the Execution Date have been paid (to the extent any such premium is due and payable), and no written notice of cancellation or termination (or any other threatened termination) has been received with respect to any such policy. Except as set forth on Schedule 4.18, there are no pending or, to the Knowledge of the Sellers, threatened claims under any Insurance Policy. Each Seller maintains sufficient insurance with reputable insurers for the Business, properties and assets of such Seller against all risks normally insured against, and in amounts normally carried, by such Seller in the Ordinary Course of Business.

4.19    Environmental Matters. Except as set forth on Schedule 4.19, (a) each Seller is in material compliance with all Environmental Laws, (b) there is no material investigation, suit, claim, judicial or administrative proceeding or other Action relating to or arising under Environmental Laws that is pending or, to the Knowledge of the Sellers, threatened against any Seller or any real property operated or leased by any Seller, (c) none of the Leased Real Property has been listed on the federal Comprehensive Environmental Response, Compensation Liability Information System (CERCLIS) database or any other similar federal, provincial or state list of known or suspected contaminated sites, (d) no Hazardous Materials have been treated, stored or Released by any Seller at the Leased Real Property in any manner or concentration that requires investigation, removal or remediation under Environmental Laws, and (e) no Seller has received any notice of or entered into any order, settlement, judgment, injunction or decree involving uncompleted, outstanding or unresolved material obligations, Liabilities or requirements relating to or arising under Environmental Laws.

4.20    Vendors and Suppliers. Schedule 4.20(a) sets forth a complete and accurate list of all Significant Vendors/Suppliers. "Significant Vendors/Suppliers" are: the twenty (20) vendors and/or suppliers of each Seller that have sold the most, in terms of dollar value, products or services to the Business during the calendar year ended December 31, 2019. True, correct and complete copies of all written Contracts (other than purchase orders issued under a master agreement) with Significant Vendors/Suppliers have been provided or made available to the Purchaser. No Significant Vendor/Supplier has given any Seller written notice or, to the Knowledge of the Sellers, oral notice terminating, canceling or materially reducing, or threatening to terminate, cancel or materially reduce, any Contract or relationship with such Seller. Except as set forth in Schedule 4.20(b), no Significant Vendor/Supplier has proposed in writing, or given any Seller written notice or, to the Knowledge of the Sellers, oral notice of its intention to propose, any material price structure changes or any other material changes to any Contract with such Seller, nor to the Knowledge of the Sellers, does any Significant Vendor/Supplier intend to propose a material change to the price structure of any such Contract or any other material change to any such Contract.

4.21    Inventory. The Sellers have managed their Inventory in the Ordinary Course of Business in light of the present and anticipated volume of the Business, including with respect to the usability, salability and merchantability thereof. None of the Inventory has been part of a current or past product recall.

4.22    Financial Statements.

(a)    The Sellers have delivered or made available to the Purchaser the following financial statements: (a) the audited consolidated balance sheet of Intermediate as of December 30, 2018, and the related consolidated statement of operations, consolidated statements of shareholder's deficit, and cash flows for the fiscal year then ended (the "Audited Financial Statements"), and (b) the unaudited consolidated balance sheet of Intermediate (the "Most Recent Balance Sheet") as of February 29, 2020 (the "Balance Sheet Date"), and the related unaudited consolidated statements of operations and consolidated statement of cash flows for the 2-month period then ended (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"). Each of the Financial Statements (i) has been prepared in accordance with GAAP applied on a consistent basis throughout the

periods covered thereby (subject, in the case of the Unaudited Financial Statements, to normal recurring year-end adjustments and the absence of all footnotes thereto); and (ii) fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of Intermediate and its subsidiaries as of the respective dates thereof and for the periods referred to therein.

(b)  Except as set forth on Schedule 4.22(b) no Seller has any Liabilities, except (i) Liabilities reflected on the liabilities side of the Most Recent Balance Sheet, (ii) Liabilities that have arisen after the Balance Sheet Date in the Ordinary Course of Business or otherwise in accordance with the terms and conditions of this Agreement (none of which is a material Liability) and (iii) Liabilities of the type that are not required to be reflected on a balance sheet prepared in accordance with GAAP (none of which is a material Liability).

4.23  Gift Cards; Season Passes; Customer Deposits.  As of the Execution Date, (i) the amount of all Liabilities of the Sellers in respect of gift cards, merchandise credits, coupons and any other similar arrangement or program, in each case, related to the Purchased Assets is no greater than $479,239; (ii) the amount of deferred revenue attributed to season passes or any other similar arrangement or program, in each case, related to the Purchased Assets is no greater than $2,451,563; and (ii) the amount of customer deposits placed with or paid to a Seller in connection with events, parties or gatherings related to the Purchased Assets is not greater than $103,568.

4.24  Affiliate Transactions.  Except as set forth on Schedule 4.24, to the Knowledge of the Sellers, no Affiliate of the Sellers (other than any other Seller or any of their respective subsidiaries), or any officer or director of the Sellers or any of their subsidiaries or any member of their immediate family (a) has any material interest in any of the Purchased Assets, (b) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as, a material supplier or customer of the Business, (c) has any cause of action or other claim whatsoever against or related to the Business or the Purchased Assets, or (d) is party to any agreement or transaction with the Sellers or their subsidiaries, other than employment arrangements in the Ordinary Course of Business.

4.25  Condition of Assets.  Except as set forth on Schedule 4.25, the Purchased Assets are, in all material respects, in good repair and operating condition, ordinary wear and tear excepted, as is suitable for their intended use.  Except as set forth on Schedule 4.25, all of the Purchased Assets that are amusement rides (including related equipment) have been operated and maintained in all material respects in substantial compliance with all applicable laws and regulations of the state in which they are located, and to the extent any such Purchased Assets have been inspected by a Governmental Body for operation during 2019, such Assets have been approved for operation.  The Sellers have operated and maintained all such Purchased Assets in accordance with prudent practice consistent with industry standards applicable to the operation of a regional amusement part, including compliance in all material respects with applicable manufacturers' written operation and maintenance recommendations.

Notwithstanding anything to the contrary in this Agreement, Purchaser acknowledges and agrees that Purchaser's sole and exclusive recourse and remedy by virtue of any breach at any time of any of the representations and warranties set forth in this Article 4 shall be to terminate

this Agreement pursuant to the provisions of Section 3.4(g) hereof; provided, that this paragraph shall in no way limit (a) Sellers' obligations under Section 8.4(b) or any rights or remedies of Purchaser for Sellers' failure to comply therewith or (b) the satisfaction of Section 9.3(a) as a condition to Purchaser's obligation to consummate the transaction contemplated by this Agreement.

**ARTICLE 5**

**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

The Purchaser hereby makes the representations and warranties in this Article 5 to the Sellers as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

5.1     Organization and Qualification.   The Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  The Purchaser is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated, or the business conducted by it require such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.  The Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.

5.2     Authority Relative to This Agreement.   The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, and (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby.   The execution and delivery by the Purchaser of this Agreement and each of the Purchaser Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite limited liability company action on behalf of the Purchaser.  This Agreement has been, and at or prior to the Closing each of the Purchaser Ancillary Agreements will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of the Purchaser Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

5.3     Conflicts; Consents and Approvals.

(a)     None of the execution and delivery by the Purchaser of this Agreement or any of the Purchaser Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with or result in a breach of any provision of (i) the limited liability company agreement (or similar organizational or governing documents) of the Purchaser, (ii) any

33

Contract to which the Purchaser is a party or by which the Purchaser or any of its properties or assets is bound, or (iii) any applicable Law, other than, in the case of clauses (ii) and (iii), such conflicts or breaches that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)     No approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Purchaser in connection with the execution and delivery by the Purchaser of this Agreement or the Purchaser Ancillary Agreements, or the consummation by the Purchaser of the transactions contemplated hereby or thereby, except for such approvals, orders, Permits, consents, registrations, declarations, notifications or filings the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.

5.4     Litigation.  There are no material Actions pending or, to the knowledge of the Purchaser, threatened against the Purchaser which, if adversely determined, would reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.  The Purchaser is not subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other Governmental Body which would reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.

5.5     Brokers and Finders.  The Purchaser has not employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

5.6     Investigation.  In entering into this Agreement, the Purchaser has relied upon its own investigation and analysis as well as the representations and warranties made by the Sellers in Article 4, and the Purchaser acknowledges that neither the Sellers nor any of their respective Affiliates makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to the Purchaser or any of its Affiliates, except as and only to the extent expressly set forth in Article 4.

## ARTICLE 6

## EMPLOYEES

6.1     Employee Offers.

(a)     On or prior to the Closing Date the Purchaser shall offer employment as of the Closing Date (on an "at will" basis) with the Purchaser or one of its Affiliates to such employees of the Sellers as determined by the Purchaser in its sole and absolute discretion.  Each such offer of employment shall be for a comparable position and at the substantially same hourly

wage rate or salary level (excluding performance-based or incentive compensation, bonuses and equity-based compensation, as applicable) in effect immediately prior to the Execution Date; provided, however, that with respect to Transferred Employees (as defined below in this Section 6.1) who enter into written employment Contracts with the Purchaser at the Closing (the "New Employment Contracts"), the terms of such New Employment Contracts shall govern such Transferred Employee's employment.  In addition, any offer of employment to any such employee of the Sellers who is a party to a written employment Contract with a Seller that entitles such employee to severance upon a termination of employment by such Seller will require, as a condition to the acceptance of such offer of employment, that such employee waive in writing his or her right to receive such severance from the Sellers and the Purchaser; provided, however, that the Purchaser shall be entitled to waive such condition if such employee does not agree to provide such waiver.  Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on the Purchaser any obligation to retain any Transferred Employee in its employment or the employment of any of its Affiliates.

(b)      Except as described in the remaining sentences of this Section 6.1, the employment of each Transferred Employee with the Purchaser or any of its Affiliates will commence immediately upon the Closing.  In the case of any Transferred Employee who is absent from active employment and receiving short-term disability or workers' compensation benefits, or is otherwise out of work on an approved leave of absence as set forth above, the employment of such Transferred Employee with the Purchaser or its designated Affiliate will commence upon his or her return to active work, and such individual will become a Transferred Employee as of such date (but only if the Closing occurs).  Each employee of a Seller to whom the Purchaser has made an offer of employment pursuant to this Section 6.1 and that has accepted such offer and commences employment with the Purchaser or any of its Affiliates on the Closing Date is hereinafter referred to as a "Transferred Employee".  The Sellers shall not and shall not authorize or direct any of their Affiliates, officers, directors or employees to (x) interfere with the Purchaser's right to make offers pursuant to this Section 6.1, (y) solicit or encourage any employees of the Sellers who receive an offer from the Purchaser pursuant to this Section 6.1 to not accept or otherwise reject any such offer or (z) voluntarily terminate any employee of Sellers (other than those employees the Purchaser determines not to make an offer to (in its sole and absolute discretion) (collectively, the "Rejected Employees")) without the prior written consent of the Purchaser, except in the case of termination for cause.  The Sellers shall provide cooperation and information to the Purchaser as requested by the Purchaser regarding its determination of appropriate terms and conditions of employment for any potential Transferred Employees.

