**Exhibit "C"**

**(Alabama Supreme Court Opinion)**

REL:  September 18, 2020

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2020

_____

### 1180508

_____

**Protective Life Insurance Company**

**v.**

**Apex Parks Group, LLC**

**Appeal from Jefferson Circuit Court**
**(CV-17-165)**

MENDHEIM, Justice.

Protective Life Insurance Company ("Protective") appeals from a judgment entered on a jury verdict rendered in the Jefferson Circuit Court against Protective and in favor of Apex Parks Group, LLC ("Apex"), in the amount of

1180508

$11,495,890.41.  We reverse the judgment and render a judgment for Protective.

## I.  Facts

Apex, a California-based corporation, owns and operates 16 moderately sized amusement parks, water parks, and family-entertainment centers nationwide.  Apex's founder and chief executive officer was Alexander Weber, who had possessed 43 years' experience in the industry and who was critical to Apex's success.  Because of Weber's importance, in early 2016 Apex sought a "key-man" insurance policy on Weber.[1]  Protective is a Birmingham-based insurance company owned by the Dai-ichi Corporation.

---

[1]

"'Key man' life insurance policies are life insurance policies purchased by businesses to pay the expenses triggered by loss of a person essential to the business's operation -- the irreplaceable CEO, inventor, marketing vice president, or any other 'key' man or woman.  These are often (but not always) intended to pay for a buy-out of the deceased key person's share in the firm's equity (especially if the firm is a closely held corporation or a partnership)."

Malla Pollack, Proof of Facts Evidencing Insurable Interest in Key Man Life Insurance Policy, 152 Am. Jur. Proof of Facts 3d § 5, 518 (2016) (footnotes omitted).

1180508

Apex applied for key-man insurance for Weber with Protective in March 2016; Apex used an insurance broker to aid in the application process. At that time, Weber was 64 years old. The initial premium quote provided to Apex on the insurance application was $40,054.33, contingent upon approval by Protective's underwriters.

On March 2, 2016, Protective had Weber interviewed by a paramedical professional to gain information about his medical history. Weber answered several detailed questions, and in the process he revealed that he had high blood pressure, high cholesterol, and that he had had a "left bundle branch block" ("LBBB") since childhood. In detailing what an LBBB is, Protective's medical expert, Dr. Vance Plumb, explained:

> "[T]he normal heartbeat is created by the passage of electricity through the heart. ... [T]here are special fibers in the heart that carry this electricity ... directly to the left bottom chamber of the heart into the right bottom chamber of the heart. The fibers that carry the electricity to the left, we call it a left bundle branch block. The ones that go to the right, the right bundle branch. ... Electricity is delivered late to the left ventricle when there is left bundle branch block."

Dr. Plumb further explained that if you have an LBBB, "you are more likely to have heart disease. If you have heart disease, you are somewhat more likely to have atrial fibrillation."

3

1180508

Both Dr. Plumb and Apex's medical expert, Dr. Hugh McElderry, testified that an LBBB is a serious heart condition. Weber also disclosed that both his father and his mother had died of heart attacks at ages 47 and 56, respectively.

The answers from Weber's interview with the paramedical professional were incorporated into the Apex application for insurance. On March 10, 2016, the application was finalized and signed by Weber and Apex's chief financial officer, Doug Honey ("the application"). Apex sought $10 million in coverage in the application.

Protective received the application on March 14, 2016. At that point, Protective underwriter Paula Nicols began the process of determining whether Protective would issue the policy and what premium it would charge. Nicols testified at trial that the standard approach for this task included consulting two underwriting manuals issued by Protective's reinsurers. Those manuals -- the "Gen Re" and "Swiss Re" manuals -- prescribe premiums in light of an applicant's medical history. Protective generally compares the "rate classifications" in the two manuals and offers an applicant the lower of the two. Protective has several ratings, which

1180508

correspond to successively higher premiums. Protective's best rating, for which Protective charges its lowest premium, is called "select-preferred." That rating is followed by "preferred," and then "standard," which each carry higher premiums than the "select-preferred" rating. After the "standard" rating, Protective has seven "table" ratings, ranging from "Table 2" to "Table 8." As the table number goes up, so does the charged premium.

Nicols testified that she considered four pieces of medical information in determining Weber's insurance rating: his LBBB, his high blood pressure, his high cholesterol, and his parents' deaths from heart attacks. Weber's LBBB meant that he could not receive Protective's select-preferred or preferred ratings. Nicols informed the insurance broker that Apex could not receive the preferred rating Apex had requested and that Protective would need Weber's medical records. Those records did not include tests associated with assessing the current status of Weber's heart issues. In fact, Weber had not seen a cardiologist in 10 years. The medical records did reveal that Weber previously had undergone stress tests, but the records did not show the results of those tests. On

1180508

April 19, 2016, Protective requested "complete records" from any cardiologist Weber may have visited for his LBBB.  Weber responded that he had not yet seen a cardiologist for his LBBB.  Nicols testified that she was not troubled by the fact that Weber had not seen a cardiologist, despite the fact that he had been given a referral to see one, because Weber "was not told he had to be seen by a cardiologist so that was up to Mr. Weber whether or not he chose to do that."

On April 30, 2016, Nicols e-mailed the broker with a "tentative offer" to Apex, stating, in part:

> "At this point and AS IS MEDICALLY, Table 2 Non-Tobacco due to left bundle branch block per exam, records from Dr. Jenkins and Dr. Dyksterhouse.  ...
>
> "....
>
> "If [Apex] will accept Table 2, no additional records are needed.  However, if [Apex] wants reconsideration, we will need copy of past testing noted per Dr. Dyksterhouse's records, or [Weber] will need to get established with his new cardiologist for follow-up to include either treadmill stress test or nuclear/imaging stress test, at no cost to Protective Life."

A Table 2 rating meant a substantial premium increase from the initial premium quoted to Apex in the application, with a first-year premium of $89,771.75.  Nonetheless, Apex subsequently orally agreed to the Table 2 rating offer, and on

6

1180508

May 3, 2016, another Protective underwriter approved the policy based on that rating.

On May 5, 2016, Weber had an appointment for an annual physical with a physician he had not previously seen, Dr. Samuel Fink.  Based on Weber's family and personal medical history, particularly the deaths of his father and mother as a result of heart attacks and his diagnosis of an LBBB, Dr. Fink recommended that Weber return the following day for a "stress echo" test.  On May 6, 2016, Weber visited Dr. Fink and underwent a stress test that involved Weber being connected to an EKG machine while he walked and then ran on a treadmill as the treadmill increased speed and incline level. The test lasted for 13 minutes.  All the medical experts at trial agreed that Weber performed extremely well in the test in terms of demonstrating physical fitness.  However, Dr. Fink had a cardiologist, Dr. Michael Burnam, read the results from the EKG machine remotely.  Dr. Burnam testified that during the stress test Weber experienced an episode of paroxysmal atrial fibrillation ("AFib").  Dr. Burnam explained that paroxysmal AFib is a separate condition from -- and is not caused by -- LBBB and that it occurs when there is a temporary

1180508

or intermittent irregular rhythm of the upper chamber of the heart. Dr. McElderry confirmed that Weber's AFib "came and went on its own." Dr. Plumb testified that, because of its intermittent nature, it was possible that Weber had been "living with this for a while." Indeed, Weber did not feel any physical difference during the stress test. Because Dr. Burnam was not able to tell from the stress test whether there was a restriction in the blood flow of Weber's coronary arteries, he recommended that Weber be taken to the emergency room ("ER").

Because of Dr. Burnam's recommendation, Dr. Fink escorted Weber to the ER during his May 6, 2016, appointment. Weber's wife testified that when Weber arrived at the ER he telephoned her to tell her about the AFib diagnosis, and she stated that they laughed about it because they recalled a television commercial with famous golfers talking about having AFib. Dr. Fink presented Weber to the ER doctor on call, Dr. Scott Brewster. Weber also met Dr. Burnam in the ER. Dr. Burnam examined Weber, and he confirmed that Weber had paroxysmal AFib, rather than persistent AFib, which meant that it was not necessary to perform a cardioversion, "an electrical shock to

1180508

the heart to return its normal rhythm." Dr. Burnam concluded that Weber had a low risk of having a stroke and so, for the time being, his condition could be treated with a mild blood-thinning medication, such as aspirin. Dr. Burnam prescribed that Weber take one aspirin tablet per day, and they discussed two additional treatment options: either taking medication or using an "an electrophysiologic approach," meaning having a procedure on the heart to correct the AFib, called an ablation. Altogether, Weber spent two hours at the ER. A follow-up appointment with Dr. Burnam was scheduled for May 9, 2016, which Dr. Burnam testified was "for additional testing" and for Weber "to decide which approach he wanted."