(c)      Notwithstanding anything to the contrary herein, except as expressly provided in Section 1.3 (but subject to the limitations set forth therein), the Purchaser shall have no Liability with respect to any past, present or future employee of any Seller, provided, however, that:

(i)      the Purchaser shall directly pay (or cause to be paid) or reimburse Sellers (the manner of Purchaser's bearing such obligation shall be at Purchaser's option) for (A) all earned and accrued wages, salaries and health benefits, in each case that are either or both earned and accrued in the Ordinary Course of Business from the Petition Date until the Closing by any employee of any Seller who is a Rejected Employee as of

35

the Closing; provided, in accordance with Section 1.3(e), in no event shall Purchaser be required to pay any amounts pursuant to this Section 6.1(c)(i)(A) in the aggregate, together with any amounts assumed by Purchaser pursuant to Section 1.3(e), in excess of an amount equal to $160,000, and (B) solely to the extent required to be paid in cash under applicable Law or policy all accrued vacation or sick leave time, in each case accrued in the Ordinary Course of Business as of the Closing by any employee of any Seller who is a Rejected Employee as of the Closing; provided, that Purchaser's aggregate payment and reimbursement obligations and amount honored pursuant to this Section 6.1(c)(i)(B) and Section 6.1(c)(ii) shall not exceed an amount equal to (1) $277,000 less (2) any amounts paid by Sellers at or prior to the Closing with respect to any of the Liabilities described in Section 6.1(c)(i)(B) and Section 6.1(c)(ii); and

(ii)    subject to the limitation set for in the proviso in Section 6.1(c)(i)(B), Purchaser shall honor all accrued vacation or sick leave time, in each case accrued in the Ordinary Course of Business as of the Closing (or, if later, the date on which such employee becomes a Transferred Employee) by any employee of any Seller who becomes a Transferred Employee; provided that in the event that any such employee is entitled in accordance with applicable Law or policy, notwithstanding such employee becoming a Transferred Employee, to be paid in cash for such time in connection with the termination of such employee's employment with Sellers, then the Purchaser shall directly pay (or cause to be paid) or prefund Sellers all such accrued vacation or sick leave time (the manner of Purchaser's bearing such obligation shall be at Purchaser's option).

6.2    Assumed Seller Plans.    Except as otherwise set forth in this Section 6.2, the Purchaser shall adopt and assume, as of the Closing Date, each of the Assumed Seller Plans with respect to all benefits to be provided under the provisions of such Assumed Seller Plans that are Assumed Liabilities.  With respect to each Assumed Seller Plan, the Purchaser or any Person designated by the Purchaser, will be substituted for the applicable Seller as the plan sponsor under each such Assumed Seller Plan and the Purchaser shall have all rights of such Seller thereunder, including full authority to maintain, amend or terminate any such Assumed Seller Plan at any time, in the Purchaser's sole discretion. The Sellers agree to reasonably cooperate with the Purchaser in adopting and effectuating any plan amendments to the Assumed Seller Plans reasonably desired by the Purchaser, so long as such amendments are effective as of, or after, the Closing Date and are consistent with applicable Law. The parties agree to reasonably cooperate in taking any actions necessary to implement the assumption by the Purchaser of the Assumed Seller Plans. Without limiting the obligations of the Sellers under Section 1.1, before, or as soon as reasonably and administratively practicable after, the Closing, the Sellers will supply the Purchaser with (a) all records concerning participation, vesting, accrual of benefits, payment of benefits, and election forms of benefits under each Assumed Seller Plan, and (b) any other information reasonably requested by the Purchaser as necessary or appropriate for the administration of each Assumed Seller Plan. Notwithstanding the foregoing, the Purchaser shall not assume any Liabilities arising out of any acts or omissions of any of the Sellers or any fiduciaries or trustees of any Assumed Seller Plan occurring on or prior to the Closing Date in connection with the operation or administration of such Assumed Seller Plan. Sellers shall retain all Liabilities for (i) the payment or provision of severance or similar benefits in connection with the termination of employment of any Transferred Employee as of the Closing Date, the

termination of employment of any current or former employee of a Seller who is not a Transferred Employee (whether before, as of, or after the Closing Date) and (ii) the payment or provision of any change in control payment, transaction bonus or similar benefits arising as a result of the transactions described herein, and no such Liabilities shall be assumed by the Purchaser under this Section 6.2, Section 1.3 or otherwise.

6.3     WARN Act Liability.  Except as set forth on Schedule 6.3, no Seller has, within ninety (90) days prior to the date of this Agreement, terminated any employees for any reason, closed any plant or facility, effectuated any layoffs of employees or implemented any early retirement, separation or similar program (regardless of whether such termination would trigger any obligations under the WARN Act), nor has any Seller announced any such action or program for the future.  The Sellers shall be solely responsible, on a joint and several basis, for any obligations or other Liabilities under the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law, that might arise on or prior to the Closing Date, or as a consequence of the transactions contemplated by this Agreement, including providing any notice of layoff or plant closing, or maintaining the employees of any Seller on such Seller's payroll for any period of notice required by the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law.  The Sellers shall retain all Liabilities, if any, for any severance or termination costs relating to employees of any Seller who, on or prior to the Closing Date, experience a termination of employment by any Seller as a result of the transactions contemplated by this Agreement.

6.4     No Third-Party Beneficiaries.

(a)     Notwithstanding anything set forth in this Article 6, nothing contained herein, whether express or implied, (i) shall be treated as an amendment or other modification of any Seller Plan or (ii) shall limit the right of the Purchaser or any of its Affiliates to amend, terminate or otherwise modify any Seller Plan or any of the Purchaser's or any of its Affiliate's employee benefit plans or programs following the Closing Date.

(b)     Without limiting the generality of Section 11.11, the Sellers and the Purchaser acknowledge and agree that all provisions contained in this Article 6 with respect to current and former employees of the Sellers are included for the sole benefit of the Sellers and the Purchaser, and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any current or former employees, directors, officers or consultants of any Seller, any participant in any Seller Plan, or any dependent or beneficiary thereof, or (ii) to employment or continued employment with the Purchaser or any of its Affiliates.

## ARTICLE 7

## BANKRUPTCY COURT MATTERS

7.1     Competing Bids.  This Agreement and the transactions contemplated hereby are subject to the Sellers' right and ability to solicit, negotiate and/or discuss and consider higher or better competing bids with respect to the Business and the Purchased Assets pursuant to the Bid Procedures, as approved by the Bid Procedures Order.  In accordance with the Bid Procedures,

37

until the conclusion of the Auction, the Sellers shall have the right to, and may cause their Representatives and Affiliates to, (a) initiate contact with, solicit, discuss or encourage submission of any inquiries, proposals, offers or bids by, and discuss and/or negotiate with, any Person (in addition to the Purchaser and its Affiliates and Representatives) in connection with any sale or other disposition of the Purchased Assets; (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person; and (c) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing; provided, that the exercise of all such rights described in this Section 7.1 shall be exercised solely in compliance with, and not in a manner inconsistent with, the Bid Procedures, as approved by the Bid Procedures Order.

7.2     Bankruptcy Court Filings. The Sellers shall use commercially reasonable efforts to obtain entry of the Bid Procedures Order and the Sale Order. The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Bid Procedures Order and the Sale Order and a finding of adequate assurance of future performance by the Purchaser of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Sellers shall consult with the Purchaser and its representatives concerning any order of the Bankruptcy Court relating to this Agreement or the Chapter 11 Cases and provide the Purchaser with copies of all applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), Sellers shall diligently defend against such appeal, petition or motion and shall use commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion; provided, that Sellers shall consult with the Purchaser regarding the status of any such actions. Any changes to the form of the Bid Procedures Order or the Sale Order must be approved by the Purchaser. Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

7.3     Bankruptcy Court Milestones. Sellers shall comply with the following timeline ("Bankruptcy Court Milestones"):

(a)     within three (3) Business Days after the Petition Date, the Sellers shall have filed the Sale Motion, including this Agreement;

(b)     no later than April 23, 2020, the Bankruptcy Court shall have, each in form and substance acceptable to the Sellers, the Purchaser, the DIP Agent and the Senior Secured Agent, (x) approved the (i) Bid Procedures and (ii) the form and manner of notice of the

38

Sale and assumption and assignment of executory contracts and unexpired leases and (y) scheduled the Auction and Sale Hearing;

(c)     no later than April 30, 2020, the Bankruptcy Court shall have, each in form and substance acceptable to the Sellers, the Purchaser, the DIP Agent and the Senior Secured Agent, approved the Sellers' retention of an investment banking firm acceptable to the Purchaser, the DIP Agent and the Senior Secured Agent (it being understood that Imperial Capital, LLC is acceptable to the Purchaser, the DIP Agent and the Senior Secured Agent);

(d)     the final date for submitting a qualified bid, as set forth in the approved Bid Procedures, shall be May 7, 2020 (the "Bid Deadline");

(e)     so long as at least one (1) qualified bid has been received (other than from Purchaser) the Auction shall be no later than May 8, 2020; and

(f)     no later than May 11, 2020, the Sale Hearing shall have occurred and the Bankruptcy Court shall have approved the transactions contemplated by this Agreement.

## ARTICLE 8

## COVENANTS AND AGREEMENTS

8.1     Conduct of Business of the Sellers.

(a)     During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) as required by the Bankruptcy Court, the Bankruptcy Code or other applicable Law, (2) as otherwise expressly contemplated by this Agreement or as set forth on Schedule 8.1(a) or (3) with the prior written consent of the Purchaser, each Seller (including Apex Beverage to the extent related to the Apex Beverage Liquor Licenses) shall:

(i)     Except with respect to any portion of the Purchased Assets and/or Business that is (x) not being operated for any period between the Execution Date and the Closing Date to the extent required by applicable Law in connection with the pending Coronavirus pandemic, and/or (y) shut down (or that remains closed to the public) subsequent to the Execution Date with the prior written consent of Purchaser (collectively, the foregoing are referred to as "Non-Operating Assets") conduct the Business and operate and maintain its assets and properties in the Ordinary Course of Business (including performing its obligations under the Material Contracts) in all material respects (taking into account such Seller's status as a debtor in possession); provided, however, in the event that Sellers are required to reopen and operate any portion of the Purchased Assets and/or Business pursuant to the provisions of this Section 8.1(a)(i) or another provision of this Agreement, Sellers shall not be in breach of this Agreement by virtue of their failure to do so in the event that such failure is the result of sufficient funds (as determined by the Purchaser and the DIP Agent in their respective sole discretion) being made available under to the DIP Financing Agreement to enable Sellers to so reopen and operate during the period prior to the Closing;

(ii)     maintain and keep its properties and Furniture and Equipment in good repair, working order and condition (normal wear and tear and casualty excepted) consistent with past practice; provided, however, during any period when any of its properties and/or Furniture and Equipment are Non-Operating Assets, Sellers shall be deemed to have satisfied their obligations under this Section 8.1(a)(ii) with respect to such properties and Furniture and Equipment by taking reasonable and customary precautions as to the safety and security of the same;

(iii)     make all premium payments required to maintain in full force and effect the Insurance Policies;

(iv)     use its commercially reasonable efforts (taking into account the extent to which some or all of the Purchased Assets and/or the Business are Non-Operating Assets) to (x) preserve the goodwill of and relationships with Governmental Bodies, customers, suppliers, vendors, lessors, licensors, licensees, contractors, distributors, insurers, agents, employees and others having business dealings with such Seller in connection with the Business; and (y) comply in all material respects with all applicable Laws (including Environmental Laws) and Permits and, to the extent consistent therewith, preserve its assets (tangible and intangible);

(v)     comply with the terms and conditions of the DIP Financing Agreement; and

(vi)     remain in material compliance with all privacy policies of the Sellers that are in place as of the date of this Agreement and cooperate with Purchaser to ensure that the transfer of all Personal Information to Purchaser in connection with the transactions contemplated by this Agreement will be consistent with such privacy policies.