On May 9, 2016, Weber had the follow-up appointment with Dr. Burnam. An EKG revealed that Weber's heart was in normal rhythm during that visit. Dr. Burnam testified that his notes of that visit reflected that he and Weber discussed Weber's options for treating his AFib and that Weber "was going to strongly consider the electrophysiologic approach." Accordingly, Dr. Burnam gave Weber a referral to Dr. Eli Gang, a cardiologist in the subspecialty that treats AFib, electrophysiology. On the same date, after speaking with

9

1180508

Dr. Burnam, Dr. Fink entered a note in Weber's patient record that stated: "Discussed [condition] with Dr. Burnam. A repeat EKG shows [Weber] is in normal sinus rhythm. He is still on the Aspirin. He will be seeing Dr. Eli Gang." On May 10, 2016, Weber wrote an e-mail, apparently as a note to himself, in which he listed several dates, one line of which stated: "June 8-9th have a Dr. appointment on Fri 10th." On May 19, 2016, Weber spoke with Dr. Fink, and Dr. Fink entered a note in Weber's medical record that stated in part that Weber "is referred to Dr. Gang."

On May 18, 2016, Protective issued the insurance policy to Apex for $10 million in coverage at a Table 2 premium ("the policy"); the policy included a cover letter, the policy schedule, policy provisions, endorsements or riders to the policy, and other information. When Protective e-mailed the policy to Apex, it explained that three "delivery" documents were included with the policy that needed to be signed in order "[t]o bind the Key-Man Life Insurance Policy for Al Weber." The first document was an "Amendment to Application with Health Statement" ("the amendment") that the e-mail explained would "acknowledg[e] that the premium was

1180508

increased for underwriting risk factors to be signed by Al Weber and Doug Honey on behalf of Apex."  The second document was a notice regarding "save-age" dating in the policy that had to be signed by both Weber and Honey.  This document specifically noted that "coverage begins only when the policy is delivered and the first premium is paid."  The third document was a policy-delivery receipt to be signed by Honey.  Weber and Honey signed the amendment and the notice regarding "save-age" on May 31, 2016.

The central document in this case is the amendment; its contents, therefore, must be provided in detail.  In addition, a copy of the amendment is attached to this opinion as an appendix.  The amendment is a single-page document, and, as already noted, it is titled:  "AMENDMENT TO APPLICATION WITH HEALTH STATEMENT."  (Capitalization in original.)  It lists the "Name of Insured" as "Al Weber, Jr." and provides the policy number.  The amendment then states:  "The application to [Protective] for the policy named above is hereby amended by the undersigned to conform in every respect to any and all changes indicated below ...."  Below this statement is a table that lists the "Amount of Insurance" as $10 million, the type

11

1180508

of policy plan, and the "Premium Payable," which is stated to
be "$89,771.75 ANNUALLY."    (Capitalization in original.)
Following the table, the amendment states:

> "Other Changes:
>
>> "Planned Periodic Premium shall be as
>> stated above.
>>
>> "I understand that the premium rate payable
>> for each $1,000 of coverage has been
>> increased due to underwriting risk."

After a gap of blank space on the page, the amendment
continues with a paragraph in bold typeface stating:

> "HEALTH STATEMENT:  I represent that I have not
> consulted any physician or other practitioner since
> the date of my medical examination (or date I signed
> the last application with [Protective], if no
> medical examination was required). It is further
> agreed that, except as stated above, all insured
> persons are in the same health as that stated in the
> last application, or medical examination with
> [Protective]."

(This statement is hereinafter referred to as "the health
statement.")  Another paragraph follows the health statement
but is not in bold typeface:

> "It is agreed by the undersigned that the changes
> shown above shall be an amendment to and form a part
> of the application and the policy, and that the
> changes shall be binding on any person who shall
> have or claim any interest in the policy.  A copy of
> this form shall be as valid as the original."

12

1180508

Signature and date lines are contained below this paragraph.

The bottom of the page contains a paragraph in bold typeface

titled "IMPORTANT NOTICE":

> "If any change is incorrect or incomplete, correct
> information should be written on this form. If any
> change is made, the policy and this form must be
> returned to [Protective].  No insurance will take
> effect until such changes have been reviewed and
> accepted by [Protective]."

As already noted, Weber and Honey signed the amendment

and the other delivery-requirement documents on May 31, 2016.

There were no written notations on the amendment of any

changes.  Protective received the signed amendment on June 23,

2016.[2]  On June 6, 2016, Weber e-mailed Honey with a question:

"Did we pay for my work life insurance?"  Honey replied:  "Not

yet."  Weber responded:  "Could you get completed by []Weds

[June 8]?"  However, Apex did not mail the check for the

amount of the first premium until June 15, 2016.  It is

undisputed that Protective cashed the check on June 21, 2016.

On June 8, 2016, Weber had an appointment with Dr. Gang.

Dr. Gang first reviewed with Weber how he felt given his AFib

diagnosis.  Dr. Gang testified that Weber "was remarkably

---

[2]No explanation for the length of the delay in receiving
the delivery-requirement documents is apparent from the record
on appeal or the parties' briefs.

1180508

absent of symptoms" and "[h]e felt well ... was very active."
Dr. Gang then performed a physical examination.  He testified
as follows with regard to that exam:  "So again, [Weber was]
in good shape, and I found no particular murmurs or any other
physical exam findings.  The only noteworthy -- noteworthy
thing was that his blood pressure was somewhat elevated on
that one visit."  Dr. Gang also ran another EKG on Weber, the
result  of  which  showed  that  Weber  was  "in  atrial
fibrillation," although his heartbeat was "within the normal
range,  even  though  it  was  irregular."   Dr.  Gang  further
testified that he discussed the "implications" of Weber's AFib
with Weber in light of the fact that "it had no effect on his
life as far as his quality of life is concerned.  He was sure
of that."  Dr. Gang elaborated:  "[W]e talked about ... what
could  he  do  about  it,  if  anything,  and  the  possibility  of
taking medications to suppress it, doing nothing about it, or
doing  an  ablation  about  it.   Those  were  the  three  general
paths  that  he  could  choose  that  we  discussed."   Dr.  Gang
stated that he gathered from that conversation that Weber "was
a  very  determined  person  to  take  care  of  what  needs  to  be
taken care of and to be on the fewest possible medications,"

14

1180508

and so Weber "was going to give [an ablation] serious consideration." Dr. Gang gave Weber three recommendations. First, he provided Weber with a "ZIO" patch, which Dr. Gang described as a patch that is attached to a patient's chest for an extended period and that provides "a realtime 24/7 EKG," allowing a physician "to see how often [a patient] actual ha[s] atrial fibrillation." Second, Dr. Gang recommended that Weber undergo a "CT angiogram" that would help Dr. Gang determine what kind of ablation to perform. Third, Dr. Gang prescribed the blood thinner Xarelto to Weber to lessen the risk of blood clots and stroke from AFib; Weber began taking the Xarelto that day.

Weber wore the ZIO patch from June 8 through June 11, 2016. The results from the patch showed that Weber was in AFib 61 percent of the time that he wore the patch and that his longest stretch of being in AFib was 22 hours and 36 minutes. Dr. Gang concluded that the results from the ZIO patch confirmed that Weber should undergo an ablation. On June 10, 2016, Weber drafted an e-mail titled "Medicine" in which he indicated that he was going to ask Dr. Fink's opinion

1180508

about getting an ablation and in which he listed "Ablation dates (July 14-15 or 21-22)."

On June 10, 2016, Weber had an appointment with Dr. Fink. On this visit, Weber's heart had a regular rate and rhythm. Dr. Fink told Weber that undergoing an ablation made sense under the circumstances.  On June 15, 2016, Weber wrote an e-mail, apparently as a note to himself, titled "Gang" in which he noted:  "Ablation Aug 18th."

As we have already noted, on June 21, 2016, Protective received and cashed the first premium check for the policy. There is no dispute that the insurance coverage went into effect when Protective received that first payment.  On June 23, 2016, Protective received the signed amendment from Apex.

On July 15, 2016, Weber had a follow-up appointment with Dr. Fink.  Dr. Fink noted in Weber's patient record that an EKG on that date indicated that Weber was in AFib.  He also recorded that Weber was scheduled to have an ablation on August 23, 2016.  On August 23, 2016, Weber underwent an ablation performed by Dr. Gang.  The medical experts agreed that the surgery was a success.  Dr. Gang saw Weber on

16

1180508

August 29, 2016, and reported that Weber felt "well" and that he wanted "to exercise vigorously."  On September 2, 2016, Weber had an appointment with Dr. Fink, who noted that Weber's heart had a regular rhythm on that visit.  Dr. Gang saw Weber on October 31, 2016, and he determined that Weber was doing well.

On November 8, 2016, while on vacation with his wife, Weber died.  The death certificate listed the cause of death as "sudden cardiac death" due to "ischemic heart disease." All the medical experts agreed at trial that Weber's AFib did not cause his death.