During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) as required by the Bankruptcy Court, the Bankruptcy Code or other applicable Law, (2) as otherwise expressly contemplated by this Agreement or as set forth on Schedule 8.1(b), or (3) with the prior written consent of the Purchaser, no Seller shall:

(vii)     acquire any material assets, tangible or intangible, other than in the Ordinary Course of Business;

(viii)     sell, lease, transfer or assign any material assets or properties, tangible or intangible, other than (x) sales of Inventory in the Ordinary Course of Business, or (y) the disposition of obsolete or immaterial assets not necessary for the conduct of the Business by the Sellers in the Ordinary Course of Business;

(ix)     accelerate, terminate (other than at its stated expiry date), extend, modify or amend in any material respect or cancel any Material Contract, any leases or subleases for Leased Real Property or any Contract that would be a Material Contract if in effect on the Execution Date; waive, release or assign any material rights or claims

40

under any Material Contract, any leases or subleases for Leased Real Property or any Contract that would be a Material Contract if in effect on the Execution Date; or enter into any lease or sublease or any Contract that would have been a Material Contract or lease or sublease for Leased Real Property had it been entered into prior to the Execution Date;

(x)    impose, suffer or create any material Encumbrance (other than Permitted Encumbrances) upon any of the Purchased Assets that will not be removed at the Closing by the effect of the Sale Order;

(xi)    incur or make any capital expenditures, except to the extent permitted by the DIP Financing Agreement;

(xii)    transfer, assign, abandon, dispose, permit to lapse or grant any license or sublicense of, or any rights to use, any rights under or with respect to any Seller Intellectual Property, other than pursuant to license agreements entered into in the Ordinary Course of Business; take any action or knowingly fail to take any action that would reasonably be expected to result in the abandonment, cancellation or unenforceability of any Seller Intellectual Property; enter into any settlement regarding breach or infringement of any Seller Intellectual Property, or disclose to any Person (not an employee of the Sellers) any Seller Intellectual Property not heretofore a matter of public knowledge; provided, however, Sellers shall not be deemed to have breached or violated its obligations under this Section 8.2(b)(vi) solely by reason of Seller's not utilizing or operating any of the Seller Intellectual Property to the extent constituting Non-Operating Assets;

(xiii)    agree to any change in the rate of compensation, commission, bonus or other direct or indirect remuneration payable, or pay any bonus, incentive, retention or other compensation, retirement, welfare, fringe or severance benefit or vacation pay, to or in respect of, any executive officers or employees of such Seller, in each case, other than increases in base compensation or wage rate made in the Ordinary Course of Business or increases in compensation or benefits that Sellers are contractually obligated to make;

(xiv)    adopt, make or agree to (x) any welfare, pension, retirement, profit sharing, incentive compensation or similar plan, program, payment or arrangement for any current or former director, employee or consultant, except pursuant to the existing Seller Plans or (y) any new employment, severance or change of control agreement;

(xv)    make any material addition to, or modification of, any Seller Plan, other than (x) contributions to any Seller Plan made in the Ordinary Course of Business or (y) the extension of coverage to employees of such Seller who became eligible after the Execution Date;

(xvi)    materially change any Tax accounting elections, methods, principles or practices, except insofar as may be required by GAAP (or any official

41

interpretation thereof); settle or otherwise finally resolve any audit or other proceeding with respect to Taxes; amend any Tax Return with respect to a material amount of Taxes;

(xvii) make any distributions or dividends of any Cash and Cash Equivalents, assets or properties of the Sellers (other than Excluded Assets) in respect of outstanding securities of the Sellers;

(xviii) fail to use commercially reasonable efforts to manage working capital of the Business in the Ordinary Course of Business (taking into account that Sellers' status as debtors-in-possession and the existence and/or any ongoing effects of the Coronavirus pandemic);

(xix) subject to the provisions hereof relating to determination of Cure Costs and Sellers' right to comply with their obligations thereunder, institute, settle or agree to settle any litigation, proceeding or other Action before any court or other Governmental Body;

(xx) agree to any limitations not existing as of the Execution Date on such Seller or any of its subsidiaries from engaging or competing in any line of business or in any geographic area or location or otherwise with any Person or from soliciting or hiring any Person;

(xxi) make any material change in the nature of the Business (taking into account that Sellers' status as debtors-in-possession and extent to which some or all of the Purchased Assets and/or the Business are Non-Operating Assets);

(xxii) [reserved];

(xxiii) cancel or terminate any insurance policy naming any Seller as a beneficiary or a loss payable payee;

(xxiv) assume or enter into any labor or collective bargaining agreement;

(xxv) modify in any material respect any privacy policies, notices or statements in a manner that limits the ability or right of any Seller to sell and transfer the Personal Information or other customer data to Purchaser as contemplated herein, or limits the use of the Personal Information or other customer data by Purchaser after the Closing;

(xxvi) amend or change, as applicable, any of the Seller Organizational Documents; or

(xxvii) enter into any Contract to take any of the actions prohibited by the foregoing clauses (b)(i) through (b)(xxvi).

8.2    Access to Information. From the Execution Date until the earlier of the Closing and the termination of this Agreement in accordance with Section 3.4, each of the Sellers shall afford the officers, directors, employees, auditors and other agents and representatives of the

42

Purchaser (such people, with respect to any Seller or the Purchaser, as applicable, the "Representatives") reasonable access, during business hours and upon advance written notice to (a) the employees, the properties, offices and other facilities of the Sellers and, (b) to the extent not prohibited by Law, all books and records, facilities, Contracts and all financial, operating and other data and information, with respect to the Business that are in the possession of the Sellers, in each case, as the Purchaser may reasonably request.  In exercising its rights hereunder, the Purchaser shall conduct itself so as not to interfere in the conduct of the business of the Sellers prior to the Closing.

8.3     Assignability of Certain Purchased Assets.

(a)     To the extent that the assignment to the Purchaser of any Purchased Asset (including any Assigned Contracts or any Permits included in the Purchased Assets) pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Law and such consent, waiver, confirmation or other approval or waiver of such prohibition in compliance with Law cannot be obtained prior to the Closing or overridden or canceled by the Sale Order or other related order of the Bankruptcy Court (such Purchased Assets, the "Nonassignable Assets"), then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Nonassignable Asset or any right or interest therein unless and until such consent, waiver, confirmation or other approval is obtained or such prohibition is waived in compliance with Law.  If any such consent, waiver, confirmation or other approval or waiver of such prohibition is not obtained prior to the Closing Date in respect of a Nonassignable Asset, then, solely to the extent not prohibited under applicable Law (including the Bankruptcy Code) or the terms of such Nonassignable Asset, the Purchaser and the Sellers (including Apex Beverage with respect to the Apex Beverage Liquor Licenses) shall reasonably cooperate with each other, as of and after the Closing Date for so long as the Sellers (other than Apex Beverage) are still debtors-in-possession in the Chapter 11 Cases or as of and after the Closing Date in the case of Apex Beverage, in each case, in any lawful and feasible arrangement designed to provide the Purchaser with the benefits of, or under, the applicable Nonassignable Asset, including enforcement for the benefit of the Purchaser of any and all rights of the Sellers against any party to the applicable Nonassignable Asset arising out of the breach or cancellation thereof by such party (an "Interim Arrangement").  The Purchaser shall be responsible for performing all obligations under each such Nonassignable Asset required to be performed by the Sellers after the Closing Date to the extent that if such Nonassignable Asset were transferred and assigned to the Purchaser as of the Closing Date, the obligations thereunder would have constituted Assumed Liabilities.  Unless the Purchaser elects that it does not desire assignment of a Nonassignable Asset (which election it may make on not less than two days' written notice to Sellers), following the Closing, the Sellers and the Purchaser shall cooperate using their respective commercially reasonable efforts to obtain as expeditiously as reasonably possible the applicable consent, waiver, confirmation or other approval with respect to each Nonassignable Asset and/or a waiver of any prohibition under applicable Law necessary for the assignment thereof to the Purchaser.  Nothing in this Section 8.3(a) shall obligate the Purchaser to waive any right or condition under this Agreement or obligate Sellers to pay any fee or charge or other similar payment to any counterparty in order to obtain any consent, waiver or other approval from any counterparty required for assignment of any Nonassignable Asset to Purchaser.  Without limiting the generality of the foregoing, the Sellers' (including Apex Beverage) cooperation shall include executing and delivering such documents as may be

reasonably necessary or desirable to enable the Purchaser to continue to sell food and beverages (including alcoholic beverages, where applicable), without interruption, after the Closing.

(b)    The Sellers (including Apex Beverage) shall, prior to and after the Closing for so long as the Sellers (other than Apex Beverage) are still debtors-in-possession in the Chapter 11 Cases or, in the case of Apex Beverage, prior to and after the Closing, in each case, take all steps reasonably necessary and shall cooperate and comply with all reasonable requests of the Purchaser to do any one or more of the following (at the Purchaser's election in its sole discretion) with respect to any or all of the Permits that are held by the Sellers (including Apex Beverage) or that are advisable, reasonably necessary, or required by Law to own, lease and operate the Purchased Assets and to own, operate and conduct the Business in the Ordinary Course of Business: (i) transfer or assign such Permits to the Purchaser; (ii) allow the Purchaser to obtain or acquire such Permits; (iii) enter into Interim Arrangements on terms and conditions reasonably satisfactory to the Purchaser and Sellers to allow the Purchaser to operate the Business under or with respect to the Permits held by or on behalf of any Seller (including Apex Beverage) (in which case the Sellers (including Apex Beverage) shall keep and maintain the corresponding Permits in accordance therewith); and (iv) make such other arrangements as may be reasonably requested by the Purchaser to accomplish the intentions and objectives of this Agreement.

8.4    Contracts and Leases.

(a)    From the Execution Date until the Closing Date, without the prior written consent of the Purchaser, (i) no Seller shall reject any Contract in the Chapter 11 Cases or any other bankruptcy proceeding or terminate, amend, supplement, modify or waive any rights under, or create any Encumbrance with respect to any Contract, or take any affirmative action not required by the terms thereof, and (ii) Sellers shall hold all Permits and other assets specified by the Purchaser in writing in abeyance pending designation for assignment or exclusion by the Purchaser in accordance with Section 1.5.

(b)    From the Execution Date until the Closing Date, the Sellers shall (i) promptly disclose to the Purchaser in writing after attaining Knowledge of any material failure of any of the Sellers to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided; however; that the delivery of any notice pursuant to this Section 8.4(b) shall not limit or otherwise affect the remedies available to the Purchaser after receiving such notice under this Agreement; and (ii) without in any way limiting the Purchaser's rights under Section 8.1(b), keep the Purchaser timely apprised of all material communications and inquiries, including all offers and reports, regarding the restructuring, modification, assignment or termination of any of the leases or subleases for the Leased Real Property.

8.5    Further Agreements.    Each Seller shall (a) promptly deliver to the Purchaser any mail or other communication received by such Seller after the Closing Date and relating to the Business, the Purchased Assets or the Assumed Liabilities, (b) promptly transfer in immediately available funds to the Purchaser any cash, electronic credits or deposits received by such Seller to the extent that such cash, electronic credits or deposits are Purchased Assets and (c) promptly forward to the Purchaser any checks or other instruments of payment that it receives to the extent

44

that such checks or other instruments are Purchased Assets. The Purchaser shall (i) promptly deliver to the Sellers any mail or other communication received by it after the Closing Date and solely relating to the Excluded Assets or the Excluded Liabilities, (ii) promptly wire transfer in immediately available funds to the Sellers, any cash, electronic credits or deposits received by the Purchaser but solely to the extent that such cash, electronic credits or deposits are Excluded Assets and (iii) promptly forward to the Sellers any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Excluded Assets.