Shortly after Weber's death, Apex submitted its claim under the policy for the $10-million benefit.  Protective then began a contestable-claim investigation.[3]  The investigation was initiated by Protective compliance analyst Janice Wisner,

---

[3]As we more fully explain in Part II of this opinion, which addresses the standards of review, California law governs the substantive issues in this case.  The California Insurance Code affords insurers a two-year contestability window after a policy takes effect.  See Cal. Ins. Code § 10113.5(a) (stating in part that "[a]n individual life insurance policy delivered or issued for delivery in this state shall contain a provision that it is incontestable after it has been in force, during the lifetime of the insured, for a period of not more than two years after its date of issue ....").

1180508

who had a third-party administrator obtain Weber's medical
records.   Those records included files from Dr. Fink,
Dr. Burnam, and Dr. Gang, which revealed Weber's AFib
diagnosis and the treatment he received for it.  The review of
Apex's claim was then submitted to Protective underwriter
Edmund Peña, one of two Protective underwriters who were
specifically assigned to review contestable claims.  Wisner
testified that Protective has underwriters who are separate
from the underwriters who issue policies to review contestable
claims because Protective "want[s] an objective review of the
claim from the start to finish."  Peña testified that he
reviewed each document Protective received, from both before
it issued the policy and after Apex submitted its claim, with
the goal being "to make sure that all of the statements by the
applicant and the policy owners [were] true and accurate."
Peña stated that his job was, if there was a discrepancy, to
evaluate the policy based on the new information, taking into
account the ratings in the Gen Re and Swiss Re manuals, to
determine whether Protective would have issued the policy if
initially it had known all the information about the

18

1180508

applicant.   Peña testified as follows with respect to his

conclusion upon completion of the investigation:

> "A.   I determined that the Table 2 rating that the
> original underwriter Paula Nicols approved the file
> at was correct based on Mr. Weber's history of left
> bundle branch block.  And then I noticed that
> Mr. Weber saw a new doctor -- one that he had never
> seen before -- on May 5th of 2016.  ...
>
> "....
>
> "The visits with ... Dr. Burnam and Dr. Fink --
> yeah.  Dr. Burnam were not admitted on the good
> health statement on our amendment to the policy
> where it asks have you seen or consulted any other
> physician since the time that the part 2 paramed
> exam was completed.
>
> "Based on that information, I determined that
> there was a material misrepresentation since he did
> not provide that information to us and I made a
> recommendation to the claim committee -- or I
> advised the claim committee of my findings.
>
> "[Protective's counsel:]   When you say you
> determined there was a material misrepresentation
> based on Mr. Weber's failure to disclose those
> doctors' visits and the AFib diagnosis, what do you
> mean by material misrepresentation?
>
> "A.   I mean that his present medical history at the
> time that the delivery requirements were received
> [was] not the same as what was admitted on the
> application and that based on our underwriting
> manual, that he would have been rated at a different
> rate; so the Table 2 rating was no longer
> applicable.
>
> "....

1180508

> "Q.  ...  Under both manuals, did you conclude that
> under no circumstances if Protective had known that
> information would it have issued this $10 million
> policy?
>
> "A.  No, we would not."

Although she was not involved in the contestable-claim review,
underwriter Nicols similarly testified that, given the
information provided regarding Weber's May doctors' visits,
the underwriting manuals would have required postponing
coverage until Weber's AFib condition had been fully
evaluated, and, based on the results of that evaluation, "the
policy would not have ever been issued as originally issued,
if it was issued at all."

Peña further testified that, after he reached his
conclusion that Apex's claim should be denied, he asked his
supervisor for a second opinion, and the supervisor concurred
with Peña's assessment.  He also consulted with Protective's
head underwriter and its chief medical director, both of whom
also agreed with Peña's conclusion.  Peña then e-mailed his
findings to Wisner.  Wisner then e-mailed Peña's
recommendation to Protective's reinsurers, one of which was
Gen Re.  An employee at Gen Re wrote Wisner an e-mail stating
that he agreed with Peña's conclusion that the policy would

1180508

have been postponed based on the AFib diagnosis and that Weber
"died during the postpone period."  Wisner then submitted the
claim to a Protective claim committee, which consisted of
herself and two other Protective employees. The committee
concluded that the claim should be denied.

On March 27, 2017, Wisner, on behalf of Protective, wrote
a letter to Apex that explained that the claim was being
denied.  The letter quoted from the amendment, and it related
the information discovered in the contestable-claim
investigation about Weber's May doctors' visits.  Wisner then
stated:

> "This medical history was not disclosed on the
> [amendment].  Our Underwriters have opined that had
> they known of this material change of health that
> occurred after the application dates of March 2,
> 2016, and before signing the [amendment] on May 31,
> 2016, the policy would not have been placed in force
> at that time and they would not have issued this
> Table 2 Non-tobacco policy.
>
> "In view of the unadmitted medical history,
> [Protective] deems that no insurance ever became
> effective and we must void the policy as of the date
> it was issued.  Under separate cover, we are issuing
> a full refund of the premium paid under this policy,
> plus applicable interest."

As the letter stated, Protective refunded the premium Apex had
paid in June 2016.

1180508

On May 16, 2017, Apex sued Protective in the Jefferson Circuit Court asserting claims of breach of contract and bad faith in failing to investigate all bases supporting coverage and in making false promises that the claim would be paid. Protective answered the complaint and asserted a counterclaim seeking rescission of the policy based upon material misrepresentations during the application process. Protective filed several summary-judgment motions, all of which the trial court denied. A two-week trial ensued. At the close of Apex's case, Protective moved for a judgment as a matter of law, contending that it had conclusively demonstrated all the elements of rescission under California law. The trial court denied the motion. Protective moved again for a judgment as a matter of law at the close of all the evidence, and the trial court again denied the motion.

After closing arguments, Protective stated that it had an objection to a portion of the trial court's jury instruction on materiality. The trial court determined that it would give the jury instructions and then it would hear any exceptions the parties had to those instructions. The jury instruction at issue stated:

1180508

   "If you determine that information was misrepresented in or omitted from the application or amendment and that the information misrepresented or omitted was material, you must next consider whether Protective has proved that Mr. Weber knew both that the information sought had been represented or omitted and that the information was material to Protective.

   "If Protective fails to prove that Mr. Weber knew and appreciated the significance of the medical information at issue, then incorrect or incomplete responses to the application or the amendment did not excuse Protective's failure to pay.

   "Ladies and gentlemen, an insured has a duty to disclose only those changes in health that he, acting in good faith, actually believes were material. In addition, someone applying for insurance will not be held to the level of knowledge or understanding that a doctor or other expert might have.

   "In considering whether Protective has met its burden of proving that Mr. Weber knew that information had been omitted from the application or amendment and that the information was material, you must consider the evidence of Mr. Weber's actual knowledge and belief about the state of his health, not merely what a reasonable person should have or could have concluded based on the information presented to him."

After the trial court completed giving its instructions to the jury, Protective registered its objection:

   "[Protective's counsel:]   Okay. Your Honor, yes, [Protective] objects to giving the jury instruction, special instruction on page -- it was on page 27 of my notes, the insured's subjective knowledge as a misstatement of the law in that the law in

23

1180508

    California and the instruction that should have been given on this point is that materiality is determined by the probable and reasonable affect that truthful disclosure would have had on the insurer in determining the advantages of the proposed contract.  That's the instruction that should have been given with respect to whether a misrepresentation was material.

    "THE COURT: Okay.  I understand.  Noted.  I stand on what was given."

On September 21, 2018, the jury rendered its verdict. The jury found Protective liable for breach of contract but not liable for bad faith.  The verdict form specified that if the jury found Protective liable for breach of contract, Apex would be "entitled to the policy benefit of $10,000,000."  The trial court entered a judgment for $10 million plus applicable prejudgment interest of $1,495,890.41, for a total amount of $11,495,890.41.  Protective renewed its motion for a judgment as a matter of law based on rescission. Protective also moved, in the alternative, for a new trial based on its objection to the jury instruction.  The trial court denied those motions without comment.  Protective appealed.

1180508

## II.  Standards of Review

The contract at issue -- the policy -- is governed by California law because the policy was issued and was delivered to Apex in California.  See, e.g., <u>Lifestar Response of Alabama, Inc. v. Admiral Ins. Co.</u>, 17 So. 3d 200, 213 (Ala. 2009) (explaining that, "[u]nder the principles of <u>lex loci contractus</u>, a contract is governed by the law of the jurisdiction within which the contract is made").  However, because the lawsuit was filed in Alabama, procedural questions are governed by Alabama law.  See, e.g., <u>Middleton v. Caterpillar Indus., Inc.</u>, 979 So. 2d 53, 57 (Ala. 2007) (noting that "<u>lex fori</u> -- the law of the forum -- governs procedural matters").