8.6    Preservation of Records. The Sellers and the Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business, the Purchased Assets and the Assumed Liabilities until the later of the closing of the Chapter 11 Cases and the liquidation and winding up of the Sellers' estates (but in no event later than five (5) years after the Closing Date except, in the case of Tax matters, until thirty (30) days following the expiration of the period of any applicable statute of limitations) and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of the Sellers or the Purchaser or any of their respective Affiliates or in order to enable the Sellers or the Purchaser to comply with their respective obligations under this Agreement or any of the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby. In the event the Sellers or the Purchaser wishes to destroy such records at the end of such preservation period, such party shall first give sixty (60) days' prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such sixty (60) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice, or such shorter period as the liquidation and winding up of the Sellers' estates shall permit. Notwithstanding anything to the contrary in this Section 8.6, Purchaser and Sellers shall be relieved of any continuing obligations under this Section 8.6 concurrently with the closing of their Chapter 11 Cases so long as Sellers shall theretofore have given Purchaser sixty (60) days' prior written notice (a "Case Closing Notice"); provided, Purchaser shall have had the right, at its option and sole expense, upon prior written notice given to Sellers within such sixty (60) day period, to take possession of Sellers records within one hundred and twenty (120) days after the date of such Case Closing Notice.

8.7    Publicity. The Sellers or the Purchaser may issue a press release or public announcement concerning this Agreement or the transactions contemplated hereby only with the prior written approval of the other parties hereto, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of the disclosing party, such disclosure is otherwise required to comply with applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Chapter 11 Cases. The party intending to make any such release referred to in the immediately preceding sentence shall use its commercially reasonable efforts, consistent with such applicable Law or Bankruptcy Court requirement, to consult with the other parties with respect to the text thereof.

8.8    Prohibition on Use of Purchased Names. Each Seller hereby agrees that, on and at all times following the Closing Date, it shall not use and shall cease using, and shall cause its respective Affiliates not to use and to cease using, directly or indirectly, the Purchased Names,

any trademarks included in the Owned Intellectual Property and any like names or combinations of words or derivations thereof or any names or marks confusingly similar thereto; provided, however, that each Seller may continue to use as company names the Purchased Names solely for purposes of conducting and administering the Chapter 11 Cases provided that, prior to, on or as promptly as practicable after the Closing Date, the Sellers use reasonable efforts to change the caption of the Chapter 11 Cases to names that are not similar to any of the Purchased Names. In connection with the Closing, each Seller shall, at its expense, undertake and promptly pursue all necessary action to change its business and corporate names to new names bearing no resemblance to any of its present names so as to permit the use of the Purchased Names by the Purchaser or any of its Subsidiaries following Closing. In furtherance of the foregoing, each Seller will (a) revoke any filing that it may have made heretofore with any Governmental Body relating to its use of the Purchased Names and of any like names or combinations of words or derivations thereof and (b) prepare and file with the appropriate Governmental Bodies appropriate documents, including articles of amendment, changing its name so as to effectuate the same and promptly deliver evidence of such name change to the Purchaser.

8.9    Taxes.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "Transfer Taxes") shall be borne and timely paid by (i) the Purchaser up to the amount of the Assumed Transfer Taxes, and the Purchaser shall indemnify, defend (with counsel reasonably satisfactory to the Sellers), protect, and save and hold the Sellers harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes, and (ii) Sellers for any amounts in excess of the Assumed Transfer Taxes, and the Sellers shall indemnify, defend (with counsel reasonably satisfactory to Purchaser), protect, and save and hold the Sellers harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes. Purchaser and Sellers shall use commercially reasonable efforts to minimize any Transfer Taxes, including in connection with determining the allocation of the purchase price under this Agreement, to the extent permitted by applicable Law; provided that the foregoing will not require Purchaser to consent to any plan of reorganization of any Seller.

(b)    Sellers shall cooperate with Purchaser in connection with the filing of any Tax Returns or in connection with any Tax contest, in each case, relating to Transferred Assets. Such cooperation shall include the provision of records and information reasonably requested by the other parties which are reasonably relevant to any such Tax Return or Tax contest and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder

8.10    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement and applicable Law (and, as to Sellers, taking into account their status as debtors-in-possession), each Seller and the Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken,

all actions, and to do, or cause to be done, all things necessary, proper or advisable to ensure that the conditions precedent to the other parties' obligations hereunder set forth in this Agreement are satisfied and to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.

(b)     Subject to the terms and conditions of this Agreement, neither the Sellers nor the Purchaser shall take any action or refrain from taking any action the effect of which would be to delay or impede the ability of the Sellers or the Purchaser to consummate the transactions contemplated by this Agreement unless taking such action or refraining from taking such action is required by applicable Law.

(c)     Following the Execution Date and until the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, the Sellers, on the one hand, and the Purchaser, on the other hand, shall keep each other reasonably informed as to the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by the Sellers or the Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

(d)     Subject to the terms and conditions of this Agreement, at and following the Closing, each of the parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to the Purchaser and its successors and assigns, all of the Purchased Assets, and for the Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby.  Nothing in this Section 8.10 shall obligate any party hereto to waive any right or condition under this Agreement or require Sellers to incur any cost or expenses for which Purchaser is not required to reimburse Sellers pursuant to this Agreement.

(e)     Without limiting the generality of this Section 8.10(e) and solely to the extent that the Sellers and the Purchaser determine that any filing is required by the HSR Act with respect to the transactions contemplated by this Agreement, the Sellers and the Purchaser shall make all premerger notification and report form filings required by the HSR Act within ten (10) Business Days after the date on which the Purchaser provides notice to the Sellers that the Purchaser desires to make such filings, but, in any case, within two (2) Business Days following the date that the Sale Order is entered (or, if the Purchaser is not the Successful Bidder, but is the Back-Up Bidder in accordance with the Bid Procedures, no later than ten (10) Business Days following the date that the Purchaser, as the Back-Up Bidder, is selected as the new Successful Bidder), and promptly file any additional information requested as soon as practicable after receipt of such request therefor.  In connection with any filing under the HSR Act, the Sellers and the Purchaser shall (i) cooperate with each other, (ii) furnish to the other party all information necessary or desirable in connection with making such filing and in connection with resolving any investigation or other inquiry by any Governmental Body under the HSR Act with respect to the transactions contemplated by this Agreement, and (iii) supply such commercially reasonable assistance as may be requested by any other party in connection with the foregoing;

provided, however, that notwithstanding anything to the contrary contained herein, neither the Sellers nor the Purchaser (nor their respective ultimate parent entities, as such term is used in the HSR Act) shall be required to disclose to any other party, any information contained in its HSR Notification and Report Form which such party, in its sole and reasonable discretion, deems confidential. Each of the Sellers and the Purchaser shall use commercially reasonable efforts to take such action as may be required to cause the termination or expiration of the waiting periods under the HSR Act as promptly as possible after the date that the filings required by the HSR Act are first made (including specifically requesting early termination of the waiting period prescribed by the HSR Act). Notwithstanding the foregoing, the Purchaser is not required to, and the Sellers shall not without the prior written consent of the Purchaser, consent to any divestiture or other structural or conduct relief in order to obtain clearance from any Governmental Body. Each party shall bear its own costs in connection with the preparation or the making of any filing under the HSR Act or resolving any investigation or other inquiry by any Governmental Body under the HSR Act with respect to the transactions contemplated by this Agreement; provided, however, that the Sellers be solely responsible for the payment of any applicable filing fees under the HSR Act.

8.11    Delivery of Certain Financial Information. At least two (2) Business Days (but no more than four (4) Business Days) before the anticipated Closing Date (the "Closing Payments Schedule Delivery Date"), the Sellers shall deliver, or cause to be delivered, to the Purchaser a certified schedule setting forth the Sellers' good faith estimate of (i) all Assumed Liabilities that are due and payable in cash at or as of the Closing and (ii) all Cure Costs of the Assigned Contracts (the "Closing Payments Schedule" and, the aggregate amount set forth therein, the "Closing Payment Amount"), which Closing Payments Schedule shall be prepared in good faith based on assumptions believed by the Sellers to be reasonable at the time made and based on the best information then available to the Sellers (provided, that any Cure Cost with respect to any Assigned Contract that is a Disputed Amount Contract as of the Closing Payments Schedule Delivery Date shall be calculated based on the most recent amount asserted with respect to such Assigned Contract by the applicable non-Seller counterparty to such Assigned Contract (if the most recent amount asserted by any such non-Seller counterparty is a range of amounts, then such amount shall be the greatest amount in such range), excluding any indemnity claims and other contingent amounts except to the extent such amounts are reasonably likely to be paid at the Closing).

8.12    Personally Identifiable Information. The Purchaser hereby agrees to maintain all personally identifiable information obtained by the Purchaser in connection with the transactions contemplated by this Agreement in accordance with the Sellers' existing privacy policies (true and correct copies of which have been provided to the Purchaser by the Sellers as of the Execution Date); provided, however, that nothing in this Agreement shall be construed to prevent the Purchaser from modifying any such privacy policies following the Closing Date to the extent permitted under such privacy policies and applicable Law.

8.13    Confidential Information. Following the Closing, Sellers agree to maintain, and shall cause their respective Affiliates to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective Affiliate's possession or of which Sellers or any of their respective Affiliates are aware. Sellers hereby further agree, unless advised by their counsel that

48

disclosure is required by applicable Law, to take all appropriate steps, consistent with Sellers' past practice, and to cause each of their respective Affiliates to take all appropriate steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure, misuse, espionage, loss and theft. In furtherance and not in limitation of the foregoing, following the Closing, Sellers shall not, and shall cause their respective Affiliates not to, unless advised by their counsel that disclosure is required by applicable Law, disclose to any Person (a) any confidential information regarding the Business, provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 8.13 or information not otherwise known by the Sellers that becomes available to any Seller from a Person other than the Purchaser, a current or former employee of any Seller, or a Person known by any Seller to be bound by an obligation of confidentiality to any Seller, or (b) any of the discussions or negotiations conducted with the Purchaser in connection with this Agreement, provided, that Sellers shall be entitled to disclose (i) any information required to be disclosed by Sellers to the Bankruptcy Court in the Chapter 11 Cases, (ii) any information required to be disclosed by Sellers pursuant to any applicable Law (including the Bankruptcy Code) or (iii) any information to Sellers' counsel and financial advisor or other professionals; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required. Notwithstanding anything in this Section 8.13 to the contrary, unless Sellers are advised by counsel that disclosure is required by applicable Law, the confidentiality of any trade secrets of the Business or the Purchaser shall be maintained for so long as such trade secrets continue to be entitled to protection as trade secrets of the Business and the Purchaser, respectively.