In reviewing the trial court's denial of Protective's motions for a judgment as a matter of law, this Court employs the same standard applicable to the trial court:

> "'This Court reviews de novo the grant or denial of a motion for a [judgment as a matter of law], determining whether there was substantial evidence, when viewed in the light most favorable to the nonmoving party, to produce a factual conflict warranting jury consideration. <u>Alfa Life Ins. Corp. v. Jackson</u>, 906 So. 2d 143, 149 (Ala. 2005) (citing <u>Ex parte Helms</u>, 873 So. 2d 1139, 1143-44 (Ala. 2003)).

25

1180508

> "'"[S]ubstantial evidence is evidence of
> such weight and quality that fair-minded
> persons in the exercise of impartial
> judgment can reasonably infer the existence
> of the fact sought to be proved."'"
> Dolgencorp, Inc. v. Hall, 890 So. 2d 98,
> 100 (Ala. 2003) (quoting Wal-Mart Stores,
> Inc. v. Smitherman, 872 So. 2d 833, 837
> (Ala. 2003), quoting in turn West v.
> Founders Life Assurance Co. of Florida, 547
> So. 2d 870, 871 (Ala. 1989)).'"

Alabama River Grp., Inc. v. Conecuh Timber, Inc., 261 So. 3d 226, 240-41 (Ala. 2017) (quoting Jones Food Co. v. Shipman, 981 So. 2d 355, 360-61 (Ala. 2006)).

Concerning the trial court's ruling on Protective's motion for a new trial based on its objection to a jury instruction, this Court considers whether the trial court exceeded its discretion in giving the instruction. "[A] trial court has broad discretion in formulating jury instructions, provided the instructions accurately reflect the law. Additionally, reversal is warranted only if the error in the instructions is prejudicial." Certain Underwriters at Lloyd's, London v. Southern Nat. Gas Co., 142 So. 3d 436, 462 (Ala. 2013).

1180508

### III.    Analysis

#### A. Issue of Bankruptcy

On June 25, 2020, Protective filed with this Court a "Suggestion of Bankruptcy" asserting that on April 8, 2020, Apex filed a Chapter 11 bankruptcy petition "in the United States Bankruptcy Court for the District of Delaware, Case No. 20-10911-JTD."  Apex states that "neither this case nor Protective was referenced in the bankruptcy proceeding." Protective's filing also asserts that "[c]ounsel for Protective has now conferred with counsel for Apex and confirmed that the bankruptcy petition was filed."

We hesitate to comment on this issue given that the Court has not received specific confirmation from Apex concerning a petition for bankruptcy.  At the same time, we note that, under 11 U.S.C. § 362(a)(1), the filing of a bankruptcy petition "operates as a stay, applicable to all entities, of ... the commencement or continuation, including the issuance or employment of process, of a judicial ... proceeding against the debtor that was or could have been commenced before" the filing of the bankruptcy petition.

> "'The automatic stay is of broad scope, directing that "[a]ll judicial

1180508

> actions against a debtor seeking recovery
> on a claim that [was] or could have been
> brought before commencement of a bankruptcy
> case, are automatically stayed." Maritime
> [Elec. Co. v. United Jersey Bank], 959 F.2d
> [1194,] at 1203, 1206 [(3d Cir. 1991)].
> Thus, "[o]nce triggered by a debtor's
> bankruptcy petition, the automatic stay
> suspends any non-bankruptcy court's
> authority to continue judicial proceedings
> then pending against the debtor." Id. at
> 1206. Unless relief from the stay is
> granted, the stay continues until the
> bankruptcy case is dismissed or closed, or
> discharge is granted or denied. 11 U.S.C.
> § 362(c). ...'"

Bradberry v. Carrier Corp., 86 So. 3d 973, 983-84 (Ala. 2011)

(quoting Constitution Bank v. Tubbs, 68 F.3d 685, 691-92 (3d

Cir. 1995)). Thus, because there could be a question about

our adjudicating this appeal, we will explain why we do not

believe the § 362(a)(1) stay is applicable in this instance.

As we have noted, the stay under § 362(a)(1) operates to

stay actions "against the debtor."

> "[C]ourts of appeals that have considered this issue
> have held that whether a proceeding is against the
> debtor within the meaning of Section 362(a)(1) is
> determined from an examination of the posture of the
> case at the initial proceeding. ... If the initial
> proceeding is not against the debtor, subsequent
> appellate proceedings are also not against the
> debtor within the meaning of the automatic stay
> provisions of the Bankruptcy Code."

Freeman v. Comm'r, 799 F.2d 1091, 1092-93 (5th Cir. 1986).

1180508

Apex filed this action against Protective asserting that
Protective breached its insurance contract with Apex when
Protective refused to pay benefits under the policy following
Weber's death. Thus, at its commencement, the suit was not an
action "against the debtor" -- Apex. For purposes of whether
the automatic-stay provision of § 362(a)(1) applies, it is
immaterial that Protective appealed the judgment against it.
Protective did style its response to Apex's suit as a
"counterclaim" seeking rescission, but under California law
rescission is an affirmative defense to an insurance-policy
claim. See, e.g., Duarte v. Pacific Specialty Ins. Co., 13
Cal. App. 5th 45, 56, 220 Cal. Rptr. 3d 170, 179 (2017)
(observing that "[i]t is well established that although an
insurer may not file a separate action for rescission once the
insured has filed suit, the insurer may assert rescission as
an affirmative defense or in a cross complaint").

> "[T]he automatic stay provision of section 362 '"by
> it terms only stays proceedings against the debtor,"
> and "does not address actions brought by the debtor
> which would inure to the benefit of the bankruptcy
> estate."' Carley Capital Group v. Fireman's Fund
> Ins. Co., 889 F.2d 1126, 1127 (D.C. Cir. 1989)
> (per curiam) (quoting Association of St. Croix
> Condominium Owners v. St. Croix Hotel Corp., 682
> F.2d 446, 448 (3d Cir. 1982) (emphasis in
> original)); see Maritime Elec. [Co. & United Jersey

1180508

> Bank], 959 F.2d [1194] at 1205 [(3d Cir. 1991)] ('within one case, actions <u>against</u> a debtor will be suspended even though closely related claims asserted <u>by</u> the debtor may continue'); <u>Brown v. Armstrong</u>, 949 F.2d 1007, 1009-10 (8th Cir. 1991).
>
> "Since section 362 mandates a stay only of litigation 'against the debtor' designed to seize or exercise control over the property of the debtor, 11 U.S.C. § 362(a), <u>it does not prevent entities against whom the debtor proceeds in an offensive posture -- for example, by initiating a judicial or adversarial proceeding -- from 'protecting their legal rights.'</u> <u>Martin-Trigona v. Champion Federal Savings and Loan Ass'n</u>, 892 F.2d 575, 577 (7th Cir. 1989); <u>see</u> <u>In re Berry Estates, Inc.</u>, 812 F.2d 67, 71 (2d Cir.) (<u>automatic stay provision applicable only to actions against the bankrupt or to seizures of property of the bankrupt</u>), <u>cert. denied</u>, 484 U.S. 819, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987); <u>Price & Pierce Int'l Inc. v. Spicer's Int'l Paper Sales, Inc.</u>, 50 B.R. 25 (S.D. N.Y. 1985)."

<u>Justice v. Financial News Network, Inc. (In re Financial News Network, Inc.)</u>, 158 B.R. 570, 572-73 (S.D. N.Y. 1993) (emphasis added). In asserting the defense of rescission, Protective sought only to defend its legal rights, not to obtain control over any property belonging to Apex. Therefore, Protective's affirmative defense of rescission was not a claim "against the debtor" within the meaning of § 362(a)(1).

In short, because the original action was initiated by the bankruptcy debtor Apex and Protective's affirmative

1180508

defense does not seek damages or property from Apex, the automatic stay imposed by § 362(a)(1) does not apply to this appeal. Accordingly, we examine the issues presented in this appeal.

B. Pertinent Background in California Insurance Law

To understand the parties' arguments in this case some explication of California insurance law must be provided. There is no dispute that Apex had paid its first premium on a "key-man" life-insurance policy for its chief executive officer Al Weber to Protective when the event triggering coverage under that policy -- Weber's death -- occurred. It is also undisputed that, when Apex submitted its claim for benefits under the policy, Protective declined to pay. Consequently, unless Protective could prove a complete defense to its breach of the contract, Protective would be liable for breach of the insurance contract. As we shall explain, under California law, rescission is such a complete defense.