8.14    Transition Services.  If requested by Purchaser prior to or after the Closing for so long as the Sellers are still debtors-in-possession in the Chapter 11 Cases, Purchaser and the Sellers agree to negotiate in good faith the terms of, and enter into effective as of the Closing (or, if such request is made by Purchaser after the Closing for so long as the Sellers are still debtors-in-possession in the Chapter 11 Cases, promptly following such request), a transition services agreement (the "TSA") acceptable to Purchaser, the Senior Secured Agent and the CRO; provided, the TSA, if any, shall (a) contain customary terms for transactions of the type contemplated by this Agreement with respect to the provision of services reasonably requested by Purchaser or the Senior Secured Agent for a reasonable period of time post-Closing (not to exceed the earlier of 180 days following the Closing and date on which the Sellers are no longer debtors-in-possession in the Chapter 11 Cases); and (b) provide that Purchaser shall pay Sellers the Sellers' actual costs for such transition services and actual and direct out-of-pocket expenses incurred by the Sellers in connection with the provision of such transition services; provided, that all actual and direct out-of-pocket expenses for third party advisors must be approved in advance by Purchaser or the Senior Secured Agent; provided, further, that Purchaser shall not be responsible, without Purchaser's or the Senior Secured Agent's prior consent, for any severance, retention, bonus, deferred compensation or other non-ordinary course employee compensation.

8.15    Gift Cards; Season Passes; Customer Deposits.  From and after the Closing Date, Purchaser shall honor (i) all outstanding gift cards, merchandise credits, coupons and any other similar arrangement or program related to the Business, (ii) all season passes and any other similar arrangement or program related to the Business and (iii) customer deposits placed with or paid to a Seller in connection with events, parties or gatherings, in each case that was validly

49

issued or deposited, as applicable, in the Ordinary Course of Business and has not, as of the Closing Date, expired and/or become subject to a limit or other provision that could cause the same to be subject to escheatment or any similar provision or condition under any applicable Law, in the case of each of the foregoing clauses (i) and (ii), solely if related to and issued or deposited, as applicable, either online or at an amusement park or other location subject to an Assumed Real Property Lease with proper authorization from the Sellers.

8.16  "As Is" Transaction. EXCEPT ONLY FOR THE REPRESENTATIONS AND WARRANTIES OF SELLERS CONTAINED HEREIN WHICH LAPSE AND TERMINATE UPON THE CLOSING AS PROVIDED IN SECTION 11.2 HEREOF, PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS OR ASSUMED LIABILITIES, INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH SUCH ASSETS AND LIABILITIES, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY (WHETHER REAL OR PERSONAL), THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY,  OR FITNESS FOR ANY PARTICULAR PURPOSE OR THE MAINTENANCE, SAFETY, CONDITION, QUALITY, OR OPERATION OF THE EQUIPMENT, AMUSEMENT ATTRACTIONS OR OTHER PERSONAL OR REAL PROPERTY OR OTHER PORTION OF THE PURCHASED ASSETS, OR ANY OTHER MATTER OR THING RELATING TO THE BUSINESS), THE PURCHASED ASSETS OR ANY PORTION THEREOF.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.  PURCHASER FURTHER  ACKNOWLEDGES  THAT  PURCHASER  HAS  CONDUCTED  AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMS OR DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, PURCHASER  WILL  DO  SO  BASED  SOLELY  UPON  SUCH  INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," "WITH ALL FAULTS."

## ARTICLE 9

### CONDITIONS TO CLOSING

9.1  Conditions Precedent to the Obligations of the Purchaser and the Sellers. The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in

writing by the Sellers and the Purchaser, in whole or in part, to the extent permitted by applicable Law and Section 11.3):

(a)     no temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall any proceeding or other Action brought by a domestic or foreign administrative agency or commission or other domestic or foreign Governmental Body seeking any of the foregoing be pending or threatened in writing; nor shall there be any action taken, or any statute, rule, regulation, order or other Law promulgated, enacted, entered, enforced or deemed applicable to the parties hereto which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded;

(b)     (i) the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, and each such order shall not have been stayed or vacated, (ii) no order of any Governmental Body staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date and (iii) the Sale Order shall not be subject to any challenge under section 363(m) of the Bankruptcy Code; and

(c)     any required filings under the HSR Act and any other applicable competition Laws, if any, shall have been made and any waiting periods thereunder (and any extensions thereof) shall have expired or been terminated.

9.2     Conditions Precedent to the Obligations of the Sellers.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers, in whole or in part, to the extent permitted by applicable Law and Section 11.3):

(a)     the representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be so true and correct in all material respects as of such date), and the Sellers shall have received a certificate signed by an authorized person of the Purchaser, dated the Closing Date, to the foregoing effect;

(b)     the Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate signed by an authorized person of the Purchaser, dated the Closing Date, to the foregoing effect;

(c)     the Purchaser shall have delivered, or caused to be delivered, to the Sellers (or at the direction of the Sellers) or the applicable third party, as applicable, all of the items set forth in Section 3.3; and

(d)    the Purchaser shall have delivered the Credit Bid Amount in accordance with Article 2.

9.3    Conditions Precedent to the Obligations of the Purchaser.  The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser, in whole or in part, to the extent permitted by applicable Law and Section 11.3):

(a)    (i) except as set forth in clause (ii) below, the representations and warranties of each Seller contained in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be so true and correct as of such date), except for such failures to be true and correct as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) the representations and warranties of each Seller contained in Section 4.1, Section 4.2, Section 4.3, Section 4.10 and Section 4.23 shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for any such representations and warranties that are made as of a specific date which shall be so true and correct in all material respects as of such date) and, in each case, the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(b)    Since the Execution Date, there shall not have occurred any event, circumstance, change, occurrence or state of facts that, individually or together with all other event, circumstance, change, occurrence or state of facts, has had, or would reasonably be expected to have, a Material Adverse Effect;

(c)    each Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date, and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(d)    the Sellers shall have delivered, or caused to be delivered, to the Purchaser or the other applicable parties all of the items set forth in Section 3.2;

(e)    no "Default" under the DIP Financing Agreement or "Event of Default" under the DIP Financing Agreement shall have occurred and be continuing;

(f)    the sum of the aggregate Determined Cure Costs shall not exceed $1,320,950 (the "Cure Costs Cap") for all of the Contracts to which any Seller is a party excluding any Cure Costs for the Real Property Leases for the Closed Parks and the other Contracts included in the *Debtors' Omnibus Motion Seeking Entry Of An Order (I) Authorizing The Rejection Of (A) Certain Unexpired Leases And (B) Certain Executory Contracts, Each Effective As Of The Petition Date, (Ii) Authorizing The Abandonment Of Certain Personal Property, Effective As Of The Petition Date, And (Iii) Granting Related Relief,* filed with the

Bankruptcy Court on or about the date hereof; provided, the Cure Costs Cap shall be reduced on a dollar-for-dollar basis by the amount of the proposed Cure Costs set forth in the Original Contract & Cure Schedules for any Contract that is rejected prior to the Closing Date with Purchaser's prior written consent in accordance with Section 8.4(a);

(g)     at the Closing, substantially all Purchased Assets, including all Assigned Contracts, shall be validly and lawfully delivered, transferred and/or assigned by the Sellers to the Purchaser and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect; provided, however, that the condition set forth in this Section 9.3(g) shall not apply to (i) Permits that by their terms cannot be transferred to Purchaser prior to the Outside Date, provided, that (A) the Sellers and the Purchaser shall have agreed to an Interim Arrangement with respect to any such Permit in accordance with Section 8.3 that will allow the Purchaser to receive the benefits of, and to make use of, such Permit in the conduct of the Business in the Ordinary Course of Business, and (B) any such Interim Arrangement referred to in clause (A) shall be (w) on terms, and subject to conditions, that are acceptable to the Purchaser in all respects, (x) in a written agreement executed by the Sellers and the Purchaser, in form and substance satisfactory to the Purchaser in all respects, (y) in effect, and not subject to any unfulfilled conditions and contingencies, as of the Closing, and (z) approved by the Bankruptcy Court pursuant to the Sale Order, (ii) any Purchased Assets that are not material (either individually or in the aggregate) to the conduct of the Business, which, for the avoidance of doubt, shall not include any Assumed Real Property Leases; (iii) any Purchased Assets in transit as of the Closing Date (whether in transit to the locations which are the subject of any Assumed Real Property Lease or from one such location to another); and (iv) any Purchased Assets located at any Closed Park; and

(h)     the DIP Agent, the DIP Lenders, the Senior Secured Agent and the Senior Secured Lenders and their respective Related Parties shall have received full and final releases from the Sellers' estates by virtue of the Sale Order, the Final Order (as defined in the DIP Financing Agreement) or otherwise.

## ARTICLE 10

## ADDITIONAL DEFINITIONS

10.1     Certain Definitions.  As used herein:

(a)     "Accounts Receivable" means (i) any and all accounts receivable, trade accounts and other amounts receivable owed to any Seller and any other rights of any Seller to payment from third parties, including those reflected (or required to be reflected under GAAP) in the books and records of such Seller, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped, products sold or services rendered, in each case owing to such Seller; (ii) all other accounts or notes receivable of any Seller and the full benefit of all security for such accounts or notes receivable; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon.

53

(b)   "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(c)   "Alternative Transaction" means a sale or sales of any of the Purchased Assets to a Person other than the Purchaser or an Affiliate of the Purchaser, whether effected pursuant to a merger, consolidation, asset acquisition, share exchange, amalgamation or plan of reorganization, excluding any sales of Inventory in the Ordinary Course of Business.

(d)   "Ancillary Agreements" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(e)   "Approved Budget" has the meaning ascribed to such term in the DIP Financing Agreement.

(f)   "Auction" has the meaning ascribed to such term in the Bid Procedures Order.

(g)   "Avoidance Actions" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller arising under Chapter 5 of the Bankruptcy Code.

(h)   "Back-Up Bidder" has the meaning ascribed to such term in the Bid Procedures Order.

(i)   "Bid Procedures" has the meaning ascribed to such term in the Bid Procedures Order.

(j)   "Bid Procedures Order" means an order of the Bankruptcy Court in form and substance satisfactory to the Sellers and the Purchaser.

(k)   "Business" means any and all business activities of any kind that are conducted by the Sellers as of the Execution Date or at any time through (and including) the Closing Date, including, among other things, the operation of family entertainment centers and gated amusement parks, featuring, including the following: miniature golf, batting cages, go-carts, video arcades, rides, water attractions, branded retail sales and on-location dining.

(l)   "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(m)   "Cash and Cash Equivalents" means, collectively, all of the Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, net of

uncleared checks issued by Sellers that are not yet reflected in the applicable bank account of Sellers.

(n)     "Closed Parks" means Indiana Beach Boardwalk Resort, Fantasy Island Amusement Park, Boomers! Houston and SpeedZone Dallas.

(o)     "Code" means the Internal Revenue Code of 1986, as amended.

(p)     "Contract" means any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other agreement or arrangement.

(q)     "CRO" has the meaning given thereto in the DIP Financing Agreement.

(r)     "Cure Costs" means the amounts necessary to cure all defaults, if any, and that must be paid in connection with the assumption of each Assigned Contract pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code.

(s)     "Determined Cure Cost" means, with respect to the Cure Cost of any particular Contract, that such Cure Cost is finally established, by the Bankruptcy Court or by agreement by the parties to such Contract at the date or time in question.

(t)     "DIP Agent" means Cerberus Business Finance, LLC, in its capacity as the administrative agent under the DIP Financing Agreement.

(u)     "DIP Financing Agreement" means that certain Senior Secured Debtor-In-Possession Financing Agreement, dated as of April 8, 2020, by and among Intermediate, Apex Parks, the "Guarantors" party thereto, the "DIP Lenders" thereunder and Cerberus Business Finance, LLC, as "Administrative Agent" and "Collateral Agent" thereunder, as amended, supplemented, amended and restated or otherwise modified from time to time.