"If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false." Cal. Ins. Code § 359. Thus,

31

1180508

for an insurer to establish a right to rescind, the insurer must demonstrate that the insured made a materially false representation in the procurement of insurance.  See, e.g., Thompson v. Occidental Life Ins. Co., 9 Cal. 3d 904, 919, 513 P.2d 353, 362 (1973) (explaining that, "under the authorities, the burden of proving misrepresentation rests upon the insurer").  "It is not necessary that the misrepresentation have any causal connection with the death of the insured." Torbensen v. Family Life Ins. Co., 163 Cal. App. 2d 401, 405, 329 P.2d 596, 598 (1958).  Accordingly, California law requires Protective to prove that, by signing the amendment, Weber made a (1) false and (2) material statement to Protective.

"A representation is false when the facts fail to correspond with its assertions or stipulations."  Cal. Ins. Code § 358.

> "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."

Cal. Ins. Code § 334.  In other words,

32

1180508

> "[t]he test for materiality is whether the
> information would have caused the underwriter to
> reject the application, charge a higher premium, or
> amend the policy terms, had the underwriter known
> the true facts. ... 'This is a <u>subjective</u> test;
> the critical question is the effect truthful answers
> would have had on [the insurer], not on some
> "average reasonable" insurer.'"

<u>Mitchell v. United Nat'l Ins. Co.</u>, 127 Cal. App. 4th 457, 474,

25 Cal. Rptr. 3d 627, 638 (2005) (quoting <u>Imperial Cas. &

Indem. Co. v. Sogomonian</u>, 198 Cal. App. 3d 169, 181, 243 Cal.

Rptr. 639, 644 (1988)).

> "On the other hand, if the applicant for
> insurance had no present knowledge of the facts
> sought, or failed to appreciate the significance of
> information related to him, his incorrect or
> incomplete responses would not constitute grounds
> for rescission. ... [A]s the misrepresentation must
> be a material one, '[a]n incorrect answer on an
> insurance application does not give rise to the
> defense of fraud where the true facts, if known,
> would not have made the contract less desirable to
> the insurer.' ... And the trier of fact is not
> required to believe the 'post mortem' testimony of
> an insurer's agents that insurance would have been
> refused had the true facts been disclosed. ..."

<u>Thompson</u>, 9 Cal. 3d at 916, 513 P.2d at 360.

<u>C.  The Parties' Arguments</u>

In the trial court, Protective contended that Weber made

two material misrepresentations by signing the amendment on

May 31, 2016, without adding any additional information:

33

1180508

(1) He misrepresented that he had "not consulted any physician or other practitioner since" he had signed the initial policy application on March 10, 2016, and (2) he misrepresented that he was "in the same health as that stated in the last application."  In challenging the trial court's denial of its renewed motion for a judgment as a matter of law before this Court, Protective focuses solely on the first alleged material misrepresentation, contending that Weber's representation that he did not consult any physicians was sufficient to allow Protective to rescind the policy.  Protective notes that in between March 10, 2016, and May 31, 2016, Weber consulted with three physicians about a new heart condition:  (1) He saw Dr. Fink and underwent a stress test that revealed that he had an occurrence of AFib during the test; (2) he went to the ER and consulted with Dr. Brewster and cardiologist Dr. Burnam about the AFib diagnosis; and (3) he had a follow-up appointment with Dr. Burnam in which Dr. Burnam and Weber discussed Weber's options for treating AFib, Weber expressed that he "was going to strongly consider" having an ablation procedure, and Weber was given a referral to Dr. Gang. Evidence indicated that he was going to see Dr. Gang soon.  As

1180508

to materiality, Protective contends that testimony from
underwriters Peña and Nicols demonstrated that if Protective
had known about those doctors' visits, Protective would have
requested the medical records from the visits, which would
have revealed Weber's AFib diagnosis. Peña and Nicols further
testified that, according to the underwriting manuals
Protective consulted, the AFib diagnosis would have caused
Protective to delay the application to see how the AFib
condition was resolved and that Weber's subsequent doctors'
visits and the ablation procedure would have caused Protective
to issue the policy at a higher rate or not issue it at all.
Consequently, Protective maintains that Weber's failure to
reveal his May 2016 doctors' visits in the amendment
unquestionably constituted a material misrepresentation
because, it argues, the information ultimately would have
caused Protective to charge a higher premium or to reject the
application altogether.

Apex counters that substantial evidence supports the
conclusion that a jury could have inferred that Weber did not
make, or at least did not knowingly make, a material
misrepresentation in the amendment. Apex offers three

35

1180508

arguments in support of this contention.  First, Apex argues that the amendment was an ambiguous document subject to more than one reasonable interpretation because it asked Apex and Weber to make multiple attestations without providing clarity as to what should be done if there was agreement on one attestation but not another.  Second, Apex argues that the representation in the health statement concerning physician consultations cannot be viewed in isolation but rather was relevant only in combination with the representation about the applicant's being in the same health.  Apex insists that Weber could have reasonably believed on May 31, 2016, that he was in the same health as he was on March 10, 2016, because he had only been diagnosed with a single episode of AFib that had not affected his daily life at all.  Third, Apex argues that its underwriting expert provided substantial evidence that, even if Protective had been given the medical records of Weber's May 2016 doctors' visits, Protective would have proceeded with approving the policy at a Table 2 rating rather than suspending the application to wait for further developments concerning Weber's AFib diagnosis.

1180508

Our review of the record indicates that Protective has accurately characterized the evidence that supported its motions for a judgment as a matter of law. That is, it is clear that Weber consulted physicians between the time he signed the initial application on March 10, 2016, and the time he signed the amendment on May 31, 2016, that those visits revealed an AFib diagnosis, and that such a diagnosis potentially could have altered Protective's policy offer. Therefore, we must closely examine Apex's responses to that evidence.

As we have noted, Apex vigorously argues -- as it did in the trial court -- that the amendment was ambiguous and that, therefore, it should be left to a jury to determine what Weber was actually attesting to by signing the amendment. See, e.g., Jefferson Standard Life Ins. Co. v. Anderson, 236 Cal. App. 2d 905, 912, 46 Cal. Rptr. 480, 485 (1965) (explaining that "[w]here, as related to the circumstances in a particular case, the form of a question soliciting information respecting a proposed insured's physical condition is ambiguous, that interpretation thereof against avoidance of the policy will be accepted"). Specifically, Apex contends that the amendment is

1180508

ambiguous because it does not define key terms, it does not explain how an applicant is supposed to include additional information, and it serves at least two purposes -- acknowledging an increase in the premium and attesting that the applicant is in "the same health" as when he or she signed the initial application.

> "The interpretation of an insurance policy is a question of law. (<u>Waller v. Truck Insurance Exchange, Inc</u>. (1995) 11 Cal. 4th 1, 18, 44 Cal. Rptr. 2d 370, 900 P.2d 619). We 'look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.' (<u>Ibid</u>.) A provision in a policy is considered ambiguous when it is capable of two or more constructions, each of which is reasonable. (<u>Ibid</u>.) We construe ambiguities against the insurer, as drafter of the policy. (<u>State of California v. Continental Insurance Company</u> (2012) 55 Cal. 4th 186, 195, 145 Cal. Rptr. 3d 1, 281 P.3d 1000.) These principles apply likewise to the questions in an application prepared by an insurer. Therefore, although an insurer generally 'has the right to rely on the applicant's answers without verifying their accuracy[,] ... [¶] ... [t]he insurer cannot rely on answers given where the applicant-insured was <u>misled</u> by vague or ambiguous questions.' (Croskey et al., <u>Cal. Practice Guide: Insurance Litigation</u> (The Rutter Group 2016) ¶¶ 5:217 to 5:218, p. 5-64 (Croskey).) Croskey provides several '[e]xamples of "inartful" questions in insurance applications,' including questions with 'ambiguous' or 'unfamiliar' terms, and questions 'lumping together many different conditions.' (<u>Id</u>. ¶ 5:218, p. 5-64, italics omitted.)"

38

1180508

Duarte, 13 Cal. App. 5th at 54, 220 Cal. Rptr. 3d at 178.

The amendment itself refutes Apex's assertion of ambiguity.  Although it is true that the amendment serves more than one purpose, the title of the document plainly states its dual purpose:  "AMENDMENT TO APPLICATION WITH HEALTH STATEMENT."  (Capitalization in original; emphasis added.) There is a large blank-space gap between the premium-adjustment information and the health statement.  The health statement itself is prefaced with the words "HEALTH STATEMENT" in bold typeface and capital letters.  Additionally, the entire health statement is in bold typeface.  In short, there was no plausible way for Weber to miss the health statement in the amendment or for Weber to believe that by signing the amendment he was attesting only to an increase in the policy premium.

Furthermore, the representation in the health statement concerning physician consultations is clear:  "I represent that I have not consulted any physician or other practitioner since the date of my medical examination (or date I signed the last application with Protective Life Insurance Company, if no medical examination was required)."  Contrary to Apex's

39

1180508

assertion, the word "consulted" is not in any way ambiguous just because it was not defined. "The fact that a term is not defined in the [insurance] policies does not make it ambiguous." County of San Diego v. Ace Prop. & Cas. Ins. Co., 37 Cal. 4th 406, 415, 118 P.3d 607, 612 (2005).