(v)     "DIP Lenders" means the "Lenders" under and as defined in the DIP Financing Agreement.

(w)     "DIP Repayment Amount" means the aggregate amount of obligations outstanding under the DIP Financing Agreement as of the Closing (after giving effect to any disbursements that are to be made pursuant to this Agreement or in accordance with the Approved Budget).

(x)     "Documents" means all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, correspondence, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, regulatory filings, operating data and plans, research material, marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form.

(y)    "Encumbrance" means any encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, covenant, easement, encumbrance, pledge, security interest, mortgage, deed of trust, hypothecation or lien, whether imposed by Contract or Law.

(z)    "Environmental Laws" means all applicable Laws relating to pollution or protection of natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.) and other similar federal, state, provincial and local statutes.

(aa)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(bb)    "Furniture and Equipment" means all furniture, fixtures, furnishings, leasehold improvements, personal property used to display or hold merchandise for retail sale, equipment, machinery, vehicles, storage tanks and other tangible personal property of every kind and description, owned or used, or held for use, in connection with the operation of the Business by the Sellers, wherever located, including appliances, fittings, lighting fixtures, signs, doors, cabinets, partitions, mantles, motors, pups, screens, plumbing, heating, air conditioning, ovens, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, televisions, monitors, security systems, carpets, floor coverings, wall coverings, office equipment, registers and safes, trash containers, meters and scales, combinations, codes and keys, display cases and tables, artwork, desks, chairs and communications equipment and the IT Assets.

(cc)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(dd)    "Governmental Body" means any applicable federal, state, local or foreign government or any agency, bureau, board, commission, court, department, political subdivision, tribunal or other instrumentality thereof.

(ee)    "Hazardous Materials" means petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos and asbestos containing materials, and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," "solid wastes," or "toxic" (or words of similar meaning) under or pursuant to or otherwise listed or regulated pursuant to any Environmental Law.

(ff)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related regulations and published interpretations.

(gg)    "Indebtedness" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar

instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (other than for services and goods acquired in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all non-contingent obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any other Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance on any property or asset of such Person (whether or not such obligation is assumed by such Person).

(hh)    "Independent Accountant" means an independent accounting firm jointly selected by the Purchaser and the Sellers. If the Purchaser and the Sellers cannot jointly agree on an Independent Accountant, the Purchaser and the Sellers shall each submit to their respective accountants the name of an accounting firm (which shall not be either of their respective accounting firms), and the Independent Accountant shall be selected by lot from these two firms by the respective accountants of the two parties.

(ii)    "Intellectual Property" means any and all intellectual property and industrial property rights in any jurisdiction throughout the world (whether or not registered) including: (i) patents, (ii) trademarks, service marks, trade dress, trade names, domain names, logos and corporate names, (iii) copyrights, (iv) registrations and applications for any of the foregoing, (v) trade secrets and confidential information or know-how (including, research and development, formulas, compositions, manufacturing and production processes and techniques, technical data and designs) and (vi) all applications, registrations, renewals and common-law rights associated in connection with any of the foregoing.

(jj)    "Inventory" means all of the Sellers' inventories (including supplies, merchandise, work in process, raw materials, spare or replacement parts, subassemblies, promotional materials, packaging and shipping materials, manufacturing supplies, samples, prototypes, displays, finished goods, consumable food and beverages, miscellaneous consumables, raw materials, all of Sellers' tangible property, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law, together with all rights of Sellers against suppliers thereof) that are used, or held for use, in connection with the operation of the Business.

(kk)    "IT Assets" means all of the Sellers' computers (including point-of-sale terminals and systems), computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation that are used, or held for use, in connection with the operation of the Business.

(ll)    "Knowledge of the Sellers" means the actual knowledge of John Fitzgerald and Greg Borman.

(mm) "<u>Laws</u>" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies (including any court of competent jurisdiction), or other requirement or rule of law.

(nn) "<u>Leased Real Property</u>" means all of the real property leased, subleased, licensed, used or occupied by any of the Sellers, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

(oo) "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(pp) "<u>Licensed Intellectual Property</u>" means any Intellectual Property that is licensed to the Sellers, and used, or held for use, in connection with the operation of the Business.

(qq) "<u>Material Adverse Effect</u>" means any event, circumstance, change, occurrence or state of facts that has had, or would reasonably be expected to have, a material adverse effect on (i) the Purchased Assets or the Business or (ii) the ability of any Seller to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement except, in each case, for any such effect resulting from any of the following: (A) changes after the Execution Date in any applicable Law or in GAAP, except to the extent such changes disproportionately affect the Sellers relative to other Persons engaged in the industry in which the Sellers operate, (B) the announcement or pendency of this Agreement or the transactions contemplated hereby on relationships, contractual or otherwise, with customers, suppliers, vendors or employees, (C) changes caused by political conditions, such as acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement, except to the extent such changes disproportionately affect the Sellers relative to other Persons engaged in the industry in which the Sellers operate, (D) earthquakes, hurricanes or floods, except to the extent such events disproportionately affect the Sellers relative to other Persons engaged in the industry in which the Sellers operate, (E) any action by the Purchaser or any of its Affiliates or the omission of an action that was required to be taken by the Purchaser or any of its Affiliates; <u>provided</u>, <u>however</u>, that the exception in this <u>clause (E)</u> shall not apply to an action or an omission to act at the request or instruction of any Seller, (F) any action taken by the Sellers which is required by this Agreement or is taken at the request of the Purchaser or (G) the commencement of the Chapter 11 Cases.

(rr)    "Neutral Accountant" means an independent accounting firm jointly selected by the Purchaser and the Sellers. If the Purchaser and the Sellers cannot jointly agree on an Neutral Accountant, the Purchaser and the Sellers shall each submit to their respective accountants the name of an accounting firm (which shall not be either of their respective accounting firms), and the Neutral Accountant shall be selected by lot from these two firms by the respective accountants of the two parties.

(ss)    "Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice.

(tt)    "Owned Intellectual Property" means all Intellectual Property owned by any Seller, and used, or held for use, in connection with the operation of the Business.

(uu)    "Permits" means all permits, approvals, concessions, grants, franchises, licenses (including liquor licenses) and other approvals issued by any Governmental Body. For the avoidance of doubt, when "Permits" is used with respect to Permits held by or in the name of the Sellers, Permits shall include the Apex Beverage Liquor Licenses.

(vv)    "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Business and, in the case of the Assumed Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of the Assumed Leased Real Property as it relates to the operation of the Business or materially detract from the value of the Assumed Leased Real Property; (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law); (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases and that do not result from a breach, default or violation by a Seller of any Contract or Law; (v) such other Encumbrance, title exceptions or imperfections of title as the Purchaser may approve in writing in its sole discretion; and (vi) any Liabilities created by this Agreement or any of the Ancillary Agreements.

(ww)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(xx)    "Purchaser Ancillary Agreements" means, collectively, the Assignment and Assumption Agreement(s), each Assignment and Assumption of Lease Agreement, and each other certificate, agreement or document (other than this Agreement) that the Purchaser is required to execute and/or deliver pursuant to the terms of this Agreement.

(yy)    "Purchaser Parties" means, collectively, the Purchaser and its subsidiaries, and any of their respective former, current or future directors, officers, employees, agents,

general or limited partners, managers, members, stockholders, investors, lenders, creditors, representatives, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, investor, lender, creditor, representative, Affiliate or assignee of any of the foregoing.

(zz)    "Related Parties" means, with respect to any Person, such Person's past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors, assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners.

(aaa)    "Release" means, with respect to any Hazardous Material, any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

(bbb)    "Sale Hearing" means the hearing seeking entry of the Sale Order.

(ccc)    "Sale Motion" means a motion in form and substance satisfactory to the Sellers and the Purchaser seeking entry of the Sale Order.

(ddd)    "Sale Order" means an order in form and substance satisfactory to the Sellers and the Purchaser (it being understood and agreed that if the Sale Order requires the Purchaser to assume, pay or otherwise become responsible for any Liabilities of the Sellers that do not constitute Assumed Liabilities as expressly defined herein, then such Sale Order shall not be satisfactory to the Purchaser).

(eee)    "Seller Ancillary Agreements" means, collectively, the Bill of Sale, the Assignment and Assumption Agreement(s), each Assignment and Assumption of Lease Agreement and each other certificate, agreement or document (other than this Agreement) that any Seller is required to execute and/or deliver pursuant to the terms of this Agreement.

(fff)    "Seller Intellectual Property" means, collectively, Owned Intellectual Property and Licensed Intellectual Property.

(ggg)    "Seller Organizational Documents" means, with respect to each Seller, its certificate of incorporation or formation, bylaws, operating agreement, or any other similar organizational or governing documents.

(hhh)    "Seller Parties" means, collectively, the Sellers and their respective subsidiaries, and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders, investors, lenders, creditors, representatives, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, investor, lender, creditor, representative, Affiliate or assignee of any of the foregoing.

(iii)    "Senior Secured Agent" means Cerberus Business Finance, LLC, in its capacity as the administrative agent under the Senior Secured Financing Agreement.

(jjj)   "Senior Secured Financing Agreement" means that certain Financing Agreement, dated as of September 18, 2014, as amended by that Amendment No. 1 to Financing Agreement, dated as of April 30, 2015, as amended by that Amendment No. 2 to Financing Agreement, dated as of September 1, 2015, as amended by that Amendment No. 3 to Financing Agreement dated as of May 13, 2016, as amended by that Amendment No. 4 to Financing Agreement, dated as of February 23, 2018, as amended by that Amendment No. 5 to Financing Agreement, dated as of January 17, 2019, as amended by that Amendment No. 6 to Financing Agreement, dated as of December 2, 2019, as amended by that Amendment No. 7 to Financing Agreement, dated as of January 13, 2020, as amended by that Amendment No. 8 to Financing Agreement, dated as of January 30, 2020, as amended by that Amendment No. 9 to Financing Agreement, dated as of February 14, 2020, as amended by that Amendment No. 10 to Financing Agreement, dated as of February 21, 2020, as amended by that Amendment No. 11 to Financing Agreement, dated as of March 31, 2020, and as amended by that Amendment No. 12 to Financing Agreement, dated as of April 8, 2020 by and among Intermediate, Apex Parks, the "Borrowers" and "Guarantors" party thereto, the "Lenders" thereunder, and Cerberus Business Finance, LLC as "Collateral Agent" and "Administrative Agent" thereunder, as amended, supplemented, amended and restated or otherwise modified from time to time.

(kkk)   "Senior Secured Lenders" means the "Lenders" under and as defined in the Financing Agreement.

(lll)   "Senior Secured Obligations" means all "Obligations" under and as defined in the Financing Agreement, including outstanding principal amount of loans under the Financing Agreement in an amount equal to not less than $78,910,287.89.

(mmm)"Specified Accrued Liabilities" means all trade accounts payable, utilities and credit card fees payable, in each case, that are incurred by the Sellers in the Ordinary Course of Business after the Petition Date.

(nnn)   "Successful Bidder" has the meaning ascribed to such term by the Bid Procedures Order.