> "Insurance policies are contracts construed in accordance with the parties' mutual intent at the time of contract formation, as inferred from the written provisions. (Civ. Code, §§ 1636, 1639; Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal. 4th 645, 666, 42 Cal. Rptr. 2d 324, 913 P.2d 878.) The 'clear and explicit' meaning of the provisions, interpreted in their 'ordinary and popular sense,' controls judicial interpretation unless 'used by the parties in a technical sense or a special meaning is given to them by usage.' (Civ. Code, §§ 1638, 1644.) If the meaning a layperson would ascribe to insurance contract language is not ambiguous, courts will apply that meaning. (AIU Ins. Co. v. Superior Court (1990) 51 Cal. 3d 807, 822, 274 Cal. Rptr. 820, 799 P.2d 1253 (AIU).)"

Vandenberg v. Superior Court of Sacramento Cnty., 21 Cal. 4th 815, 839-40, 982 P.2d 229, 244-45 (1999). Weber was the chief executive officer of a successful company with over 40 years' experience in his industry. There is simply no way to conclude that Weber could have thought that such a statement would not cover three scheduled doctors' visits with two separate doctors, one of whom was a cardiologist, plus a visit to an ER during which he was seen by two doctors, all of which

1180508

concerned a diagnosis of AFib.  See, e.g., <u>Feurzeig v.</u> <u>Insurance Co. of the West</u>, 59 Cal. App. 4th 1276, 1283, 69 Cal. Rptr. 2d 629, 632 (1997) (observing that, "[i]n construing a policy, the courts may consider whether the insured was a sophisticated buyer of insurance represented by a professional broker").

Moreover, the fact that the amendment did not provide instructions on what to do if the health statement itself could not be signed even if there was agreement as to the premium increase also does not render the document ambiguous. Apex points out that it introduced health-statement documents from other insurers that were clearer because they dealt solely with health matters, they asked specific health questions, and they gave lined spaces for the applicant to provide answers.  Apex also notes that its underwriting expert, Joseph Schlesser, testified that he found the amendment confusing and not like other health-statement documents used in the insurance industry.  But "[t]he fact that an agreement could have been made even clearer does not render the existing terms ambiguous." <u>Banning Ranch</u> <u>Conservancy v. Superior Court of Orange Cnty.</u>, 193 Cal. App.

1180508

4th 903, 914, 123 Cal. Rptr. 3d 348, 356 (2011). Again, all indications are that Weber was a smart individual, and Apex worked with a broker in procuring the policy. Nothing prevented Weber from seeking clarification as to how to proceed before he signed the amendment. Nothing required Weber to sign the amendment absent any further disclosures just because Apex had agreed to the premium increase. Accordingly, as a matter of law, because the health statement was clear and unambiguous, the trial court erred in submitting this issue to the jury.

Apex's second argument is that the representation in the health statement pertaining to physician consultations must be viewed in combination with the representation that the applicant was in "the same health" as when he or she signed the initial application and that, therefore, the physician-consultation representation, standing alone, could not constitute a misrepresentation. In support of this assertion, Apex cites the letter Protective sent Apex explaining the reason it was denying the claim, which focused on a "material change of health" rather than the physician consultations. Apex also notes that Peña admitted that, if an insured

42

1180508

consulted a doctor for a minor ailment and failed to disclose

that visit, it would not be a material misrepresentation and

that he also stated that the "same health" representation was

the "linchpin" of the health statement.

> "[Apex's counsel:]   ...   But you would agree,
> wouldn't you, that if someone saw the doctor for
> poison ivy, the only diagnosis was poison ivy, the
> treatment was itch cream, that would not be a
> material misrepresentation for failing to disclose
> that, right?
>
> "A.  Correct.
>
> "Q.  In fact, you will agree with me that really the
> linchpin of that form over there is whether or not
> you are in the same health as you were when you
> disclosed your health up front, right?
>
> "A.  Correct."

Apex argues that this testimony demonstrates that Weber's

representation about physician consultations alone could not

constitute a material misrepresentation and that, therefore,

Weber's beliefs about his health at the time he signed the

amendment become relevant to the inquiry of materiality.  In

that regard, Apex repeatedly argues that it was plausible for

Weber to believe his health had not changed because he

experienced no symptoms from his AFib and his doctors

consistently commented on his excellent physical fitness.

43

1180508

However, there are at least two problems with Apex's argument. First, under the plain language of the health statement, the representation concerning physician consultations and the representation about the applicant being in the same health are separate sentences. Again, the health statement provides:

> "HEALTH STATEMENT:  I represent that I have not consulted any physician or other practitioner since the date of my medical examination (or date I signed the last application with Protective Life Insurance Company, if no medical examination was required). It is further agreed that, except as stated above, all insured persons are in the same health as that stated in the last application, or medical examination with Protective Life Insurance Company."

Thus, the representation about physician consultations does not depend upon the good-health representation. Compare McAuliffe v. John Hancock Mut. Life Ins. Co., 245 Cal. App. 2d 855, 857, 54 Cal. Rptr. 288, 289 (1966) (noting that "[h]ere the inquiry about medical consultation was part of the same sentence asserting 'good health' of the insured, and denying any 'injury, ailment, illness, or disease or symptom thereof.' Such an inquiry does not relate to minor indispositions but is construed as 'referring to serious ailments which undermine the general health.'" (quoting Jefferson Standard Life Ins.

1180508

<u>Co. v. Anderson</u>, 236 Cal. App. 2d 905, 910, 46 Cal. Rptr. 480,

484 (1965))).

Second, Apex ignores testimony from Peña that immediately

preceded the portion it highlights:

> "[Apex's counsel:]  And you will agree with me that
> in filling out that form, if someone had seen a
> doctor for something minor like poison ivy or went
> to an orthopedic because they got tennis elbow and
> they failed to disclose that, that would not be a
> material change?
>
> "A.   It would be a material -- it would be a
> misrepresentation if they didn't include it on the
> form.  We would make that determination whether or
> not it would be considered a material
> misrepresentation on the form.
>
> "Q.  Fair enough.  It might be a misrepresentation.
> . . ."

In the foregoing portion of his testimony, Peña raises the

salient point -- which Apex's counsel conceded -- that the

insurer determines whether an applicant's particular

consultation with a physician is material.  "It is generally

held that an insurer has a right to know all that the

applicant for insurance knows regarding the state of his

health and medical history."  <u>Thompson</u>, 9 Cal. 3d at 915, 513

P.2d at 360.   Throughout its brief Apex cites several

California cases stating that, when an applicant is ignorant

1180508

of a fact or fails to appreciate its significance, the failure to reveal the fact to the insurer cannot be deemed a misrepresentation.  Indeed, <u>Thompson</u> is one such case.  See 9 Cal. 3d at 916, 513 P.2d at 36 ("[I]f the applicant for insurance had no present knowledge of the facts sought, or failed to appreciate the significance of information related to him, his incorrect or incomplete responses would not constitute grounds for rescission."); see, e.g., <u>MacDonald v. California-Western States Life Ins. Co.</u>, 203 Cal. App. 2d 440, 451-52, 21 Cal. Rptr. 659, 666 (1962) (concluding that, because the plaintiff did not know the seriousness of his heart ailment, his failure to disclose it did not constitute concealment); <u>Miller v. Republic Nat'l Life Ins. Co.</u>, 789 F.2d 1336, 1339-40 (9th Cir. 1986) ("First, there is no breach of the duty to disclose if the applicant is ignorant of the relevant information.  ... Second, there is no breach of the duty to disclose if the applicant, acting in good faith, does not understand the significance of the information he fails to disclose.  ... A lay person will not be held to the level of knowledge or understanding that a doctor or other expert might have.").  But the legal observation Apex highlights from

1180508

Thompson, MacDonald, Miller, and other cases is irrelevant to
the physician-consultation representation in the health
statement. Weber unquestionably knew that in May 2016 he had
recently consulted multiple physicians concerning the AFib
diagnosis. Because the health statement clearly and directly
prompted Weber about physician consultations, Weber had a duty
to honestly attest to whether he had visited any doctors since
the date he signed the application. It was left to Protective
to determine whether those physician consultations were for a
minor indisposition or were material to the application. See,
e.g., Cohen v. Penn Mut. Life Ins. Co., 48 Cal. 2d 720, 727-
28, 312 P.2d 241, 245 (1957) ("Defendant did not ask on the
application for merely his evaluation of his physical
condition, but also for a truthful statement of his medical
history. ... Defendant was entitled to determine for itself
the matter of the deceased's insurability, and to rely on him
for such information as it desired 'as a basis for its
determination to the end that a wise discrimination may be
exercised in selecting its risks.'" (quoting Robinson v.
Occidental Life Ins. Co., 131 Cal. App. 2d 581, 586, 281 P.2d
39, 42 (1955) (emphasis added))); Freeman v. Allstate Life

1180508

Ins. Co., 253 F.3d 533, 537 (9th Cir. 2001) (applying California law and holding that "[w]here an insured is aware of her condition, symptoms, or treatment, she is obliged to disclose them upon request" (emphasis added)). In short, the fact that a particular physician consultation could be immaterial does not mean that all such consultations are immaterial; it was Weber's duty to disclose the consultations and Protective's duty to determine whether those consultations would materially affect its offer of insurance. Weber's belief about the seriousness of his condition had no role in this assessment because, in the health statement, the physician-consultation representation is independent of the same-health representation.