(ooo)   "Surplus Cash" means an amount equal to 100% of the Cash and Cash Equivalents remaining of the Excluded Cash for use in connection with the wind-down of the Sellers' estates pursuant to the Wind-Down Budget which is held by Sellers as of the date (the "Surplus Determination Date") which is earlier of (i) the date on which the wind-down of the Sellers' estate is substantially complete (including satisfaction or discharge of all of Seller's material monetary obligations) and (ii) 90 days after the Closing Date; provided that, notwithstanding the foregoing, Surplus Cash shall not include the amount of any Excluded Cash held by Sellers on the Surplus Determination Date that is attributable to any fees, costs and/or expenses for items covered under the Wind-Down Budget that have accrued but not been paid as of the Surplus Determination Date.

(ppp)   "Tax" and "Taxes" means any foreign, federal, state, county, or local income, sales and use, excise, franchise, real and personal property, gross receipt, capital stock, production, business and occupation, disability, employment, payroll, severance, withholding or similar taxes, including all interest, additions, surcharges, fees or penalties related thereto.

(qqq)  "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(rrr)  "WARN Act" means the federal Worker Adjustment Retraining Notification Act, or any similar provision of any federal, state, provincial, regional, foreign or local Law.

10.2    Additional Defined Terms.  The following terms have the meanings set forth in the Sections set forth below:

Actions ................................................... 21
Agreement ............................................... 1
Allocation Comments ............................... 14
Apex Beverage ........................................ 1
Apex Beverage Liquor Licenses ............... 68
Apex Beverage Obligations ...................... 68
Apex Parks .............................................. 1
Assigned Contracts .................................. 3
Assignment and Assumption Agreement .. 15
Assignment and Assumption of Lease
    Agreement ......................................... 15
Assumed Leased Real Property ................. 3
Assumed Liabilities .................................. 7
Assumed Real Property Leases ................. 3
Assumed Seller Plans ............................... 4
Assumed Taxes ........................................ 8
Assumed Transfer Taxes .......................... 8
Audited Financial Statements ................... 31
Balance Sheet Date .................................. 31
Bankruptcy Code ..................................... 1
Bankruptcy Court ..................................... 1
Bankruptcy Court Milestones ................... 38
Bankruptcy Deposit Accounts ................... 6
Bankruptcy Exceptions ............................. 20
Bid Deadline ............................................ 39
Bill of Sale .............................................. 15
Case Closing Notice ................................. 45
Chapter 11 Cases ..................................... 1
Closing .................................................... 15
Closing Date ............................................ 15
Closing Payment Amount .......................... 48
Closing Payments Schedule ...................... 48
Closing Payments Schedule Delivery Date
    ......................................................... 48
Contract & Cure Update Schedule ........... 10

Credit Bid ............................................... 14
Credit Bid Amount ................................... 14
Disputed Amount Contract ....................... 11
e-mail ..................................................... 64
Excluded Assets ....................................... 5
Excluded Cash ......................................... 5
Excluded Cash Deficiency Amount ........... 14
Excluded Liabilities .................................. 8
Execution Date ........................................ 1
Exempt Trust ........................................... 29
Financial Statements ................................ 31
Indiana Beach Note .................................. 5
Insurance Policies .................................... 30
Interim Arrangement ................................ 43
Intermediate ............................................ 1
Material Contracts ................................... 23
Material Permits ...................................... 25
Most Recent Balance Sheet ...................... 31
New Employment Contracts ...................... 35
Nonassignable Assets ............................... 43
Non-Assigned Contracts ........................... 5
Non-Operating Assets .............................. 39
Original Contract & Cure Schedule .......... 10
Outside Date ............................................ 17
Permitted Sale Parks ............................... 68
Personal Information ................................ 23
Petition Date ........................................... 1
Post-Closing Cure Payment Arrangement . 12
Proposed Allocation ................................ 14
Purchase Price ......................................... 14
Purchased Assets ..................................... 2
Purchased Names ..................................... 3
Purchaser ................................................ 1
Purchaser Released Parties ....................... 68
Qualified Plan ......................................... 29

Rejected Employees ..................................35
Representatives..........................................42
Retained Documents..................................2
Seller Plans ..............................................29
Seller Releasing Parties ............................68
Sellers ......................................................1
Significant Vendors/Suppliers..................31

Surplus Determination Date ......................61
Transfer Taxes..........................................46
Transferred Employee ..............................35
TSA...........................................................49
Unaudited Financial Statements...............31
Wind-Down Budget...................................5

## ARTICLE 11

## MISCELLANEOUS

11.1    Payment of Expenses.   Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, Sellers will bear their own respective costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.  The costs and expenses of Purchaser shall be paid in accordance with the DIP Financing Agreement.

11.2    Survival of Representations and Warranties; Survival of Post-Closing Covenants. The representations, warranties, covenants and agreements in this Agreement and/or the Ancillary Agreements, or in any instrument delivered pursuant to this Agreement and/or the other Ancillary Agreements, shall terminate on the Closing Date, except that each of the covenants set forth in this Agreement or any of the Ancillary Agreements that are to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.  At and at all times after the Closing, in no event shall the Purchaser, on the one hand, or the Sellers, on the other hand, have any recourse against (a) the Sellers or any of the Seller Parties, or (b) the Purchaser or any of the Purchaser Parties, in each such case, with respect to any representation, warranty, covenant or agreement made by the Sellers or the Purchaser in this Agreement or any of the Ancillary Agreements, except, solely in the case of the Purchaser or the Sellers, as applicable, with respect to breaches of covenants set forth in this Agreement or any of the Ancillary Agreements that are to be performed thereby at or after the Closing.

11.3    Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules hereto) and the Ancillary Agreements represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  Notwithstanding the foregoing, (a) any modifications to the Schedules that are made from time to time in accordance with and as contemplated by Section

1.5 and/or Section 6.1 shall not require the consent of the Sellers (except to the extent expressly set forth in such Sections) and (b) the Purchaser shall be permitted to increase the Credit Bid Amount from time to time in its sole discretion without consent from the Sellers.

11.4   Counterparts. For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.5   Governing Law. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

11.6   Jurisdiction, Waiver of Jury Trial. (a) THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK, NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.7   Notices. All notices (including any notices contemplated by Section 1.5 or Section 6.1), requests, demands, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made, received or rescinded (a) on the day of delivery when delivered personally, (b) on the day sent when sent by electronic mail ("e-mail") or facsimile, (c) one (1) Business Day after deposit with an overnight courier service or (d) three (3) Business Days after mailed by certified or registered mail, return receipt requested, with postage prepaid to the parties at the following addresses, facsimile numbers, if any, or e-mail addresses (or at such other address, facsimile number or e-mail address for a party as shall be specified by like notice):

If to the Sellers:

TZEW Intermediate Corp.
c/o Apex Parks Group, LLC
c/o Mr. Scott Avila
Chief Restructuring Officer
Paladin Management
633 W. 5th Street, 28th Floor
Los Angeles, CA  90071
Email: savila @paladinmgmt.com

with a copy (which shall not constitute effective notice) to:

Pachulski Stand Ziehl & Jones LLP
919 N. Market Street, Suite 1700
Wilmington, Delaware  19801
Attn: Laura Davis Jones, Esq.
Facsimile No.:  (302) 652-4400
Email: ljones@pszjlaw.com and dbertenthal@pszjlaw.com

If to the Purchaser:

APX ACQUISITION COMPANY LLC
c/o Cerberus Business Finance, LLC
875 Third Avenue
New York, NY 10022
Attn: Joseph Naccarato
Facsimile No.: 212-284-7906
Email:  jnaccaratp@cerberus.com

With a copy (which shall not constitute effective notice) to:

KTBS Law LLP
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, CA 90067
Attn: Michael L. Tuchin, Esq.
Facsimile No.: 310-407-9090
Email:  mtuchin@ktbslaw.com

11.8    Binding Effect; Assignment.  This Agreement shall be binding upon the Purchaser and, subject to entry of the Bid Procedures Order and the Sale Order, the Sellers and any trustee or estate representative appointed in the Chapter 11 Cases or any successor Chapter 7 case, and inure to the benefit of such parties and their respective successors and permitted assigns.  No assignment of this Agreement or of any rights or obligations hereunder may be made by the Sellers or the Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be

65

void; provided, however, that the Purchaser may assign, delegate or transfer, in whole or in part, this Agreement and any of its rights, obligations and/or interests hereunder, without the consent of the Sellers, to one or more of its designees or Affiliates. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to the Purchaser shall also apply to any such assignee unless the context requires otherwise.

11.9    Severability. If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

11.10    Right to Equitable Relief. The Sellers and the Purchaser acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (b) remedies at law would not be adequate to compensate the non-breaching party. Accordingly, each of the Sellers and the Purchaser shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches or threatened breaches of the provisions of this Agreement and to enforce its rights hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief without the necessity of proving the inadequacy of money damages as a remedy. The right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the Sellers and the Purchaser hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies. Each of the Sellers and the Purchaser hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason. The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor the Purchaser would have entered into this Agreement.

11.11    Third Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns (including, for the avoidance of doubt, any plan administrator administering the Chapter 11 Cases), any legal or equitable rights hereunder, except that (a) each of the Seller Parties and the Purchaser Parties shall be a third party beneficiary of Section 3.6 and (b) each of the Purchaser Released Parties shall be a third party beneficiary of Section 11.16.

11.12   Time of the Essence.  Time is of the essence in the performance of each of the obligations of the parties and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

11.13   Certain Interpretations.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     All references in this Agreement to Articles, Sections, clauses, parts and Schedules shall be deemed to refer to Articles, Sections, clauses, parts and Schedules to this Agreement unless otherwise specified.

(ii)    All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)   The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi)    Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)   Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)     The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

67

11.14  <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Representative of any party hereto or any Subsidiary of Sellers will have any liability (whether in Contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

11.15  <u>Limited Involvement of Apex Beverage</u>.  Apex Beverage holds certain alcoholic beverage licenses that permit Sellers to sell alcoholic beverages for on-site consumption at certain of the Parks (the "Permitted Sale Parks"), which alcoholic beverage licenses and Permitted Sale Parks are described on Schedule 11.15 attached hereto and incorporated herein by this message (collectively, the "Apex Beverage Liquor Licenses").  In connection with the Apex Beverage Liquor Licenses, Apex Beverage shall cooperate, in all commercially reasonable respects (including, without limitation, executing such Interim Arrangements or other customary documentation as Purchaser or the applicable Governmental Bodies may require), with Purchaser's efforts to obtain prior to the Closing, temporary licenses, interim transfers of the Apex Beverage Liquor Licenses or other arrangements with the applicable Governmental Bodies that would allow Purchaser to sell alcoholic beverages for on-site consumption at the Permitted Sale Parks immediately following the Closing.   Purchaser and the other Sellers hereunder acknowledge and agree that except to the extent of Apex Beverage's agreements pursuant to this Section 11.15 and those pursuant to any other provisions hereof where Apex Beverage is expressly referenced or makes covenants, undertakings or agreements or gives representations or warranties by reference to its name (collectively, along with Apex Beverage's obligations under this Section 11.15, the "Apex Beverage Obligations"), Apex Beverage is not joining in the obligations of Sellers pursuant to any other covenant, undertaking, agreement, representation and warranty or other term or provision hereof and Purchaser shall have no recourse to or remedy against Apex Beverage by any reason of the breach of any covenant, undertaking, agreement, representation and warranty or other term or provision hereof other than the Apex Beverage Obligations.