Protective's assessment as to the materiality of Weber's May 2016 physician consultations would, of course, depend upon the information it obtained after learning of those consultations, i.e., the reason for Weber's consultations as detailed in his medical records. That is the subject of Apex's final argument in defense of Weber's misrepresentation. Apex argues that, even if Protective had been aware of Weber's physician consultations in May 2016, Protective still would

48

1180508

have issued the policy at the Table 2 rating and thus that Weber's misrepresentation about doctors' visits was not material to Protective.  As we noted at the outset of this analysis, "'[t]he test [for materiality] is the effect which truthful answers would have had upon the insurer.'"  Old Line Life Ins. Co. of America v. Superior Court of Alameda Cnty., 229 Cal. App. 3d 1600, 1604, 281 Cal. Rptr. 15, 17–18 (1991) (quoting Taylor v. Sentry Life Ins. Co. 729 F.2d 652, 655 (9th Cir. 1984)).  Apex's underwriting expert, Joseph Schlesser, testified that the Protective underwriter who initially approved Apex's application, Paula Nicols, was -- like himself -- an "aggressive" underwriter.  Schlesser explained that an aggressive underwriter often approves applications without seeking every single bit of medical information on the applicant that he or she could possibly obtain.  Additionally, he opined, an aggressive underwriter heavily relies on his or her experience in arriving at the correct rating for an application rather than strictly following the underwriting-manual guidelines.  Schlesser supported his labeling Nicols an "aggressive" underwriter by noting that Nicols could have requested more information or asked Weber to provide a more

49

1180508

current evaluation of his LBBB before approving the Apex
application but that she chose not to do so because she was
comfortable with the information she had.  Schlesser also
observed that Nicols did not strictly follow the Swiss Re
guidelines in a couple of areas with respect to the
information Weber provided in the application, with Nicols
being more lenient toward Weber's health than a strict
application of the guidelines would have dictated.  Schlesser
then opined that an aggressive underwriter like Nicols or
himself most likely would have approved Apex's application at
the Table 2 rating even if he or she had been given the
medical records for Weber's May 2016 doctors' visits.

> "[Apex's counsel:]  Would you, as a self-described
> aggressive underwriter, then -- would you have been
> comfortable then issuing a policy to Mr. Weber, even
> though he had atrial fibrillation, in light of the
> other medical conditions that you knew about?
>
> "A.   Yeah.   And mainly because it wasn't chronic
> atrial fibrillation.  There wasn't a recommendation
> at that time for any further intervention.  That is
> not a major finding.  You look at other factors,
> too.  The gentlemen was in very good cardiovascular
> health.
>
>     "....
>
> "Q.  ...  What other factors would have contributed
> to you as an underwriter in determining that even

1180508

        though Mr. Weber had AFib, that you could still
        insure him at the Table 2 rates?

        "A.    Just his cardiac fitness.    He also had a
        resting echocardiogram.    He had no symptoms that
        would suggest further or, you know, significant
        obstructive heart disease."

Schlesser then explained why he believed that Protective

underwriter Peña had misapplied the underwriting-manual

guidelines in concluding that Weber's AFib diagnosis would

have required a postponement of Apex's application to await

further evaluation of his newly diagnosed AFib condition.

        "[Apex's counsel:]    ...    So why did you disagree
        then with how Mr. Peña decided to rate Mr. Weber as
        not being insurable anymore because of the AFib?

        "A.    I believe he ran the guidelines incorrectly.
        He used --

        "Q.    In what way?    In what way?

        "A.    Both manuals say that atrial fibrillation newly
        found on exam should be postponed until
        investigation.    That -- the -- both manuals cover
        this, and that is, as I understand it, the many
        years that I've been in underwriting and I've seen
        many occasions of atrial fibrillation.    It's put in
        there when we don't have a real good picture.    We
        have one EKG, and we have nothing else to go by.

            "If we're looking at May 31st, we have more than
        just a single EKG.    We have a stress test.    We have
        an echocardiogram.    We have notes that say he was
        sent home after the heart rate -- the rapid heart
        rate resolved spontaneously.    He had a follow-up

                                51

1180508

>        where he was back into a normal heart rate.  So I
>        think he interpreted those guidelines incorrectly."

Apex argues that Schlesser's testimony presented an issue of
fact as to whether Weber made a material misrepresentation on
the health statement because he stated that the medical
records from Weber's May 2016 doctors' visits reflected that
Weber's AFib was not serious and that, therefore, at that
time, Nicols would have approved Apex's application at the
Table 2 rating.  Because "the true facts, if known, would not
have made the contract less desirable to [Protective]," Apex
contends, Weber's misrepresentation about physician
consultations was not "material" to its approval of the
policy.  <u>Thompson</u>, 9 Cal. 3d at 916, 513 P.2d at 360.

    Schlesser's testimony is Apex's most compelling evidence,
but Protective contends that his testimony is both legally and
factually flawed.  Protective argues that Schlesser's
testimony is legally flawed because he testified as to how <u>he</u>
would interpret the underwriting manuals rather than how
<u>Protective</u> would have done so.  Because materiality "is a
subjective test viewed from the insurer's perspective,"
<u>Superior Dispatch, Inc. v. Insurance Corp. of New York</u>, 181
Cal. App. 4th 175, 191, 104 Cal. Rptr. 3d 508, 520 (2010),

1180508

Protective contends that Schlesser's opinion about the proper way to read the underwriting manuals is irrelevant. However, as Apex observes, if expert testimony was irrelevant to a determination of materiality, "then there would be no need for a trial in any insurance [rescission] case because the insurer would just announce 'what it would have done' and that would be the end of every dispute." Apex's brief, p. 58. Indeed, the California Supreme Court has stated that "the trier of fact is not required to believe the 'post mortem' testimony of an insurer's agents that insurance would have been refused had the true facts been disclosed." Thompson, 9 Cal. 3d at 916, 513 P.2d at 360. In any event, as the foregoing summary of Schlesser's testimony relates, Schlesser did address his evaluation from Protective's perspective by specifically positing what he believed Nicols would have done if she had been made aware of Weber's May 2016 doctors' visits at that time. Protective's first objection to Schlesser's testimony is therefore without merit.

Protective also argues that Schlesser's testimony is based on two inaccurate factual premises and therefore must be rejected. First, Protective contends that Schlesser

53

1180508

mistakenly asserted that Protective's evaluation of the application must be viewed as of May 31, 2016.

Schlesser testified:

"A.    When presented all the information as of May 31st, we have to take -- remember when we are looking at a point in time, people have episodes of rapid heart rate that are spontaneously resolved and never come back again.

"[Protective's counsel:]  Was his resolved?

"A.  As of May 9th, yes.

"Q.  Was it resolved in June?

"A. In June, they did a Holter monitor or a ZIO patch, and it showed that he was -- he had a rapid heart rate 22 hours out of 61.

"Q.  That doesn't [seem] very resolved, does it?

"A.   Well, as of May 31st, that's the information you have to go by."

Protective contends that Schlesser's assumption of May 31, 2016, as the correct date for evaluating the materiality of Weber's misrepresentation is erroneous because, even though Weber signed the amendment on May 31, 2016, Protective did not receive the amendment until June 23, 2016. Consequently, Protective maintains, if Weber had indicated in the amendment that he had consulted physicians, Protective would have requested all of Weber's medical records up to

1180508

June 23, 2016. This would have meant that Protective would have seen the medical records from Weber's visit to Dr. Gang on June 8, 2016, which showed that Weber was in AFib during that visit, that Dr. Gang prescribed the blood thinner Xarelto to Weber, that Weber was given a ZIO patch to further evaluate his AFib, and that Weber "was going to give [an ablation] serious consideration."  Protective also would have seen the results from Weber wearing the ZIO patch in June 2016, which showed that, over a three-day period, Weber was in AFib 61 percent of the time, and that his longest stretch of being in AFib was 22 hours and 36 minutes.  Protective further would have seen that, based on the ZIO patch results, Dr. Gang recommended that Weber undergo an ablation.  Protective argues that it is undisputed that, if Weber's June 2016 medical records are considered, Protective would have reissued the policy at a higher premium rate.  Indeed, Schlesser admitted that Weber's medical records from June 2016 showed that his AFib had not, in fact, resolved and that this would have entirely changed Protective's materiality evaluation.[4]

---

[4]In his testimony, Schlesser acknowledged that "if we're looking on June 21st and saying there's been no change in health insurability from what's described in the application, what was described in the application is now completely

1180508

However, just because Protective would have had access to the June 2016 medical records because it happened not to receive the amendment until June 23, 2016, does not mean that it could use that information in evaluating whether Weber had made a material misrepresentation in the amendment. Apex argues -- correctly, we believe -- that Weber cannot be held responsible for information he could not have known as of the date he signed the amendment. "It would be 'patently unfair' to allow the insurer to avoid its obligations under the policy on the basis of information that the applicant did not know ...." Miller, 789 F.2d at 1340. Obviously, Weber could not have known on May 31, 2016, the information discovered during his June 2016 doctors' visits because they had not yet occurred. "A representation is false when the facts fail to correspond with its assertions or stipulations." Cal. Ins. Code § 358. The facts corresponding to a representation are those that exist at the time the representation is made.[5]

different."