11.16  <u>General Release</u>. Effective upon the Closing, Sellers, on behalf of themselves and their respective past, present and future estates, subsidiaries, divisions, successors and assigns (collectively, in their capacities as parties granting releases pursuant to this <u>Section 11.16</u>, the "<u>Seller Releasing Parties</u>"), hereby release the Purchaser and its past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors, assigns and other Purchaser Parties (collectively, in their capacities as parties being released pursuant to this <u>Section 11.16</u>, the "<u>Purchaser Released Parties</u>"), from any and all claims, contracts, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, Liabilities, costs and expenses, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute or common law, of any kind, nature, or description, including as to any of the foregoing, any claim

68

by way of indemnity or contribution, which any Seller Releasing Party has, may have had or may hereafter assert against any Purchaser Released Party arising from or related in any way, either directly or indirectly, to any action or inaction of any Purchaser Released Party relating to the Sellers, the Business, the Excluded Assets, the Excluded Liabilities or the Chapter 11 Cases; provided, however, that the foregoing release shall not apply to the Sellers' rights or the Purchaser's obligations under this Agreement, any Purchaser Ancillary Agreements, any Seller Ancillary Agreements and/or any other agreements entered into in connection with the transactions contemplated hereby.  Subject to entry of the Bid Procedures Order and the Sale Order, the foregoing release shall be binding on any trustee or estate representative appointed in the Chapter 11 Cases or any successor Chapter 7 case.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLERS:**

**TZEW INTERMEDIATE CORP.**

By: _____
Name: T. Scott Avila
Title: CRO

**APEX PARKS GROUP, LLC**

By: _____
Name: T. Scott Avila
Title: CRO

**APEX REAL PROPERTY HOLDINGS, LLC**

By: _____
Name: T. Scott Avila
Title: CRO

**SPEEDZONE MANAGEMENT, LLC**

By: _____
Name: T. Scott Avila
Title: CRO

**SPEEDZONE HOLDINGS, LLC**

By: _____
Name: T. Scott Avila
Title: CRO

**SPEEDZONE BEVERAGE COMPANY, LLC**

By: _____
Name: T. Scott Avila
Title: CRO

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

SELLERS (continued):

APEX BEVERAGE AND CONCESSIONS, LLC

By: _____
Name: T. Scott Nila
Title: CRO

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**PURCHASER:**

**APX ACQUISITION COMPANY LLC**


By:  _____
Name:  Joseph Naccarato
Title:  Authorized Person

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

EXECUTION VERSION

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT is entered into as of May 7, 2020 (this "Amendment"), by and among (a)(i) TZEW Intermediate Corp., a Delaware corporation ("Intermediate"), (ii) Apex Parks Group, LLC, a Delaware limited liability company ("Apex Parks"), (iii) Apex Beverage and Concessions, LLC, a Delaware limited liability company and indirect subsidiary of Apex Parks ("Apex Beverage"), and (iv) the other direct and indirect subsidiaries of Apex Parks party hereto as set forth on the signature pages attached hereto (together with Intermediate, Apex Parks and Apex Beverage, and the bankruptcy estates of each Seller that is a debtor in a Chapter 11 Case (as defined below)) and their respective successors, collectively, the "Sellers"), and (b) APX Operating Company, LLC (formerly known as APX Acquisition Company LLC), a Delaware limited liability company (the "Purchaser" and, together with Sellers, the "Parties").

## BACKGROUND

A.    Purchaser and Sellers are parties to that certain Asset Purchase Agreement, dated as of April 12, 2020 (the "Asset Purchase Agreement").

B.    Purchaser and Sellers desire to amend the Asset Purchase Agreement on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

Section 1.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned thereto in the Asset Purchase Agreement.

Section 2.    Amendment to Asset Purchase Agreement.  The Parties hereby agree to amend the Asset Purchase Agreement as follows:

(a)    The last sentence of Section 2.1 of the Asset Purchase Agreement is hereby deleted in its entirety and the following substituted therefor:

"Notwithstanding anything to the contrary herein, (a) under no circumstances shall any portion of the Credit Bid Amount be converted into or otherwise require a cash payment and (b) Purchaser, in its sole discretion, may elect at the Closing to designate a portion of the Credit Bid Amount up to an amount equal to $35,000,000 to, in lieu of being treated as an offset against the Senior Secured Obligations held by the Senior Secured Lenders pursuant to section 363(k) of the Bankruptcy Code, be restructured secured indebtedness of Purchaser (or its designee(s) hereunder) under a financing agreement to be entered into by the Purchaser (or its designee(s) hereunder), the Secured Agent and the Senior Secured Lenders at Closing (the "Restructured Indebtedness"), which such agreement shall be on terms satisfactory to each of the parties thereto (it being understood and agreed that if such designation occurs, the "Credit Bid Amount"

shall, for all purposes under this Agreement, be an amount equal to (x) $45,000,000 *minus* (y) such designated amount)."

(b)     The reference in the first sentence of Section 2.2 of the Asset Purchase Agreement to "twenty days" is hereby deleted and replaced with "thirty days".

(c)     The reference in Section 3.4(b) of the Asset Purchase Agreement to "May 14, 2020" is hereby deleted and replaced with "June 2, 2020".

(d)     The reference in Section 7.3(b) of the Asset Purchase Agreement to "April 23, 2020" is hereby deleted and replaced with "April 25, 2020".

(e)     The reference in Section 7.3(f) of the Asset Purchase Agreement to "May 11, 2020" is hereby deleted and replaced with "May 29, 2020".

(f)     Section 9.2 of the Asset Purchase Agreement is hereby amended by (i) removing the "and" at the end of subsection (c); (ii) deleting "." at the end of subsection (d) and replacing "; and" therefor; and (iii) and adding a new subsection (e) as follows:

"(e)     if there is any Restructured Indebtedness in accordance with Section 2.1, then the Sellers shall have received a release of all obligations with respect to such Restructured Indebtedness (in form and content reasonably satisfactory to Sellers) by virtue of the Sale Order or otherwise."

Section 3.     Effect of Amendment.  Except as expressly amended hereby, the Asset Purchase Agreement shall continue in full force and effect.  Any references to the Asset Purchase Agreement (whether in the Asset Purchase Agreement or any agreement, document or certificate contemplated thereby and/or executed in connection therewith) are hereby amended to mean the Asset Purchase Agreement as amended by this Amendment.

Section 4.     No Third Party Beneficiaries.  This Amendment shall bind and inure to the benefit of the Parties and their respective successors and assigns.  This Amendment shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

Section 5.     Governing Law; Jurisdiction.  THIS AMENDMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE,

THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK, NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

Section 6.    Counterparts.  For the convenience of the Parties, this Amendment may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

Section 7.    Headings.    Headings of the Sections of this Amendment are for convenience of the Parties only, and will be given no substantive or interpretive effect whatsoever.

[*The remainder of this page is intentionally left blank.*]

**IN WITNESS WHEREOF**, the Parties have caused this Amendment to be duly executed as of the date first above written.

<u>**SELLERS:**</u>

**TZEW INTERMEDIATE CORP.**

By: _____
Name:   Scott Avila
Title:    Chief Restructuring Officer

**APEX PARKS GROUP, LLC**

By: _____
Name:   Scott Avila
Title:    Chief Restructruing Officer

**APEX REAL PROPERTY HOLDINGS, LLC**

By: _____
Name:   Scott Avila
Title:    Chief Restructruing Officer

**SPEEDZONE MANAGEMENT, LLC**

By: _____
Name:   Scott Avila
Title:    Chief Restructruing Officer

**SPEEDZONE HOLDINGS, LLC**

By: _____
Name:   Scott Avila
Title:    Chief Restructruing Officer

**SPEEDZONE BEVERAGE COMPANY, LLC**

By: _____
Name:   Scott Avila
Title:    Chief Restructruing Officer

SELLERS (continued):

APEX BEVERAGE AND CONCESSIONS, LLC

By: _____

Name:    Scott Avila

Title:    Chief Restructruing Officer

**PURCHASER:**

**APX OPERATING COMPANY, LLC**
(f/k/a APX Acquisition Company LLC)

By: _____
Name:    Joseph Naccarato
Title:    Authorized Person

EXECUTION VERSION

**SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT**

THIS SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT is entered into as of May 18, 2020 (this "Amendment"), by and among (a)(i) TZEW Intermediate Corp., a Delaware corporation ("Intermediate"), (ii) Apex Parks Group, LLC, a Delaware limited liability company ("Apex Parks"), (iii) Apex Beverage and Concessions, LLC, a Delaware limited liability company and indirect subsidiary of Apex Parks ("Apex Beverage"), and (iv) the other direct and indirect subsidiaries of Apex Parks party hereto as set forth on the signature pages attached hereto (together with Intermediate, Apex Parks and Apex Beverage, and the bankruptcy estates of each Seller that is a debtor in a Chapter 11 Case (as defined below)) and their respective successors, collectively, the "Sellers"), and (b) APX Operating Company, LLC (formerly known as APX Acquisition Company LLC), a Delaware limited liability company (the "Purchaser" and, together with Sellers, the "Parties").

BACKGROUND

A.    Purchaser and Sellers are parties to that certain Asset Purchase Agreement, dated as of April 12, 2020, as amended by that certain First Amendment to Asset Purchase Agreement, dated as of May 7, 2020 (as amended, amended and restated, supplemented or otherwise modified, the "Asset Purchase Agreement").

B.    Purchaser and Sellers desire to amend the Asset Purchase Agreement on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

Section 1.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned thereto in the Asset Purchase Agreement.

Section 2.    Amendment to Asset Purchase Agreement.  The Parties hereby agree to amend the Asset Purchase Agreement as follows:

(a)    The reference in the first sentence of Section 2.2 of the Asset Purchase Agreement to "not later than thirty days after the Execution Date" is hereby deleted and replaced with "no later than May 20, 2020".

(b)    The reference in Section 3.4(b) of the Asset Purchase Agreement to "June 2, 2020" is hereby deleted and replaced with "June 8, 2020".

Section 3.    Effect of Amendment.  Except as expressly amended hereby, the Asset Purchase Agreement shall continue in full force and effect.  Any references to the Asset Purchase Agreement (whether in the Asset Purchase Agreement or any agreement, document or certificate contemplated thereby and/or executed in connection therewith) are hereby amended to mean the Asset Purchase Agreement as amended by this Amendment.

178624.3

Section 4.    No Third Party Beneficiaries.  This Amendment shall bind and inure to the benefit of the Parties and their respective successors and assigns.  This Amendment shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

Section 5.    Governing Law; Jurisdiction.    THIS AMENDMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK, NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

Section 6.    Counterparts.  For the convenience of the Parties, this Amendment may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

Section 7.    Headings.  Headings of the Sections of this Amendment are for convenience of the Parties only, and will be given no substantive or interpretive effect whatsoever.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have caused this Amendment to be duly executed as of the date first above written.

SELLERS:

TZEW INTERMEDIATE CORP.

By: _____
Name: _____
Title: _____

APEX PARKS GROUP, LLC

By: _____
Name: _____
Title: _____

APEX REAL PROPERTY HOLDINGS, LLC

By: _____
Name: _____
Title: _____

SPEEDZONE MANAGEMENT, LLC

By: _____
Name: _____
Title: _____

SPEEDZONE HOLDINGS, LLC

By: _____
Name: _____
Title: _____

SPEEDZONE BEVERAGE COMPANY, LLC

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT]

SELLERS (continued):

APEX BEVERAGE AND CONCESSIONS, LLC

By:
Name:
Title:

**PURCHASER:**

**APX OPERATING COMPANY, LLC**
(f/k/a APX Acquisition Company LLC)

By: _____
Name:    Joseph Naccarato
Title:    Authorized Person