    [5]Section 356, Cal. Ins. Code, provides: "The completion of the contract of insurance is the time to which a representation must be presumed to refer." However, § 356 was not discussed or argued by the parties at trial or on appeal. Therefore, its potential implications have no bearing on this case.

1180508

Therefore, the information discovered about Weber's AFib condition in June 2016 is irrelevant to whether Protective was permitted to rescind the policy based on the representations Weber made in the amendment he signed on May 31, 2016. Accordingly, the fact that Schlesser based his assessment from the vantage point of May 31, 2016, did not invalidate his testimony.

A more valid objection to Schlesser's testimony concerns what the record reflects about Weber's AFib condition in May 2016. Schlesser's testimony was based on the premise that, as of May 31, 2016, Weber's AFib had resolved. As we have already recounted, Schlesser testified that "[t]here wasn't a recommendation at that time for any further intervention." More specifically, Schlesser also testified:

> "As of May 31st, he had one episode of rapid heartbeat. It resolved on its own, and he was sent home by a doctor with an Aspirin. And he followed up the following week by another doctor -- I'm sorry -- with a cardiologist. At that time his heart was back into what's called normal sinus rhythm."

Protective contends -- and we agree -- that Schlesser's premise is flatly contradicted by Weber's May 2016 medical records. Instead, those medical records show that Weber's doctors were encouraging, and that Weber was seeking, further

1180508

treatment for his AFib.  It is true that during Dr. Burnam's
physical evaluation of Weber in the ER on May 6, 2016,
Dr. Burnam confirmed that Weber's AFib was not persistent and
concluded that it was sufficient <u>for the time being</u> to
prescribe aspirin as a blood thinner to Weber.  But, on that
visit Dr. Burnam and Weber also discussed further treatment
options, including the possibility of Weber undergoing an
ablation procedure.  It is true that during Weber's May 9,
2016, follow-up appointment with Dr. Burnam, an EKG showed
that Weber's heart was in normal sinus rhythm.  But,
Dr. Burnam's notes specifically reflected that he and Weber
again discussed further treatment options and that Weber "was
going to strongly consider" undergoing an ablation.  To that
end, during that appointment Dr. Burnam gave Weber a referral
to Dr. Gang, an AFib subspecialist.  Additionally, after
talking to Dr. Burnam that day, Dr. Fink entered a note in
Weber's medical file confirming that Weber "will be seeing
Dr. Eli Gang."  After speaking with Weber on May 19, 2019,
Dr. Fink entered a note in Weber's medical file that
reiterated that Weber "is referred to Dr. Gang."  Those facts
show that Apex is simply incorrect in arguing that the only

58

1180508

evidence from that time supporting that Weber was going to see
Dr. Gang was Weber's "cryptic handwritten notes" about his
AFib condition and a May 10, 2016, note referencing an
appointment with an "unnamed doctor" in June 2016.  Apex's
brief, pp. 48, 21.  Weber's notes are certainly corroborative
evidence, but the medical records alone -- which Protective
would have requested had it been aware of Weber's May 2016
physician consultations -- plainly indicated that Weber's
doctors had encouraged, and that Weber was going to seek,
further treatment from an AFib subspecialist.  In other words,
the actions of both Weber and his doctors in May 2016 belied
any notion that Weber's AFib had "spontaneously resolved."
Based on this information, the only reasonable conclusion is
that Protective would have postponed the application to await
further developments regarding Weber's AFib condition.
Waiting would have revealed the subsequent developments in
June 2016 we previously discussed, and Schlesser conceded that
information from June and beyond would have required:  (1) a
postponement of the application and (2) the ultimate
reissuance of the policy at a higher rating.  Thus, because
Schlesser's assessment was based on the erroneous assumption

59

1180508

that Weber's May 2016 medical records reflected that his AFib condition had spontaneously resolved, his testimony did not provide substantial evidence that Protective nonetheless would have issued the policy at a Table 2 rating if it had been made aware of Weber's May 2016 physician consultations at that time. Accordingly, Weber's misrepresentation concerning those physician consultations unquestionably was material to Protective.

In sum, the amendment was not ambiguous and the representation in the health statement about physician consultations was separate from the representation that the applicant was in the same health. Therefore, because Weber indisputably knew he had consulted multiple physicians in May 2016 and yet signed the amendment on May 31, 2016, without disclosing those consultations, Weber misrepresented his medical history to Protective. Furthermore, because the May 2016 medical records revealed that both Weber and his doctors believed he needed further treatment for his AFib condition, Weber's misrepresentation clearly was material to Protective's policy offer to Apex. Accordingly, we conclude that the record unequivocally demonstrated that Weber made a material

1180508

misrepresentation to Protective by signing the amendment on May 31, 2016, without revealing the fact of his multiple physician consultations during that month. Because Protective demonstrated that Weber made a material misrepresentation and Apex failed to introduce substantial evidence to the contrary, Protective was entitled to rescind the policy, which was a complete defense to Apex's claims of breach of contract. Thus, the trial court erred in denying Protective's motions for a judgment as a matter of law.

## IV.  Conclusion

For the reasons discussed above, Protective was entitled to a judgment as a matter of law on Apex's claim of breach of contract, and the trial court erred by submitting this claim to the jury for consideration. Accordingly, we reverse the judgment in favor of Apex on the breach-of-contract claim and render a judgment as a matter of law in favor of Protective. Because of this Court's resolution of the issues, we pretermit discussion of the parties' arguments pertaining to the jury instructions.

1180508

REVERSED AND JUDGMENT RENDERED.

Bolin, Wise, Bryan, Sellers, and Stewart, JJ., concur.

Parker, C.J., dissents.

Mitchell, J., recuses himself.

APPENDIX


Protective.
Life Insurance Company

**AMENDMENT TO APPLICATION WITH HEALTH STATEMENT**                   BLCCC

NAME OF INSURED  AL WEBER, JR                          POLICY B00746717

The application to PROTECTIVE LIFE INSURANCE COMPANY for the policy named above is hereby amended by the undersigned to conform in every respect to any and all changes indicated below:

| Amount of Insurance: | Plan of Insurance: | Premium Payable: |
|---|---|---|
| $10,000,000 | CUSTOM CHOICE UL 10 | $89,771.75 ANNUALLY |

Other Changes:
Planned Periodic Premium shall be as stated above.

I understand that the premium rate payable for each $1,000
of coverage has been increased due to underwriting risk
factors.

**HEALTH STATEMENT:**  I represent that I have not consulted any physician or other practitioner since the date of my medical examination (or date I signed the last application with Protective Life Insurance Company, if no medical examination was required). It is further agreed that, except as stated above, all insured persons are in the same health as that stated in the last application, or medical examination with Protective Life Insurance Company.
It is agreed by the undersigned that the changes shown above shall be an amendment to and form a part of the application and the policy, and that the changes shall be binding on any person who shall have or claim any interest in the policy. A copy of this form shall be as valid as the original.

Signed at   Aliso Viejo, CA    this  31st    day of  May    20 16

X _____    X _____
        Witness to Signature(s)            Signature of The Insured(s)
                                           (Not required for ages under 18)   AL WEBER

                                        X _____
                                           Signature of Adult Applicant/Owner(s)
                                           (If other than insured)   Doug Haney

If Corporation, show full name of Corporation and    By: X  Doug Haney, CFO
Signature of officer, other than the insured.

**COPY TO BE RETURNED TO COMPANY AFTER COMPLETION**

**IMPORTANT NOTICE**
If any change is incorrect or incomplete, correct information should be written on this form. If any change is made, the policy and this form must be returned to the Company. No insurance will take effect until such changes have been reviewed and accepted by the Company.

A-447 3-02

B00746717 1220

LAN380  ~U0B04815~LCMP983  ~05/18/2016~13095700~BLCCC

06
23
16
09
12